**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.:**

WBDH-BC HOLDINGS LTD., an
Ontario Corporation,

      Plaintiff,

v.

VARSATEL CORPORATION, a Florida
corporation, COMTEL DIRECT, LLC, a
Florida Limited Liability Company,
HARRISON VARGAS, an individual,
GINNA PAULSEN an individual,
LOUIS ARRIOLA, an individual, THE
MAPLE WOOD ISLE ASSOCIATION,
INC., a Florida not-for-profit
corporation, and CHT HOLDINGS, LLC,
a Delaware Limited Liability Company,

      Defendants.

_____/

## COMPLAINT

Plaintiff, WBDH-BC HOLDINGS LTD. ("WBDH"), by and through its

undersigned attorneys, sues Defendants, VARSATEL CORPORATION ("Varsatel"),

COMTEL DIRECT, LLC ("Comtel"), HARRISON VARGAS ("Vargas"), GINNA

PAULSEN ("Paulsen"), LOUIS ARRIOLA ("Arriola"), THE MAPLE WOOD ISLE

ASSOCIATION, INC. (the "Association"), CHT HOLDINGS, LLC ("CHT") and

alleges as follows:

1

## PARTIES

1.    WBDH is a corporation organized under the laws of Ontario, Canada with its principal place of business in Canada.

2.    Varsatel is a Florida corporation with its principal place of business in Broward County, Florida.

3.    Comtel is a Florida Limited Liability Company with its principal place of business in Broward County, Florida.  Upon information and belief, Comtel has two members.  The first member is defendant, CHT (discussed *infra*) and the second member is defendant Paulsen, who is a citizen of Florida.

4.    Vargas is a citizen of Florida.  Upon information and belief, Vargas is currently located outside of the United States, including the Dominican Republic. Vargas has breached the contract alleged herein in Broward County, Florida.

5.    Paulsen is a citizen of Florida, residing in Broward County, Florida. Paulsen has breached the contract alleged herein in Broward County, Florida.

6.     Arriola is an individual presently residing in California and who engages in business and otherwise engages in substantial and not isolated activities in Florida. At the time Arriola entered into the agreements that are the subject of this action, Arriola was residing in Miami, Florida.  Arriola has breached the contract alleged herein in Broward County, Florida and contractually agreed to be served with any notice or demand in Florida.

7.    The Association is a Florida not-for-profit corporation with its principal place of business in Broward County, Florida.

8.     CHT is a Delaware Limited Liability Company with its principal place of business in Broward County, Florida.  CHT has two members.  Upon information and belief, defendant Vargas is one member of CHT and is an individual who is a citizen of Florida, and the other member is a Delaware corporation with its principal place of business in North Carolina.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332(a).  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and this civil action is between citizens of a State and citizens of a foreign state.

10.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within Broward County, Florida.

11.     Defendants Varsatel, Comtel, Vargas and Paulsen each contractually stipulated to be subject to the personal jurisdiction of this Court and the venue of this judicial district.  Additionally, upon information and belief, Defendants Varsatel, Comtel, Vargas, Paulsen and Arriola are each subject to the jurisdiction of this Court pursuant to Fla. Stat. § 48.193 by inter alia operating, conducting, engaging in, or carrying on a business or business venture in this state, having an office or agency in this state, and committing tortious acts within this state.

12.     The Association is subject to the jurisdiction of this Court pursuant to Fla. Stat. § 48.193 by *inter alia* operating, conducting, engaging in, or carrying on a

business or business venture in this state and having an office or agency in this state and also by owning, using, possessing, or holding a mortgage or other lien on any real property within this state.

13.     CHT is subject to the jurisdiction of this Court pursuant to Fla. Stat. § 48.193 by *inter alia* operating, conducting, engaging in, or carrying on a business or business venture in this state, having an office or agency in this state, and committing tortious acts within this state.

## GENERAL ALLEGATIONS

14.     On or about December 5, 2018, WBDH made a business loan to Varsatel and Comtel in the initial amount of $10 million (the "Loan"). In connection with the Loan, Varsatel and Comtel executed and delivered to WBDH various loan documents, including *inter alia* a Loan Agreement, a Non-Revolving Line of Credit Note (the "Initial Note"), and a Security Agreement (collectively, the Loan Agreement, the Initial Note and the Security Agreement shall be referred to herein as the "Loan Documents"). True and correct copies of the Loan Documents are incorporated herein and attached hereto as **EXHIBIT 1**.

15.     On or about December 20, 2019, the Loan was amended as to Varsatel. In connection therewith, Varsatel executed and delivered to WBDH an Amended and Restated Non-Revolving Line of Credit Note (the "Amended Note"). A true and correct copy of the Amended Note is incorporated herein and attached hereto as **EXHIBIT 2**.

16.     Pursuant to the Amended Note, the principal balance of the Loan as to Defendant Varsatel was increased to $17 million.   Defendant Comtel did not execute the Amended Note.

17.     In order to partially collateralize the Loan, Defendants, Vargas and Paulsen agreed to provide WBDH with a mortgage on a residential property located in Coral Springs, Florida.  In connection therewith, Vargas and Paulsen executed and delivered to WBDH the Mortgage, Assignment of Rents and Security Agreement (the "Mortgage").  A true and correct copy of the Mortgage is attached hereto and incorporated herein as **EXHIBIT 3**.

18.     The Mortgage was recorded on December 7, 2018, Instrument Number 115488631, in the public records of Broward County, Florida.

19.     Defendants Vargas and Paulsen also agreed to unconditionally guarantee all of Varsatel's and Comtel's obligations and liabilities, past, present, and future, to WBDH.

20.     In that regard, on or about December 5, 2018, Vargas and Paulsen executed and delivered to WBDH that certain Guaranty (the "Vargas/Paulsen Guaranty").  A true and correct copy of the Vargas/Paulsen Guaranty is attached hereto and incorporated herein as **EXHIBIT 4**.

21.     Vargas and Paulsen also pledged their ownership interests in Comtel and Varsatel to WBDH.  On or about December 5, 2018, Vargas and Paulsen executed and delivered to WBDH that certain Pledge Agreement (the "Pledge Agreement").  A true and correct copy of the Pledge Agreement is attached hereto and incorporated herein as **EXHIBIT 5**.

22.     In connection with the Loan, Defendant Varsatel, Defendant Arriola and LDI Networks, Inc. ("LDI"), a company owned by Arriola, agreed to assign to WBDH certain payments that would have been otherwise owed to Varsatel by LDI. This agreement was memorialized in the Assignment of Proceeds and Guaranty, dated January 21, 2020 (the "Assignment"). A true and correct copy of the Assignment is attached hereto and incorporated herein as **EXHIBIT 6**.

23.     Arriola agreed to personally guarantee the payments that were to be made to WBDH under the terms of the Assignment.

24.     Additionally, on or about January 18, 2020, Defendant Arriola executed that certain Guaranty relative to the Loan (the "Arriola Guaranty").  A true and correct copy of the Arriola Guaranty is attached hereto and incorporated herein as **EXHIBIT 7**.

25.     Pursuant to the terms of the Arriola Guaranty, Defendant Arriola and LDI agreed to unconditionally guarantee up to $2 million of Varsatel's and Comtel's obligations and liabilities, past, present, and future, to WBDH.

26.     Varsatel, Comtel, Vargas and Paulsen subsequently defaulted on the Loan.

27.     Varsatel and Comtel breached multiple financial covenants and reporting requirements under the Loan Documents.

28.     Moreover, Varsatel and Comtel have not made a required payment under the Loan Documents since November 1, 2020.

29.     On or about October 23, 2020, WBDH delivered to Varsatel, Comtel, Vargas and Paulsen formal notice that the Loan was in default and that the amounts due under the Loan Documents had been accelerated.

30.     Vargas and Paulsen have failed to fulfill their obligations under the Vargas/Paulsen Guaranty.

31.     LDI and Arriola subsequently defaulted on their obligations under the Assignment and Arriola Guaranty by failing to pay to WBDH certain future proceeds as required under the Assignment.

32.     On or about November 4, 2020, WBDH delivered to LDI and Arriola formal notice of default.

33.     Arriola has failed to fulfill his obligations under the Arriola Guaranty.

34.     WBDH has retained undersigned counsel to pursue this matter and has agreed to pay a reasonable fee for their services.   WBDH is entitled to attorneys' fees and costs under the terms and conditions of the Loan Documents.

35.     Defendant CHT is also a communications company that is principally owned and controlled by Vargas.

36.     Upon information and belief, Vargas and Paulsen have abandoned and shut down the business operations for both Varsatel and Comtel.

37.     At the same time, Vargas has allowed CHT to enter into lucrative contracts for the purchase and development of a multimillion-dollar fiber optic submarine internet connection cable running from Virginia Beach, Virginia to the Dominican Republic.

38.     Since defaulting on his contracts with WBDH, Vargas has fled the United States and is believed to be living in the Dominican Republic.

39.     At a time when Varsatel and Comtel were indebted to WBDH, Comtel and Varsatel transferred over $1 million of proceeds from the Loan to CHT.

40.     Specifically, between December 5, 2018 and September 21, 2020, Varsatel and/or Comtel made $1,218,245.37 in transfers to CHT from the loan proceeds advanced to Varsatel and Comtel under the Loan (collectively, the "Transfers"). A spreadsheet detailing the Transfers is attached hereto and incorporated herein as **EXHIBIT 8**.

41.     Upon information and belief, Varsatel and Comtel have transferred additional funds to CHT to the detriment of Varsatel's and Comtel's creditors.

42.     Varsatel and Comtel's banking records indicate that hundreds of thousands of dollars were transferred from Varsatel and/or Comtel's bank accounts to, or the benefit of Vargas. This includes, but is not limited to, transfers to Vargas himself, his ex-wife and companies affiliated with Vargas (the "Additional Transfers").

43.     Varsatel and Comtel made the Transfers to CHT with the intent to deplete the assets of Varsatel and Comtel and increase the assets of CHT. This is also true as to the Additional Transfers that were made to, or for the benefit of, Vargas.

44.     Varsatel and Comtel knew that making the Transfers to CHT was improper.

45.     Neither Varsatel nor Comtel had any legal obligation to make the Transfers to CHT.

46.     Neither Varsatel nor Comtel received any consideration from CHT in exchange for the Transfers to CHT.

47.     WBDH was a creditor of both Varsatel and Comtel at the time of the Transfers and Additional Transfers.

48.     Varsatel and Comtel concealed from creditors that the companies made the Transfers and Additional Transfers.

49.     Had Varsatel and Comtel not made the Transfers to CHT and the Additional Transfers, the funds comprising the Transfers and Additional Transfers would have been retained as property of Varsatel and Comtel and would have been available for distribution to Varsatel and Comtel's creditors.

50.     At the time of the Transfers and Additional Transfers, the collective dollar amount owed by Varsatel and Comtel to its creditors exceeded the dollar amount of the value of each of Varsatel's and Comtel's assets.

51.     Accordingly, at the time of the Transfers and Additional Transfers and at all material times thereafter, Varsatel's and Comtel's remaining assets were unreasonably small in relation to the business these companies were conducting.

52.     At the time of the Transfers and Additional Transfers, Varsatel and Comtel knew or should have known that they would be unable to repay the debts owing to WBDH and their other creditors as such debts became due.

## COUNT I – BREACH OF PROMISSORY NOTE
### (against Varsatel)

53.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

54.     WBDH owns and holds the Initial Note and the Amended Note.

55.     Varsatel is in default under the terms of the Initial Note and the Amended Note for failing to pay the indebtedness when due.

56.     Varsatel owes WBDH the principal due under the Initial Note and the Amended Note, together with default interest thereon and costs and expenses in connection therewith, plus any protective advances that may be advanced by WBDH in the future, which equates to $20,631,023.96 as of July 16, 2021, with a per diem interest amount of $9,781.46 (excluding attorney fees).

WHEREFORE, WBDH demands judgment against Varsatel for damages as set forth herein, accrued interest at the maximum rate allowed by law, costs and attorney's fees and such other and further relief as this Court deems legal and proper.

## COUNT II – BREACH OF PROMISSORY NOTE
### (against Comtel)

57.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

58.     WBDH owns and holds the Initial Note.

59.     Comtel is in default under the terms of the Initial Note for failing to pay the indebtedness when due.

60.     Comtel owes WBDH the principal due on the Initial Note, together with default interest thereon and costs and expenses in connection therewith, plus any protective advances that may be advanced by WBDH in the future, which equates to $11,991,556.10 as of July 16, 2021, with a per diem interest amount of $5,753.42 (excluding attorney fees).

WHEREFORE, WBDH demands judgment against Comtel for damages as set forth herein, accrued interest at the maximum rate allowed by law, costs and attorney's fees and such other and further relief as this Court deems legal and proper.

## COUNT III – MORTGAGE FORECLOSURE
### (against Vargas, Paulsen, and the Association)

61.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

62.     This is an action to foreclose a mortgage encumbering real property in Broward County, Florida.

63.     Vargas and Paulsen are listed as the record owners of the following described real property in Broward County, Florida, which is encumbered by the Mortgage:

Lot 16, Block E, MAPLEWOOD, according to the Plat thereof, recorded in Plat Book 80, Page 37, of the Public Records of Broward County, Florida

Parcel ID Number: 484128-03-0880

(the "Property").

64.     WBDH owns and holds the Initial Note and the Mortgage.

65.     Vargas and Paulsen defaulted under the Initial Note and the Mortgage by failing to pay the indebtedness when due.

66.     By virtue of Vargas' and Paulsen's defaults described above, WBDH is entitled to foreclose its interest in the Property.

67.     The Association may claim some right or interest in the Property; however, any such claim, lien or interest is inferior and subordinate to the interest and lien of WBDH.

WHEREFORE, WBDH hereby demands: (a) Judgment be entered foreclosing the Mortgage, adjudicating WBDH's interest in the Property superior to any interest of Vargas, Paulsen, and the Association, and ordering the Property described in the Mortgage sold to satisfy Varsatel and Comtel's indebtedness, including all principal, accrued interest at the maximum default rate allowed under the Loan Documents and Mortgage plus interest, costs, attorneys' fees and for other such relief that this Court deems just and proper.

## COUNT IV – FORECLOSURE OF SECURITY AGREEMENT
### (against Varsatel and Comtel)

68.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

69.     On or about December 5, 2018, Varsatel and Comtel executed and delivered that certain Security Agreement, granting to WBDH a security interest in Varsatel's and Comtel's equipment, inventory, accounts, intellectual property, approvals, interest agreements, property, fixtures, pledges, insurance, liens and

security interests, guaranties, personal property, and all proceeds and products of the foregoing.  Additionally, Varsatel assigned its accounts due from LDI to WBDH by way of the Assignment (the "Collateral").

70.     Varsatel and Comtel are in default under the terms of the Loan by, among other things, failing to pay the indebtedness due to WBDH.

71.     By virtue of Varsatel's and Comtel's defaults described above, WBDH is entitled to foreclose its interest in the Collateral.

WHEREFORE, WBDH hereby demands: (a) Judgment be entered foreclosing the Security Agreement, adjudicating WBDH's interest superior to any of Varsatel's and/or Comtel's interests in the Collateral, and ordering the Collateral described in the Security Agreement sold to satisfy the indebtedness, including all principal, accrued interest at the maximum default rate allowed under the Loan Documents plus interest, costs, attorneys' fees and for other such relief that this Court deems just and proper.

### COUNT V – FORECLOSURE OF PLEDGE AGREEMENT
### (against Vargas and Paulsen)

72.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

73.     On or about December 5, 2018, Varsatel and Comtel executed and delivered that certain Pledge Agreement, granting to WBDH a security interest in, *inter alia*, Vargas' and Paulsen's ownership interests in Varsatel and Comtel

(described in the Pledge Agreement as the Pledged Shares) and other related collateral (described in the Pledge Agreement as the "Collateral").

74.     Varsatel and Comtel are in default under the terms of the Loan by, among other things, failing to pay the indebtedness due to WBDH.

75.     By virtue of Varsatel's and Comtel's defaults described above, WBDH is entitled to foreclose its interest in the Pledged Shares and the Collateral.

WHEREFORE, WBDH hereby demands: (a) Judgment be entered foreclosing the Pledge Agreement, adjudicating WBDH's interest superior to any of Vargas' and Paulsen's interests in the Pledged Shares and the Collateral, and ordering the Pledged Shares and the Collateral as described in the Pledge Agreement sold to satisfy the indebtedness, including all principal, accrued interest at the maximum default rate allowed under the Loan Documents plus interest, costs, attorneys' fees and for other such relief that this Court deems just and proper.

## COUNT VI – BREACH OF GUARANTY AGREEMENT
### (against Vargas and Paulsen)

76.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

77.     Varsatel and Comtel are in default under the terms of the Loan Documents by, among other things, failing to pay the indebtedness due to WBDH.

78.     Thereafter, as a result of the default by Varsatel and Comtel, demand was made for payment of the entire outstanding principal balance due, all accrued interest thereon at the maximum rate allowed by law and other related costs and fees under the Vargas/Paulsen Guaranty.

14

79.     Vargas and Paulsen are in default under the terms of the Vargas/Paulsen Guaranty by, among other things, failing to pay the indebtedness due to WBDH.

80.     WBDH owns and holds the Initial Note, the Amended Note and the Vargas/Paulsen Guaranty.

81.     Vargas and Paulsen owe WBDH the principal due on the Vargas/Paulsen Guaranty, plus interest thereon at the maximum rate allowed by law, late charges, attorneys' fees and other costs and expenses.

82.     The Vargas/Paulsen Guaranty provides for payment of attorney's fees and WBDH is entitled to recover its attorney's fees from Vargas and Paulsen.

WHEREFORE, WBDH demands judgment against Vargas and Paulsen for damages as set forth herein, accrued interest thereon at the maximum rate allowed by law, costs and attorney's fees and such other and further relief as this Court deems just and proper.

## COUNT VII – BREACH OF GUARANTY AGREEMENTS
### (against Arriola)

83.     WBDH re-alleges and incorporates the allegations made in Paragraphs 1 through 52 as if stated herein.

84.     On or about January 18, 2020, Arriola and LDI executed and delivered to WBDH the Arriola Guaranty, which unconditionally guarantees payment of up to $2 million of Varsatel's and Comtel's obligations and liabilities to WBDH.

85.     Varsatel and Comtel are in default under the terms of the Loan Documents by, among other things, failing to pay their indebtedness due to WBDH under the Loan Documents.

86.     As a result of the default by Varsatel and Comtel, demand for payment was made upon Arriola.

87.     Arriola is in default under the terms of the Arriola Guaranty by failing to pay the $2 million in indebtedness that is due thereunder.

88.     Similarly, in the Assignment of Proceeds and Guaranty, dated January 21, 2020 (the "Assignment"), Arriola agreed to personally guarantee the payments that were to be made to WBDH under the terms of the Assignment.

89.     Specifically, between May 2020 and April 2021 there are at least $2,003,500.00 in missed payments to WBDH under the Assignment.

90.     As of July 16, 2021, WBDH was owed $2,507,214.04 under the Assignment.  This amount increases at a per diem rate of $5,857.14.

91.     Lender owns and holds the Assignment and the Arriola Guaranty.

92.     Arriola owes WBDH the $2 million due under the Arriola Guaranty plus the $2,507,214.04 that is due under the Assignment, with a per diem amount of $5,857.14.

WHEREFORE, WBDH demands judgment against Arriola for damages as set forth herein, accrued interest thereon at the maximum rate allowed by law and such other and further relief as this Court deems just and proper.

## COUNT VIII – CLAIM TO SET ASIDE  FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT FLORIDA STATUTES § 726.105(1)(a) <u>(against CHT and Vargas)</u>

93.    WBDH re-alleges and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

94.    This is an action to avoid fraudulent transfers pursuant to Fla. Stat. § 726.105(1)(a).

95.    Within four years preceding the date of this complaint, Varsatel and/or Comtel transferred at least $1,218,245.37 of their funds to or for the benefit of CHT and Vargas as more fully set forth  above.

96.    Additionally, an ongoing review of Varsatel and Comtel's banking records indicate that hundreds of thousands of dollars were transferred from Varsatel and/or Comtel's bank accounts to, or the benefit of, Vargas.  This includes, but is not limited to, transfers to Vargas himself, his ex-wife and companies affiliated with Vargas.

97.    CHT and/or Vargas were the initial transferees and/or subsequent transferees  of the fraudulently transferred funds or were the entities for whose benefit the Transfers and Additional Transfers were made.

98.    The Transfers and Additional Transfers were made with the actual intent to hinder, delay, or defraud Varsatel's and Comtel's creditors.

99.    Pursuant to Fla. Stat. § 726.108(1)(a), WBDH, as a creditor of both Varsatel and Comtel, is empowered to avoid the Transfers and Additional

Transfers.

**WHEREFORE**, Plaintiff, WBDH-BC Holdings, Ltd., demands entry of judgment in its favor (i) avoiding the Transfers to CHT as set forth in this Complaint, (ii) avoiding the Additional Transfers, and (iii) granting such other and further relief as the Court deems just and proper.

### COUNT IX – CLAIM TO SET ASIDE FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT FLORIDA STATUTES § 726.105(1)(b) (against CHT and Vargas)

100.    WBDH re-alleges and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

101.    Within four years preceding the date of this complaint, Varsatel and/or Comtel transferred at least $1,218,245.37 of their funds to or for the benefit of CHT and Vargas as more fully set forth above.

102.    CHT and/or Vargas were the initial transferees and/or subsequent transferees of the fraudulently transferred funds or were the entities for whose benefit the Transfers and Additional Transfers were made.

103.    Varsatel and/or Comtel received less than a reasonably equivalent in exchange for the Transfers and the Additional Transfers.

104.    At the time of the Transfers and Additional Transfers, Varsatel and/or Comtel (i) were engaged or were about to engage in a business or a transaction for which these companies' remaining assets were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably

believed that they would incur, debts beyond these companies' ability to pay as they became due.

105.    Pursuant to Fla. Stat. § 726.108(1)(a), WBDH, as a creditor of both Varsatel and Comtel, is empowered to avoid the Transfers and the Additional Transfers.

**WHEREFORE**, Plaintiff, WBDH-BC Holdings, Ltd., demands entry of judgment in its favor (i) avoiding the Transfers to CHT as set forth in this Complaint, (ii) avoiding the Additional Transfers, and (iii) granting such other and further relief as the Court deems just and proper.

### COUNT X – CLAIM TO SET ASIDE FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT FLORIDA STATUTES §726.106(1) (against CHT and Vargas)

106.    WBDH re-alleges and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

107.    Within four years preceding the date of this complaint, Varsatel and/or Comtel transferred at least $1,218,245.37 of their funds to or for the benefit of CHT and Vargas as more fully set forth above.

108.    CHT and/or Vargas was the initial transferee and/or subsequent transferee of the fraudulently transferred funds or were the entities for whose benefit the Transfers and Additional Transfers were made.

109.    Varsatel and/or Comtel received less than reasonably equivalent in exchange for the Transfers and Additional Transfers.

110.   At the time of the Transfers and Additional Transfers, Varsatel and/or Comtel were insolvent, or became insolvent as a result of such Transfers, or alternatively, Varsatel and/or Comtel intended to incur, or believed they would incur, debts that would be beyond their ability to pay as such debts matured.

111.   Pursuant to Fla. Stat. § 726.108(1)(a), WBDH, as a creditor of both Varsatel and Comtel, is empowered to avoid the Transfers and Additional Transfers.

**WHEREFORE**, Plaintiff, WBDH-BC Holdings, Ltd., demands entry of judgment in its favor (i) avoiding the Transfers to CHT as set forth in this Complaint, (ii) avoiding the Additional Transfers, and (iii) granting such other and further relief as the Court deems just and proper.

### COUNT XI – CLAIM TO RECOVER AVOIDED TRANSFERS
### (Florida Statutes §726.108(1)(a)
### (against CHT and Vargas)

112.   WBDH re-alleges and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

113.   This is an action to recover avoided fraudulent transfers pursuant to Fla. Stat. § 726.108(1)(a).

114.   CHT and/or Vargas were the initial transferees and/or subsequent transferees of the fraudulently transferred funds or were the entities for whose benefit the Transfers and Additional Transfers were made.

62.   To the extent that this Court avoids the Transfers and Additional Transfers pursuant to Counts VIII, IX and/or X, WBDH is entitled to recover

the value of said Transfers and Additional Transfers, plus interest, from CHT and/or Vargas pursuant to Fla. Stat. § 726.108(1)(a).

**WHEREFORE**, Plaintiff, WBDH-BC Holdings, Ltd., demands entry of a judgment in its favor and against Defendants, CHT Holdings, LLC, and Vargas in the amount of at least $1,218,245.37, plus interest and costs, together with such other and further relief as the Court deems just and proper.

## COUNT XII – CLAIM TO IMPOSE AN EQUITABLE LIEN
## (against CHT)

115.    WBDH re-alleges and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

116.    This is an action to impose an equitable lien upon the bank account(s) of CHT.

117.    WBDH transferred $1,218,245.37 in funds to either Comtel or Varsatel that were earmarked for the benefit of CHT and were immediately subsequently transferred by Comtel or Varsatel to CHT.

118.    Upon information and belief, the Transfers were made to a CHT bank account ending in 5601.

119.    As such, WBDH conferred a benefit on CHT.

120.    CHT has knowledge of the benefit WBDH conferred upon it.

121.    CHT has accepted and retained the benefit of the Transfers.

122.    The circumstances alleged in this complaint are such that it would be inequitable for CHT to retain the benefit of the Transfers without paying WBDH

the fair value of the Transfers.

**WHEREFORE**, Plaintiff, WBDH-BC Holdings, Ltd., demands entry of judgment in its favor against Defendant, CHT Holdings, LLC, imposing an equitable lien in the amount of $1,218,245.37 against the bank account(s) of CHT Holdings, LLC, plus interest and costs, together with such other and further relief as the Court deems just and proper.

Dated: July 19, 2021.

Respectfully Submitted,

**SHRAIBERG, LANDAU & PAGE, P.A.**
*Attorneys for WBDH-BC Holdings, Ltd.*
2385 NW Executive Center Drive, Suite 300 Boca Raton, FL 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: plandau@slp.law
Email:pdorsey@slp.law

By:    /s/ Philip J. Landau
          Philip J. Landau, Esq.
          Florida Bar No. 504017
          Patrick Dorsey, Esq.
          Fla. Bar No. 0085841

# EXHIBIT 1

# LOAN AGREEMENT

**THIS AGREEMENT** is made as of December 5, 2018

BETWEEN:  **WBDH-BC HOLDINGS LTD.**, a corporation existing under the laws of the Province of Ontario having a registered records office at 199 Bay Street, Suite 2200, Commerce Court West, Toronto, ON M5L 1G4

     ("**Lender**")

AND:   **Comtel Direct, LLC**, a limited liability company existing under the laws of Florida and having an address at 1820 N. Corporate Lakes Blvd. Suite 101, Weston, Fl. 33326, and **Varsatel Corporation**, a corporation existing under the laws of Florida and having an address at 1820 N. Corporate Lakes Blvd. Suite 101, Weston, Fl. 33326

     (referred to herein as "**Borrower**" but jointly and severally liable hereunder).

**WHEREAS**, the Borrower has requested and the Lender has agreed to provide a loan (the "**Loan**") in the principal sum not to exceed the Loan Amount, to be advanced in accordance with the terms and conditions of this Agreement and secured by the Security as provided in the Security Agreements on the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, and the representations, warranties, covenants and conditions set out below, the Parties, intending to be legally bound, hereby agree as follows.

## ARTICLE 1
## INTERPRETATION

**1.1** **Definitions**

 (a) "**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified;

 (b) "**Agreement**" means this Loan Agreement and the Exhibits and Schedules hereto or thereto, as the same may be amended, modified or restated, and in effect at any time;

 (c) "**Applicable Law**" means, with respect to any Person, property, transaction or event, any present or future: (i) domestic or foreign statute, law (including common and civil law), treaty, code, ordinance, convention, rule, regulation, restriction or by-law (zoning or otherwise); (ii) judgment, order, writ, injunction, decision, direction, determination, ruling, decree or award; (iii) regulatory policy, practice, ruling, interpretation, guideline or directive; or (iv) any order, permit, approval, grant, license, consent, right, franchise, privilege, certificate exemption, waiver, registration or other authorization, binding on or affecting the Person, property, transaction or event referred to in the context in which the term is used in each case whether or not having the force of law;

 (d) "**Applicable Securities Laws**" means all Applicable Laws of any Governmental Authority (including the rules and regulations of any stock exchange on which any of the securities of the Borrower are listed for trading or to which application has been made by the

- 2 -

Borrower for the listing of any of its securities) relating to the distribution, issue, transfer, trading or purchase and sale in or of securities;

(e) "**Blocked Accounts**" means Borrower's accounts maintained at Citibank N.A. with account numbers ending in 4021 and 4018 that shall be subject to the Deposit Account Control Agreement.

(f) "**Borrower**" means Varsatel Corporation and Comtel Direct, LLC, jointly and severally, and their permitted successors and assigns;

(g) "**Borrower's Industry**" means the wholesale telecommunications industry.

(h) "**Business**" means the business of the Borrower, as conducted by the Borrower as of the date hereof, including without limitation, the sale of online marketing services and products and related services and development of all other services ancillary thereto;

(i) "**Business Day**" means a day (other than a Saturday, Sunday or statutory holiday) on which banks are generally open for business in the City of Vancouver, British Columbia, Canada;

(j) "**Closing**" means the closing of the Loan in accordance with the terms of this Agreement;

(k) "**Closing Date**" means the date of the Closing;

(l) "**Collateral**" has the meanings provided for in the Security Agreements;

(m) "**Contract**" means any contract, agreement, license, franchise, lease, arrangement, commitment, understanding or other right or obligation (written or oral);

(n) "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise and "**Controlling**" and "**Controlled**" have meanings correlative thereto;

(o) "**Credit Parties**" means the Borrower and the Guarantors;

(p) "**Deliver**" or any derivative thereof means actual delivery to the other Party or its professional legal advisors;

(q) "**Deposit Account Control Agreement**" means an agreement acceptable in form and substance to Lender perfecting Lender's security interest in the Blocked Accounts.

(r) "**Disclosure Statement**" means the Disclosure Statement attached hereto as <u>Exhibit A</u>;

(s) "**Distribution**" means any amount paid to or on behalf of the directors, officers, shareholders, partners or unitholders of the Borrower, or to any Affiliates thereto, by way of salary (except for the regular reasonable salary of the officers of the Borrower), bonus, commission, management fees, directors' fees, dividends, redemption of shares, distribution of profits or otherwise, and whether payments are made to such Persons in their capacity as shareholders, partners, unitholders, directors, officers, owners or creditors or otherwise, or any other direct or indirect payment in respect of the earnings or capital of the Borrower.

(t)     "**Encumbrance**" includes any assignment, mortgage, charge, pledge, lien, hypothec, encumbrance, security interest or insurance securing or in effect securing any obligation, conditional sale or title retention agreement, contractual deposit, trust deposit, escrow arrangement or other preferential arrangement whatsoever, howsoever created or arising, whether absolute or contingent, fixed or floating, legal or equitable, perfected or not, and includes the rights of a lessor pursuant to an operating lease, capitalized lease or sale leaseback arrangement, any right of set-off and any guarantees or indemnities;

(u)     "**Environment**" means soil, surface waters, groundwater, land, stream sediments, surface or subsurface strata, and ambient air;

(v)     "**Environmental Laws**" means all Applicable Laws that address, are related to, or are otherwise concerned with, the protection of the Environment, health or safety issues (including occupational safety and health);

(w)     "**Equity Interests**" of any Person means (i) any and all shares or other equity interests (including common shares, preferred shares, partnership interests, trust interests, limited liability company interests and limited liability partnership interests) in such Person and (ii) all rights to purchase, warrants or options, including securities convertible into or exchangeable for, participations or other equivalents of or interests in (however designated) such shares or other interests in such Person (whether or not currently exercisable, exchangeable or convertible);

(x)     "**Financial Indebtedness**" of any Person at any date means, without duplication, all Indebtedness of such Person: (i) for borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof); (ii) evidenced by bonds, debentures, notes or other similar instruments; (iii) in respect of letters of credit or other similar instruments (or reimbursement obligations with respect thereto); (iv) to pay the deferred and unpaid purchase price of property or services; (v) in respect of capitalized lease obligations of such Person; (vi) secured by an Encumbrance on any property of such Person, whether or not such Indebtedness is assumed by such Person or the recourse of the holder of such Indebtedness is limited to such property; (vii) under conditional sale or other title retention agreements relating to assets purchased by such Person; (viii) to the extent not otherwise included in this definition, Hedging Obligations of such Person; (ix) in respect of redemption obligations with respect to any Equity Interests issued in that Person which are (I) redeemable, retractable, payable or required to be purchased or otherwise retired or extinguished, or convertible into debt of such Person (A) at a fixed or determinable date, (B) at the option of any holder thereof, or (C) upon the occurrence of a condition not solely within the control and discretion of such Person; or (II) convertible into any other securities that are convertible described in (I) above; and (x) all Guarantees of Indebtedness of the type referred to in any of the foregoing sub-clauses (i) to (ix) of another Person. Notwithstanding the foregoing, the following shall not be considered Financial Indebtedness: (i) earn-outs or similar profit sharing arrangements provided for in acquisition agreements which are determined on the basis of future operating earnings or other similar performance criteria (which are not determinable at the time of acquisition) of the acquired assets or entities; (ii) accrued expenses, trade payables, customer deposits or deferred income taxes arising in the ordinary course of business of such Person; and (iii) reserves for deferred income taxes or general contingencies. Any Indebtedness which is incurred at a discount to the principal amount at maturity thereof shall be deemed to have been incurred at the full principal amount at maturity thereof. For all purposes hereof, the Financial Indebtedness of any Person shall include the Financial Indebtedness of any partnership or joint venture (other than a joint venture that is itself a

- 4 -

corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly non-recourse to such Person;

(y)  "**GAAP**" or "**Generally Accepted Accounting Principles**" means generally accepted accounting principles in effect in the United States of America as of the date of determination thereof consistently applied, without giving effect to any principles that would allow Borrower to value its Indebtedness at fair value; provided, however, expenses related to rental payments under real estate leases may be recognized on either an accrual or a cash basis.  In the event Borrower modifies its accounting principles and procedures as applied as of the date hereof, Borrower shall provide Lender with such statements of reconciliation in form and substance acceptable to Lender;

(z)  "**Governmental Authority**" means any (i) multinational, federal, provincial, territorial, state, regional, municipal, local or other government or any governmental or public department, (ii) court, tribunal, arbitral body, statutory body, commission, board, bureau or agency, (iii) self-regulatory organization or authority including any stock exchange on which any securities of the Borrower are listed, (iv) subdivision, agent, commission, board or authority of any of the foregoing, or (v) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing and includes a Securities Regulatory Authority;

(aa)  "**Guarantee**" means, as to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning;

(bb)  "**Guarantors**" means Ginna Paulsen and Harrison Vargas (each also being referred to as an "**Individual Guarantor**");

(cc)  "**Hazardous Substances**" means any pollutant, contaminant, waste of any nature, hazardous substance, hazardous material, toxic substance, dangerous substance, dangerous good or other substance that is prohibited, listed, defined, designated or classified as dangerous, hazardous, radioactive, explosive or toxic or a pollutant or a contaminant under or pursuant to any applicable Environmental Laws, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials or any substance which is deemed under Environmental Laws to be deleterious to natural resources or worker or public health and safety;

- 5 -

(dd)    "**Hedging Obligations**" of any Person means the obligations of such Person pursuant to (i) any interest rate swap agreement, interest rate collar agreement or other similar agreement or arrangement designed to protect such Person against fluctuations in interest rates; (ii) agreements or arrangements designed to protect such Person against fluctuations in foreign currency exchange rates in the conduct of its operations; or (iii) any forward contract, commodity swap agreement, commodity option agreement or other similar agreement or arrangement designed to protect such Person against fluctuations in commodity prices, in each case entered into in the ordinary course of business for bona fide hedging purposes and not for the purpose of speculation;

(ee)    "**Indebtedness**" means all present and future obligations, indebtedness, liabilities, covenants, agreements and undertakings of a Person howsoever arising, whether direct or indirect, absolute or contingent, matured or not, extended or renewed, wheresoever and howsoever incurred, including all future advances and re-advances, and whether the same is from time to time reduced and thereafter increased or entirely extinguished and thereafter incurred again and whether such Person be bound alone or with others and whether as principal or surety, including all interest, fees, expenses, indemnities and costs;

(ff)    "**Key-Man Insurance Policy**" means the insurance policies, in amounts and in forms acceptable to Lender, covering the Guarantors, issued by an insurance company acceptable to Lender, together with, from time to time, any renewal or replacement policy;

(gg)    "**Lender**" means **WBDH-BC HOLDINGS LTD.**, a corporation existing under the laws of the Province of Ontario;

(hh)    "**Loan**" has the meaning set out in the recitals;

(ii)    "**Loan Amount**" means the aggregate principal amount of up to $10,000,000.00;

(jj)    "**Loan Compliance Package**" means the monthly package to be prepared by the Borrower and delivered to the Lender pursuant to the terms of this Agreement as described in the attached Exhibit D together with the monthly "**Loan Compliance Certificate**", a form of which is attached as Exhibit E;

(kk)    "**Material Adverse Change**" means any event, occurrence, development or state of occurrence or state of circumstances or facts which, individually or in the aggregate, has had or would reasonably be expected to have: (i) a material and adverse effect on the business, condition (financial or otherwise), results of operations, assets or liabilities (actual or contingent) of the Borrower; (ii) a material impairment of the ability of the Borrower to perform its obligations under any Transaction Document to which it is a Party; (iii) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any Transaction Document to which it is a Party; (iv) a material adverse effect on the enforceability of the Transaction Documents against the party(ies) thereto; or (v) a material adverse effect on the ability of the Lender to enforce its rights and remedies under the Transaction Documents; except any such effect resulting from or arising in connection with: (a) any change in GAAP; (b) any change in the global, national or regional political conditions (including the outbreak of war or acts of terrorism) or in the general economic, business, regulatory, political or market conditions or in the national or global financial or capital markets, or (c) any change in the industry in which the Borrower operates; provided that, for the purposes of (b) and (c), such effect does not primarily relate to (or have the effect primarily relating to) the Borrower or

disproportionately adversely affects the Borrower compared to other entities operating in the industries in which the Borrower operates.

(ll)     "**Mortgage**" means the Mortgage, Security Agreement and Fixture Filing executed by Guarantors in favor of Lender to be recorded in the Broward County, Florida public records and encumbering real property located at 10007 Vestal Place, Coral Springs, Florida ("**Florida Real Property**").

(mm)   "**Order**" means any order, judgment, ruling, injunction, assessment, award, decree, directive or writ of any Governmental Authority;

(nn)    "**Parties**" means the Borrower and the Lender and "**Party**" means any of them;

(oo)    "**Payment Date**" means the date of the payments made by the Borrower to the Lender on a monthly basis starting on January 1st, 2019 and continuing on the first (1st) day of each month to and including the Maturity Date;

(pp)    "**Permitted Encumbrances**" means:

(i)      Encumbrances in respect of Financial Indebtedness referred to under "Permitted Financial Indebtedness";

(ii)     Encumbrances arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges, good faith cash deposits in connection with tenders, contracts or leases to which the Borrower is a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(iii)    mechanics', workmen's, materialmen's, landlords', carriers' or other similar Encumbrances with respect to obligations arising in the ordinary course of business which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest, provided in any event such Encumbrances are not registered or recorded;

(iv)    customary rights of setoff, revocation, refund or chargeback under deposit agreements with banks or other financial institutions where the Borrower maintains deposits in the ordinary course of business; and

(v)     Encumbrances listed on the Disclosure Statement;

(qq)    "**Permitted Financial Indebtedness**" means any of the following:

(i)      unsecured trade Indebtedness, income taxable payable, accounts payable and other accrued liabilities incurred in the ordinary course of business in accordance with customary commercial terms; and

(ii)     Financial Indebtedness listed on the Disclosure Statement;

(rr)     "**Person**" means any individual, firm, partnership, company, corporation or other body corporate, government, governmental body, agency, instrumentality, unincorporated body or association and the heirs, executors, administrators or other legal representatives of an individual;

(ss)     "**Pledge**" means a pledge of the shares of Varsatel Corporation and a pledge of the membership interests of Comtel Direct, LLC to Lender, in support of the Related Party Guaranty, in a form satisfactory to the Lender;

(tt)     "**Proceeding**" means any action, suit, proceeding, claim, arbitration, mediation or civil, criminal or administrative investigation or examination before any Governmental Authority or before any arbitrator or mediator or similar party, or any investigation or review by any Governmental Authority or similar party;

(uu)     "**Proprietary Assets**" means:

(i)     any patent, patent application, trademark (whether registered or unregistered), trademark application, trade name, fictitious business name, service mark (whether registered or unregistered), service mark application, copyright (whether registered or unregistered), copyright application, application, trade secret, know-how, customer list, franchise, system, computer software, computer program, source code, invention, design, blueprint, engineering drawing, proprietary product, technology, proprietary right or other intellectual property right or intangible asset; and

(ii)     any right to use or exploit any of the foregoing;

(vv)     "**Related Party Guaranty**" means the Guaranty Agreement executed by the Guarantors in favor of Lender, in a form satisfactory to the Lender;

(ww)     "**Restricted Payment**" means, with respect to any Person, any payment to such Person:

(i)     of any dividends, withdrawals of capital or other payments of any kind on or in respect of any shares of its capital, except for Tax distributions made to members or shareholders of Borrower in accordance with and pursuant to the Borrower's Organizational Documents;

(ii)     on account of, or for the purpose of setting apart any property for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any share of its capital or any warrants, options or rights to acquire any such shares, or the making by such persons of any other distribution in respect of any shares of its capital;

(iii)     of any principal of or interest or premium on or of any amount in respect of a sinking or analogous fund or defeasance fund for any debt or liability of such person ranking in right of payment subordinate to any liability of such Person under the Transaction Documents;

(iv)     in respect of any loan (excluding repayment of any Permitted Financial Indebtedness approved in advance by Lender) or advance to, or arrangement for the purpose of providing funds or credit to (excluding extensions of trade credit in the ordinary course of business in accordance with customary commercial terms),

or capital contribution to (whether by means of a transfer of cash or other property or any payment for property or service for the account or use of) any other Person, or any purchase or other acquisition of all or substantially all of the assets of any other Person;

(v)     in respect of salary or bonus other than at fair market levels; or

(vi)    of any management, consulting or similar fee or any bonus payment or comparable payment, or by way of gift or other gratuity, to any Affiliate of such Person or to any shareholder, member, manager, director or officer thereof.

(vii)   For the avoidance of doubt, no payment of money from one Borrower to another shall be deemed a "Restricted Payment" for the purposes of this Agreement.

(xx)    "**Risk Insurance Policy**" means the risk insurance policies issued in favour of the Borrower set forth on <u>Exhibit B</u>, together with, from time to time, any renewal or replacement policy;

(yy)    "**Security**" means the security interests provided or intended to be provided in the Security Agreements;

(zz)    "**Security Agreements**" means: (i) the Security Agreement executed by Borrower in favor of Lender and (ii) the Mortgage, each in a form satisfactory to the Lender and to be entered into at Closing or such later time as Lender shall elect in its sole discretion;

(aaa)   "**Subsidiary**" or "**subsidiary**" means: (i) any corporation or company of which at least a majority of the outstanding securities having by the terms thereof ordinary voting power to elect a majority of the board of such corporation or company is at the time directly, indirectly or beneficially owned or under the Control of the Borrower; (ii) any partnership of which, at the time, the Borrower directly, indirectly or beneficially owns or Controls at least a majority of the voting interests (however designated) thereof, or otherwise Controls such partnership; and (iii) any other Person of which at least a majority of the voting interests (however designated) are at the time directly, indirectly or beneficially owned or Controlled by the Borrower;

(bbb)   "**Tax**" or "**Taxes**" shall mean any federal, state, county, local, or foreign tax, charge, fee, levy, impost, duty, or other assessment, including without limitation income, gross receipts, excise, employment, sales, use, consumption, asset, transfer, recording, license, payroll, franchise, severance, documentary, stamp, environmental, withholding, social security, real property, personal property, registration, ad valorem, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Governmental Authority, including any estimated payments relating thereto, any interest, charges, surcharges, penalties, and additions imposed thereon or with respect thereto;

(ccc)   "**Tax Act**" means the Internal Revenue Code of 1986 (as amended from time to time);

(ddd)   "**Tax Returns**" means all reports, forms, elections, designations, schedules, statements, estimates, declarations of estimated tax, information statements and returns required to be filed with a Governmental Authority with respect to any Tax;

(eee)   "**Transaction Documents**" means, collectively, this Agreement, the Security Agreements, the Guaranty, the Pledge, the Promissory Note, the Deposit Account Control Agreement,

and all other documents, instruments, certificates, ancillary agreements and other writings delivered in connection with the foregoing or the consummation of the transactions contemplated hereunder or thereunder; and

(fff)    "**Working Capital**" shall be calculated as the Borrowers' combined cash balance plus accounts receivable (excluding any intercompany trade receivables and any intercompany loans) less accounts payable (excluding any amounts owing to or from related party entities that are stood still and subordinate to the Loan and any intercompany trade payables) as at any calendar month-end.

## 1.2    Other Terms

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein or in any other Transaction Document) in accordance with the terms hereof and thereof, (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, when used in any Transaction Document, shall be construed to refer to such Transaction Document in its entirety and not to any particular provision thereof, (iv) all references in a Transaction Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement of the other Transaction Document in which such references appear, (v) any reference to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Applicable Law and any reference to any Applicable Law shall, unless otherwise specified, refer to such Applicable Law as amended, modified or supplemented from time to time, (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; (vii) in the event that any day on or before which any action is required to be taken hereunder is not a Business Day, then such action shall be required to be taken on or before the requisite time on the next succeeding day that is a Business Day, and (viii) all amounts are in United States dollars and "$" means United States dollars.

## 1.3    Exhibits

The following are the Exhibits hereto:

| | |
|---|---|
| Exhibit A | Disclosure Statement |
| Exhibit B | Risk Insurance Policies |
| Exhibit C | Principal Payment Amortization |
| Exhibit D | Loan Compliance Package |
| Exhibit E | Form of Loan Compliance Certificate |
| Exhibit F | Borrower Ownership |

- 10 -

# ARTICLE 2
# LOAN

2.1    **Loan**

    (a)    **Generally**.  Subject to the terms and conditions of this Agreement, Lender agrees to make available the Loan to the Borrower in the principal amount of up to the Loan Amount.  The Loan is a secured, non-revolving term credit facility.

    (b)    **Availability**.  The Loan shall be made available to the Borrower in one advance in the amount of $10,000,000.00 (the "**Initial Draw**").  The Initial Draw shall be available on or before December 7, 2018.

    (c)    **Non-Revolving**.  The Loan is a non-revolving term facility and any payment on account of the Loan may not be re-borrowed.

2.2    **Fees and Expenses**

The Borrower shall pay:

    (a)    all reasonable out-of-pocket expenses and fees and disbursements ("**Transaction Expenses**") incurred by the Lender in connection with (i) the negotiation and consummation of this Agreement and the other Transaction Documents and the transactions contemplated hereunder and thereunder, including any due diligence or other review conducted prior to the negotiation of this Agreement as well as any filing fees related to the Transaction Documents, provided that the Transaction Expenses shall not exceed $62,500.00 (against which Borrower's prepayment of $30,000.00 shall be applied); and (ii) any amendment, modification or waiver, or consent with respect to, this Agreement or any of the other Transaction Documents requested or required due to the action or inaction of the Borrower that would require such amendment, modification, waiver or consent;

    (b)    all reasonable out-of-pocket expenses and fees and disbursements incurred by or on behalf of the Lender in connection with any attempt to enforce any right of the Lender against the Borrower or any Person or other entity that may be obligated to the Lender by virtue of this Agreement or any of the other Transaction Documents, unless a court of competent jurisdiction determines that such Lender is not entitled to enforce such right or the Lender is not otherwise the prevailing party in any such attempt to enforce such Lender's rights, with prevailing party being determined relative to the relief obtained as against the relief requested; and

    (c)    a transaction structuring fee to the Lender equal to one and one half percent (1.5%) of any portion of the Loan Amount advanced to Borrower, payable on the date of such advance (the "**Structuring Fee**").  The parties agree that the Structuring Fee shall be payable as a deduction from the balance of the Initial Draw, which deduction is not reflected in the amount set forth in Section 2.1(b)(ii) above.

    (d)    a default fee to the Lender equal to one half percent (.5%) of the outstanding loan balance (the "**Default Fee**"), payable on the last day of any calendar month if on such date an Event of Default is continuing and uncured.

(e)     a discharge fee to the Lender calculated as set forth in the table below, payable on the date all amounts due under the Transaction Documents are repaid in full (the "**Discharge Fee**"):

| Date of Discharge Fee Payment | Discharge Fee |
|---|---|
| Before the 12th Payment Date | $400,000.00 |
| Before the 24th Payment Date | $550,000.00 |
| Before the 36th Payment Date | $650,000.00 |
| Before the 48th Payment Date | $750,000.00 |
| On or after the 48th Payment Date | $850,000.00 |

**2.3     Interest Rates**

The Borrower agrees to pay to the Lender interest payable and calculated monthly and in arrears on the outstanding principal balance of the Loan, computed on the basis of a 365-day year for the actual number of days elapsed, accruing from the date of the first advance of the Loan from the Lender to the Borrower at the "**Applicable Rate**", determined as follows:

(a)     In all situations other than as described in Section 2.3(b), the Applicable Rate shall mean an annual rate equal to seventeen percent (17%) per annum; and

(b)     For any period during which an Event of Default has occurred and continues uncured, the Applicable Rate shall mean an annual rate equal to twenty-one percent (21%) per annum.

**2.4     Promissory Note.**

The Borrower's obligation to repay the Loan shall be evidenced by a Promissory Note executed by the Borrower to the order of the Lender at Closing (the "**Promissory Note**"). The outstanding balance payable under the Promissory Note shall be payable subject to the terms and conditions contained herein.

**2.5     Repayment**

(a)     **Maturity Date**.  The outstanding balance of the Loan and accrued and unpaid interest thereon shall become immediately due and payable upon the earlier of: (a) November 30th, 2023 (the "**Maturity Date**"); (b) ten (10) Business Days after notice of an Event of Default is issued by the Lender to the Borrower, unless that default is cured by the Borrower; or (c) the closing of a sale of all or substantially all of the Borrower's assets or shares, unless otherwise extended or waived, as applicable, only as approved in writing by Lender.

(b)     **Initial Draw**.

(i)     **Interest Only Payments**.  The Borrower agrees to pay interest to the Lender at the Applicable Rate on the Initial Draw on each Payment Date through and including the twenty-fourth (24th) Payment Date.

(ii)     **Amortized Payments**.  Starting on the twenty-fifth (25th) Payment Date and continuing until the Maturity Date or full repayment of the outstanding principal balance of the Loan, accrued and unpaid interest thereon and any fees and expenses owing to Lender pursuant to this Agreement, Borrower agrees to pay interest to the Lender at the Applicable Rate and a portion of the outstanding principal amount of the Initial Draw, in accordance with a sixty (60) month amortization as set forth in the amortization table attached hereto as Exhibit C, as updated from time to time

as a result of any prepayment of the principal balance of the Loan or any change in the Applicable Rate.

**2.6      Prepayment**

Prepayment of the outstanding principal balance of the Loan by the Borrower in whole or part may be made at any time, subject to the terms and limitations of this Section.

(a)      In the event that (A) Borrower makes a prepayment of all or a portion of the outstanding balance of the Loan, before the twelfth (12th) Payment Date,  then Lender shall only be obligated to accept such prepayment if, in addition, Borrower simultaneously pays Lender an amount (the "**Prepayment Yield Amount**") equal to (i) the aggregate amount of the first twelve (12) months of payments that would have been made on the first twelve (12) Payment Dates, *plus* (ii)  any accrued but unpaid fees due to Lender, including, but not limited to, any transaction fees the Structuring Fee, the Discharge Fee or any applicable Default Fee, *minus* (iii) the aggregate amount of all interest payments made by Borrower to Lender prior to the date of such prepayment. For avoidance of doubt, no Prepayment Fee shall be due or payable after the twelfth (12th) Payment Date, provided that all amounts due to Lender relating to the first twelve (12) Payment Dates have been satisfied in full.

(b)      The occurrence of an Event of Default that results in an acceleration of the Indebtedness will be deemed to be a prepayment of the outstanding Indebtedness and Borrower will pay to the Lender in addition to the other outstanding amounts of the Indebtedness, the applicable Prepayment Yield Amount (if such Prepayment Yield Amount would otherwise be due and payable as a result of such acceleration pursuant to Section 2.6(a)), as if the outstanding principal amount of the Indebtedness was being prepaid by the Borrower on the next Business Day following the date of acceleration. The Prepayment Yield Amount that is payable upon acceleration of the Indebtedness is not a penalty but represents liquidated damages intended to compensate the Lender to ensure the Lender earns its minimum return, and to ensure that the Credit Parties do not avoid the payment of the Prepayment Yield Amount by intentionally defaulting hereunder.

**2.7      Application of Payments and Prepayment**

All payments made by the Borrower to the Lender shall be applied first to expenses, then to accrued but then unpaid fees, then to accrued but unpaid interest, then to any principal of the Loan currently due, and the balance to prepayment of principal of the Loan.

**2.8      Manner of Payments**

All payments to be made by the Borrower to the Lender under this Agreement shall be made to the Lender in lawful currency of the United States and by wire transfer in immediately available funds to such account or accounts of the Lender as the Lender may direct from time to time.

**2.9      Waiver.**

To the extent permitted by Applicable Law, any provision of Applicable Law which would restrict the rate of interest on any judgement debt shall be inapplicable to this Agreement and is hereby waived by the Borrower.

- 13 -

**2.10   No set-off.**

Repayment of the Loan shall be made without set-off, counter-claim or reduction of any kind.

**2.11   Closing**

Closing of the Loan shall take place simultaneously with the execution and delivery of this Agreement by the Parties hereto (or at such other date as shall be mutually agreed to in writing by the Parties).

On the Closing Date:

(a)   the Credit Parties shall execute and deliver to the Lender the Transaction Documents to which each is a party.

**ARTICLE 3**
**CONDITIONS TO FUNDING**

**3.1   Conditions to Obligations of the Lender**

The obligation of the Lender to advance the Initial Draw to Borrower is subject to the satisfaction (or waiver by the Lender) of the following conditions:

(a)   **No Restraining Order**. No temporary restraining order, preliminary or permanent injunction or other order or decree issued by any court of competent jurisdiction or other legal restraint or prohibition which has the effect of preventing the consummation of the transactions contemplated in this Agreement is in effect;

(b)   **Approvals**. All approvals and consents of or filings with any Governmental Authority required in connection with the transactions contemplated by this Agreement have been obtained or made (other than filings required to be made at a future time), and are in full force and effect; and all necessary approvals as required under the Organizational Documents of the Borrower to (i) enter into this Agreement and create the Security, and (ii) otherwise perform its obligations under the Transaction Documents have been obtained, are in effect and have not been rescinded;

(c)   **Due Diligence**.  The Lender shall be satisfied with its due diligence investigation in its sole discretion relative to the financial disclosure Lender has requested from Borrower in respect of Affiliates.

(d)   **Representations and Warranties Correct**. The representations and warranties of the Credit Parties set out in the Transaction Documents are true and correct as of the date of the advance, except that the accuracy of representations and warranties that by their terms speak as of a specified date will be determined as of such date;

(e)   **Performance of Obligations**. Each of the Credit Parties has performed or complied with all agreements and covenants required to be performed or complied with by it under the Transaction Documents;

(f)   **Compliance Certificate**. The Lender has received a certificate, in the form provided by Lender to Borrower, dated as of the date of the advance and signed by a duly authorized officer of the Borrower on behalf of the Borrower stating that the conditions specified in Sections 3.1(d) and 3.1(e) are satisfied;

- 14 -

(g) **Transaction Expenses**. All Transaction Expenses incurred by the Lender and payable by the Borrower and the Structuring Fee have been paid or provided for in a manner satisfactory to the Lender;

(h) **Security Filings**. The Borrower has executed and delivered to the Lender copies of all filings necessary or appropriate for the perfection of the Security as the result of which the Lender shall have security over the Collateral, subject only to Permitted Encumbrances;

(i) **Consents and Waivers**. All required consents, approvals, authorizations, permits and waivers of third parties necessary for the Credit Parties to consummate and perform the transactions contemplated in and by the Transaction Documents have been obtained, have not been amended and remain in full force and effect;

(j) **Transaction Documents**. Each of the Transaction Documents to which any Credit Party is a party shall have been executed by the applicable signatory thereto and delivered to the Lender;

(k) **Officer's Certificate**. Each of the entity Credit Parties has delivered to the Lender a certificate, executed by a duly authorized signatory, dated as of the Closing Date, certifying the authenticity and continued effectiveness of attached copies of the Organizational Documents and resolutions of its board of directors, members or partners approving the transactions contemplated by each of the Transaction Documents and authorizing the execution and delivery of each of the Transaction Documents by the applicable Credit Party;

(l) **Subordination Agreements**. The Lender shall have received a subordination agreement from any other lender to the Borrower, in each case in a form satisfactory to the Lender.

(m) **Opinions of Borrower's Counsel**. The Lender shall have received such opinions of legal counsel to the Borrower, dated as of the Closing Date (or an alternative date acceptable to Lender) and in a form satisfactory to the Lender;

(n) **Loan Policy**. Lender shall have received a loan policy ("**Title Policy**") issued by a title insurance company of its choosing in the full amount of the Loan naming Lender as the insured party and Guarantors as the owners and fee simple title holders of the Florida Real Property, and insuring the lien of the Mortgage as a first and prior lien upon the Florida Real Property, subject to no exceptions other than exceptions approved by Lender. The Title Policy must specifically insure Lender for claims and questions related to claims for mechanics' or materialmen's liens and shall include endorsements and other items satisfactory to Lender, in its sole discretion; and

(o) **Other Documents and Undertakings**. The Lender shall have received from the Credit Parties such other documents as it may reasonably request in respect of the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower hereby represents and warrants to the Lender that, except as disclosed in the Disclosure Statement, the statements contained in the following subsections of this Article 4 are true and correct as of the date of this Agreement and as of the Closing Date. Any reference to the "knowledge" of the Borrower

shall be deemed to refer to the actual knowledge of any of the following individuals: (i) Harrison Vargas or (ii) Ginna Paulsen.

## 4.1    Power and Authority

Each Credit Party has the requisite power and authority to enter into the Transaction Documents to which it is a Party and to perform its obligations hereunder and thereunder. The execution and delivery of the Transaction Documents and the performance by the Credit Parties of the transactions contemplated by the Transaction Documents to which they are a party have been duly authorized as required by their respective Organizational Documents, and no other action on the part of any Credit Party is necessary to authorize the execution and delivery by the Credit Parties of this Agreement or any other Transaction Document or any agreement ancillary thereto and the consummation by it of the transactions contemplated hereby and thereby. This Agreement has been, and the other Transaction Documents executed at a Closing will be, duly executed and delivered by the Credit Parties and constitute or will constitute legal, valid and binding obligations of the Credit Parties and enforceable against the Credit Parties in accordance with their respective terms.

## 4.2    No Conflict or Violations

Neither the execution and delivery of this Agreement nor the other Transaction Documents by the Credit Parties nor the consummation of the transactions contemplated herein and therein by the Credit Parties nor compliance by the Credit Parties with any of the provisions hereof or thereof will:

    (a)    violate, conflict with, or result in a material breach of any provision of, require any consent, approval or notice under, or constitute a material default (or an event which with or without notice or lapse of time or both, would constitute a material default) under, or result in granting to a third party a right to reduce fees or other payments to any Credit Party under, or result in granting to a third party a right of first refusal, first opportunity, or other right or option to acquire properties or assets of the Credit Parties under, or grant to a third party a right to force the Credit Parties to purchase one or more assets under, or result in a right of termination or acceleration under, or result in the creation of any Encumbrance upon, any of the properties or assets of the Credit Parties or cause any Financial Indebtedness of the Borrower to come due before its stated maturity or cause any credit commitment to cease to be available, or cause any payment or other obligation to be imposed on the Credit Parties under, any of the terms, conditions or provisions of:

        (i)    the Organizational Documents; or

        (ii)    any note, bond, mortgage, indenture, loan agreement, deed of trust, Encumbrance, or other Contract to which any Credit Party is a Party or to which any of its properties or assets may be subject or by which it is bound; or

    (b)    violate any Applicable Law;

    (c)    cause the suspension or revocation of any material Permit currently in effect; or

    (d)    violate or cause the suspension or revocation of any license to any Proprietary Asset.

    (e)    To the knowledge of the Borrower, no director, officer, member, manager, agent or employee of the Borrower or its Affiliates has: (i) used any of corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic

government official or employee from corporate funds; or (iii) made any bribe, payoff, influence payment, kickback or other unlawful payment.

### 4.3    Organization and Qualification

Comtel Direct, LLC is a limited liability company duly organized and validly existing under the laws of Florida and has the requisite limited liability company power and authority to own its assets as now owned and to carry on the Business.  Varsatel Corporation is a corporation duly incorporated and existing under the laws of Florida and has the requisite corporate power and authority to own its assets as not owned and to carry on the Business. Each Credit Party is duly registered or otherwise authorized to do business and is in good standing in each jurisdiction in which the character of its properties, owned, leased, licensed or otherwise held, or the nature of its activities makes such registration or authorization necessary.  Correct, current and complete copies of the articles of organization, operating agreement and any other member or voting agreements (collectively, the "**Organizational Documents**") of the Borrower have been made available to Lender.

### 4.4    Subsidiaries; Ownership

(a)    **Subsidiaries**.  No Borrower has any Subsidiaries or holds any securities or other ownership, equity or proprietary interests in any Person.  Except as disclosed in the Disclosure Statement, as of the date hereof, no Borrower has any agreement of any kind regarding the acquisition of the business operations of any Person or the Equity Interests of any Person.

(b)    **Ownership**.  All Persons holding any membership interests, units, shares or other ownership interest in any Borrower, including any Person holding any contingent or exercisable rights to the same (including warrants) are listed on Exhibit F.

### 4.5    Reporting Status and Securities Laws Matters

The Borrower is not a "reporting issuer" under any Applicable Securities Laws and is in compliance in all material respects with all Applicable Securities Laws.

### 4.6    Consents

Except as disclosed in the Disclosure Statement, no consent, approval, order or authorization of, or designation, registration, declaration or filing with, any Governmental Authority or other Person on the part of any Credit Party is required in connection with its valid execution, delivery and performance of the Transaction Documents to which it is a Party.

### 4.7    Indebtedness

Except as disclosed in the Disclosure Statement, Permitted Financial Indebtedness, and Indebtedness incurred in connection with the fulfillment of ordinary course operating obligations, none of which are outstanding beyond the date required for payment thereof, the Borrower has no outstanding Indebtedness.

### 4.8    Accounts

Other than the Blocked Accounts, there are no depository accounts or disbursement accounts in the name of the Borrower not disclosed on the Disclosure Statement.

- 17 -

**4.9     Litigation and Judgments**

Except as disclosed in the Disclosure Statement, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened, at law or in equity or before any federal or state court, or before any arbitrator or mediator of any kind and, to the knowledge of the Borrower, no Credit Party is in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court, arbitrator or mediator or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

**4.10    Intellectual Property**

    (a)    The Borrower owns all right, title and interest in and to, or has validly licensed (and is not in material breach of such licenses), all Proprietary Assets and all other intellectual property and proprietary rights that are material to the conduct of the Business, as presently contemplated;

    (b)    all such Proprietary Assets are sufficient, in all material respects, for conducting the Business, as presently contemplated;

    (c)    all such Proprietary Assets are valid and enforceable (subject to the effects of bankruptcy, insolvency, reorganization, moratorium or laws relating to or affecting creditors' rights generally), and do not infringe in any material way upon any third parties' intellectual property and proprietary rights, and no event will occur as a result of the transactions contemplated by the Transaction Documents that would render invalid or unenforceable any such Proprietary Assets; and

    (d)    to the knowledge of the Borrower, no third party is infringing upon such Proprietary Assets in a manner that currently would reasonably be expected to adversely affect such Proprietary Assets in any material respect.

**4.11    Contracts**

    (a)    The Borrower is not in material breach or violation of, or material default (in each case, with or without notice or lapse of time or both) under, any Contract of the type listed below (collectively, the "**Material Contracts**"), and except as disclosed on the Disclosure Statement, the Borrower has not received or given any notice of default under any such Material Contract which remains uncured and to the knowledge of the Borrower, there exists no state of facts which after notice or lapse of time or both would constitute a material default or breach of such Material Contract:

        (i)    any lease of real property by the Borrower, as tenant, with third parties;

        (ii)    other than leases of real property by the Borrower, any Contract under which the Borrower is obliged to make payments on an annual basis in excess of $100,000.00 in the aggregate;

        (iii)    any partnership, limited liability company agreement, joint venture, alliance agreement or other similar agreement or arrangement relating to the formation, creation, operation, management, business or Control of any partnership or joint venture which is not wholly-owned by the Borrower (other than any such agreement or arrangement relating to the operation or business of a property in the ordinary course and which is not material with respect to such property);

- 18 -

(iv)    any Contract under which Financial Indebtedness in excess of $50,000.00 is outstanding or may be incurred or pursuant to which any property or asset of the Borrower is mortgaged, pledged or otherwise subject to an Encumbrance (other than Permitted Encumbrances), or any Contract restricting the incurrence of Indebtedness by the Borrower or the incurrence of Encumbrances (other than Permitted Encumbrances) on any properties or securities or restricting the payment of dividends or distributions;

(v)    any Contract that purports to limit the right of the Borrower to, in any material respect:

    (A)    engage in any line of business; or

    (B)    compete with any Person or operate in any location;

(vi)    excluding ordinary course purchases and sales of inventory, any Contract providing for the sale or exchange of, or option to sell or exchange, any property with a fair market value in excess of $10,000.00, or for the purchase or exchange of, or option to purchase or exchange, any property with a fair market value in excess of $10,000.00 entered into in the past twelve (12) months or in respect of which the applicable transaction has not been consummated;

(vii)    any Contract entered into in the past twelve (12) months or in respect of which the applicable transaction has not yet been consummated for the acquisition or disposition, directly or indirectly (by amalgamation, merger or otherwise), of assets (other than Contracts referenced in Section 4.11(a)(v)(B)) or Equity Interests of another Person, in each case other than in the ordinary course of business of the Borrower;

(viii)    any standstill or similar Contract currently restricting the ability of the Borrower to offer to purchase or purchase the assets or Equity Interests of another Person; and

(ix)    any agreement among or between any Borrower and any Affiliate of any Borrower.

**4.12    Permits**

The Borrower holds in good standing all permits, licences, approvals (including regulatory approvals), franchises, rights-of-way, easements and entitlements, including but not limited to the permits required in connection with the Business, (collectively, "**Permits**") which it requires, or is required by Applicable Law, to hold, own, lease, license or use the property included in the Business and to carry on the Business.

**4.13    Compliance with Borrower Instruments; Applicable Laws; Permits**

Borrower is not in violation of any provisions of its Organizational Documents as currently in effect. The Borrower is in compliance in all respects with all Applicable Laws. All Permits and other authorizations by any Governmental Authority held by the Borrower and which are necessary to the Business are valid and sufficient in all respects for the business presently carried or presently contemplated to be carried on by it.

**4.14    Taxes**

(a)    The Borrower has:

    (i)    as relates to income and sales Taxes, duly and timely filed, or caused to be filed, all material Tax Returns required to be filed by it prior to the date hereof, other than those which have been administratively waived, and all such Tax Returns are true and correct in all material respects;

    (ii)    paid, or have arrangements in place with the applicable Tax authority, on a timely basis all Tax and all assessments and reassessments of Tax due on or before the date hereof, other than Tax which is being or has been contested in good faith and for which, in the reasonable opinion of the Borrower, adequate reserves have been made, except to the extent that failure to pay such Tax is not material;

    (iii)    duly and timely withheld, or caused to be withheld, all Tax required by Law to be withheld by it (including Tax and other amounts required to be withheld by it in respect of any amount paid or credited or deemed to be paid or credited by it to or for the account of any Person) and duly and timely remitted, or caused to be remitted, to the appropriate Tax authority such Tax required by Law to be remitted by it, except to the extent that such failure is not material; and

    (iv)    duly and timely collected, or caused to be collected, any sales or transfer taxes, including goods and services, state sales, use, franchise and/or excise taxes, required by Applicable Law to be collected by it and duly and timely remitted to the appropriate Tax authority any such amounts required by Applicable Law to be remitted by it, except to the extent that such failure is not material;

(b)    the unpaid Tax of the Borrower as of the date hereof does not exceed the reserves and provisions for Tax accrued but not yet due;

(c)    no deficiencies, litigation, proposed adjustments or matters in controversy with respect to Tax exists or has been asserted which remain unresolved at the date hereof, and no action or proceeding for assessment or collection of Tax has been taken, asserted, or to the knowledge of the Borrower, threatened, against the Borrower or any of their assets, except such deficiencies, litigation, proposed adjustments, confirmations, actions or proceedings that is not material;

(d)    there are no currently effective elections, agreements or waivers extending the statutory period or providing for an extension of time with respect to the assessment or reassessment of any Tax of, or the filing of any Tax Return or any payment of any Tax by the Borrower;

(e)    there are no Encumbrances, other than Permitted Encumbrances, for Tax upon any of the assets of the Borrower;

(f)    the Borrower is substantially in compliance with Applicable Laws, including any documentation and recordkeeping requirements thereunder, applicable to the allocation of income and deductions and transactions among related taxpayers; and

(g)    the Borrower is not a Party to any indemnification, allocation or sharing agreement with respect to Tax that could give rise to a payment or indemnification obligation (other than customary Tax indemnification provisions contained in credit or loan agreements or

agreements related thereto or other transactions entered into in the ordinary course) and the Borrower has no liability for Tax of any Person as a transferee or successor, by contract, or otherwise.

**4.15    Employment Agreements and Collective Agreements**

Except as disclosed in the Disclosure Statement, the Borrower is not a Party to or bound or governed by:

(a)    any change of control agreement with any officer or any written or, to the knowledge of the Borrower, oral agreement, arrangement or understanding providing for an existing retention, severance or termination compensation or benefits to any officer; or

(b)    any existing collective bargaining or union agreements.

There are no material labour disputes, strikes or lock-outs relating to or involving any employees of the Borrower. There are no actual applications or, to the knowledge of the Borrower, threatened applications for certification, voluntary recognition, related employer, successor employer or union bargaining rights in respect of the Borrower.

**4.16    Property and Interests**

(a)    Except as is not material, the Borrower is, except with respect to the properties referred to in the Disclosure Statement, the absolute legal and beneficial owner of, and has marketable title to, all of its owned material property or assets free of all Encumbrances or demands whatsoever, other than Permitted Encumbrances.

(b)    The Borrower does not own any real property.

(c)    All real property currently leased or subleased or licensed by the Borrower from a third party (collectively, the "**Leased or Licensed Properties**") is listed in the Disclosure Statement identifying the name of the lessee (i.e., the Borrower or otherwise) and the documents under which such lease or license is created (collectively, the "**Lease or License Documents**"). The Borrower holds good and valid leases or licenses in the Leased or Licensed Properties, free and clear of all Encumbrances other than Permitted Encumbrances. Each of the Lease or License Documents is valid, binding and in full force and effect as against the Borrower and, to the knowledge of the Borrower, as against the other Party thereto. Except as disclosed in the Disclosure Statement, none of the Borrower nor, to the knowledge of the Borrower, any of the other parties to the Lease or License Documents, is in breach or violation or default (in each case, with or without notice or lapse of time or both) under any of the Lease or License Documents which breach, violation or default has not been cured and is not material, and the Borrower has not received or given any notice of default under any Lease or License Document which remains uncured which is material. To the knowledge of the Borrower, the Borrower is not in violation of any covenants, or not in compliance with any condition, restrictions or Permitted Encumbrances, affecting any Leased or Licensed Properties which violations or non-compliances are material.

(d)    All accounts for materials, work and services performed or materials placed or furnished upon or in respect of construction at each Leased or Licensed Property have been fully paid or the Borrower has made arrangements with such contractor for payment in the ordinary course.

(e)       To the knowledge of the Borrower, all of the buildings and improvements (including fixtures, systems and utilities) on the real property owned or leased or licensed or otherwise held by the Borrower were constructed and are maintained in accordance with Applicable Laws and are maintained in good operating condition and repair, subject to normal wear and tear.

**4.17    Personal Property**

The Borrower owns or has a valid and enforceable lease or license of all personal property used in the Business as presently carried on or contemplated to be carried on, except as is not material.  Other than for the Permitted Encumbrances or Encumbrances that will be released at Closing, there has been no assignment, sale, transfer, conveyance, mortgage, charge, pledge, security interest or hypothecation, absolute or contingent, direct or indirect, of the whole or any part of any rights, title and interest in any of the properties or assets that will be subject to the Transaction Documents.  At the Closing Date and as provided by, and subject to the terms of, the Security Agreements, the Lender shall have a first-ranking security interest on all of the present and after acquired personal property of the Borrower, subject only to the Permitted Encumbrances.

**4.18    Insurance**

The Borrower is covered by valid and currently effective insurance policies issued in favor of the Borrower that are commercially reasonable, taking into account the industries in which the Borrower operates, copies of which have been provided to the Lender, including without limitation the Risk Insurance Policies and the Key-Man Insurance Policy (Key-Man Insurance Policy to be provided within forty-five (45) days of the Closing Date).  With respect to each such insurance policy (provided that the following shall not apply to the Key-Man Insurance Policy until forty-five (45) days after the Closing Date):

(a)       the policy is in full force and effect and all premiums due thereon have been paid;

(b)       the Borrower is not in breach or default, and has not taken any action or failed to take any action which, with notice or the lapse of time, would constitute such a breach or default, or permit termination or modification of, any such policy;

(c)       to the knowledge of the Borrower, no insurer on any such policy has been declared insolvent or placed in receivership, debt restructuring proceedings or liquidation, and no notice of cancellation or termination has been received by the Borrower with respect to any such policy;

(d)       none of such policies will terminate or lapse by reason of the transactions contemplated by the Transaction Documents;

(e)       no insurer under any such policy has cancelled or generally disclaimed liability under any such policy or indicated any intent to do so or not to renew any such policy;

(f)       there is no claim by the Borrower pending under any such policy that has been denied or disputed by the insurer; and

(g)       all claims under such policies have been filed in a timely fashion.

**4.19    Related Party Transactions**

Except as disclosed in the Disclosure Statement:

- 22 -

(a)    The Borrower's Affiliates, officers, directors, members or employees, or any Affiliate of any of the foregoing, or to the Borrower's knowledge, any supplier, distributor or customer of the Borrower or any member of the immediate family of any officer or director of any Credit Party has any material interest in any property, real or personal, tangible or intangible, including Proprietary Assets used in or pertaining to the Business, except for the normal rights of a member.

(b)    Other than arrangements in the ordinary course of business, there are no agreements, understandings or proposed transactions between the Borrower and any of its respective officers, directors, employees, members, managers or Affiliates.

(c)    To the Borrower's knowledge, no officer, director, member or manager of any Credit Party has any material direct or indirect ownership interest in any firm or corporation with which the Borrower has a material business relationship that competes in any material respect with the Borrower. To the Borrower's knowledge, no member of the immediate family of any Guarantor (other than any other Guarantor) is directly or indirectly interested in any Material Contract.

**4.20    Pension and Employee Benefits**

(a)    Except as disclosed in the Disclosure Statement, the Borrower does not maintain any health, welfare, supplemental unemployment benefit, bonus, profit sharing, option, insurance, incentive, incentive compensation, deferred compensation, share purchase, share compensation, disability, pension or retirement plans and other material employee or director compensation or benefit plans, policies, trusts, funds, agreements or arrangements for the benefit of directors or former directors of the Borrower, employees or former employees of the Borrower, which are maintained by or binding upon the Borrower, as applicable, or in respect of which the Borrower has any actual or, to the Borrower's knowledge, potential liability (collectively, the "**Plans**").

(b)    None of the execution and delivery of this Agreement or any Transaction Document by the Borrower or consummation of the transactions contemplated in this Agreement or a Transaction Document or compliance by the Borrower with any of the provisions hereof or thereof shall result in any payment (including severance, unemployment compensation, bonuses or otherwise) becoming due to any director, officer or employee of the Borrower, or result in any increase or acceleration of contributions, liabilities or benefits, or acceleration of vesting, under any Plan or restriction held in connection with a Plan.

**4.21    Environmental**

(a)    Except as is not material, the Borrower is in compliance with all, and has not violated any, Environmental Laws.

(b)    Except as is not material:

(i)    The Borrower has not Released, and, to the Borrower's knowledge, no other Person has Released, any Hazardous Substances (in each case except in compliance with applicable Environmental Laws) on, at, in, under or from any of the real properties (including the workplace environment) currently or previously owned, leased or operated by the Borrower; and

(ii)    there are no Hazardous Substances or other conditions that could reasonably be expected to result in liability of or adversely affect the Borrower under or related to any Environmental Law on, at, in, under or from any of the real properties (including the workplace environment) currently or, to the Borrower's knowledge, previously owned, leased or operated by the Borrower.

(c)    There are no pending claims or, to the the Borrower's knowledge, threatened claims, against the Borrower arising out of any Environmental Laws.

(d)    No Encumbrance in favour of a Governmental Authority arising under Environmental Laws is pending or, to the Borrower's knowledge, threatened, affecting the Borrower or any real property owned, or leased by the Borrower, except as is not material.

(e)    There are no Orders from any Governmental Authority which relates to Environmental Laws and which requires any material work, repairs, construction or capital expenditures by the Borrower.

## 4.22    Full Disclosure

The written statements and information furnished to the Lender by the Borrower in connection with the negotiation of this Agreement and the Transaction Documents, taken together as a whole, do not as of the date thereof or date furnished contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the material statements contained therein not materially misleading in light of the circumstances under which such statements were made.

## 4.23    No Brokers

Except for R.C. Morris Capital Management Ltd., and/or Noble Capital Markets, Inc., the Borrower is not obligated for the payment of fees or expenses of any broker or finder in connection with the origination, negotiation or execution of this Agreement or the other Transaction Documents, or in connection with any transaction contemplated hereby or thereby.

## 4.24    Financial Statements

The financial statements furnished to Lender pursuant to this Agreement or in connection with the Borrower's request for credit, present fairly the financial condition of the applicable Credit Parties and have been prepared in accordance with GAAP consistently applied and there has been no Material Adverse Change since the date of such statements.  The Borrower does not have any liability (contingent or otherwise) or other obligations for the payment of money of the type required to be disclosed in accordance with generally accepted accounting principles which are not disclosed on such financial statements.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES BY THE LENDER

The Lender represents to the Borrower that on the Closing Date:

## 5.1    Authority

The Lender has the requisite legal right, power and capacity, as applicable, to enter into, execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party.  Assuming due execution and delivery by the other Parties, this Agreement is, and upon their execution, the other Transaction Documents to which the Lender is a party will be legal, valid and binding

- 24 -

obligations of the Lender enforceable against the Lender in accordance with their respective terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally. The entering into of this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby will not result in a violation of any of the terms or provisions of any Applicable Laws applicable to the Lender, or any of the organizational documents of the Lender, or any material Contract to which the Lender is a party or by which it is bound.

**5.2     No Impairment**

Nothing contained in this Article 5 is intended to otherwise impair the representations, warranties or covenants of the Borrower or the Lender in this Agreement or the other Transaction Documents.

**ARTICLE 6**
**EVENTS OF DEFAULT**

**6.1     Events of Default**

The occurrence of any of the following events is an event of default (each, an "**Event of Default**"):

(a)     the Borrower defaults in the payment of any amount when due under this Agreement, which default, in the case of payment of interest or fees, is not remedied within three (3) Business Days; or

(b)     the Borrower transfers (in a single transaction or series of related transactions) any assets having a fair market or book value, individually or in aggregate, greater than $10,000.00, to another Person without the prior written consent of the Lender, other than: (i) sales in the ordinary course of business; (ii) the sale, transfer or other disposition of any tangible personal property that, in the reasonable business judgment of the Borrower has become redundant, obsolete or worn out and which is disposed of in the ordinary course of business; (iii) the payment of any debt identified in the Exhibit A disclosure; or (iv) any transfer in accordance with the "Use of Proceeds" provided in Section 7.1(cc); or

(c)     if any Credit Party shall (i) institute or commence proceedings to be adjudicated a bankrupt or insolvent or consent to the filing of a bankruptcy or insolvency proceeding, (ii) file, institute or commence or otherwise take any proceeding relating to reorganization, adjustment, arrangement, composition, compromise, stay of proceedings or relief similar to any of the foregoing under any Applicable Law regarding bankruptcy, insolvency, reorganization or relief of debtors or similar or analogous laws of any other jurisdiction, (iii) consent to the filing of any such proceeding, (iv) consent to the appointment of a receiver, liquidator, trustee or assignee in bankruptcy or similar official or to the liquidation, dissolution or winding-up or of all or a substantial part of its property and assets, (v) make an assignment for the benefit of creditors, or (vi) take any limited liability company or other action authorizing or in furtherance of any of the foregoing; or

(d)     any proceeding is filed, instituted or commenced by any Person seeking (i) to adjudicate any Credit Party as bankrupt or insolvent or the liquidation, reorganization, winding-up, adjustment, arrangement, composition, compromise, stay of proceedings or similar relief of or for any Credit Party under any Applicable Law regarding bankruptcy, insolvency, reorganization or relief of debtors or analogous or similar laws of any other jurisdiction, or (ii) to appoint a receiver, liquidator, trustee or assignee in bankruptcy or similar official of any Credit Party or of all or a material part of the applicable Credit Party's property and

assets, if such proceeding shall continue un-dismissed or un-stayed for a period of sixty (60) days; or

(e)     any material representation or warranty made by any Credit Party in this Agreement or any of the Transaction Documents shall be false as of the time such representation and warranty was made or deemed to be made; or

(f)     if there is any material breach by any Credit Party of any other covenant, condition or provision contained in this Agreement or any Transaction Document and the breach (if capable of being cured) is not cured within twenty (20) days of receipt by the Borrower of written notice from the Lender; or

(g)     if a writ, execution, attachment or similar process is issued or levied against all or a portion of the property of the Borrower in connection with any judgment or judgments against the Borrower aggregating in excess of $100,000.00 and is not released, satisfied, discharged, vacated or stayed within thirty (30) days after its entry, commencement or levy; or

(h)     if a judgment for the payment of money aggregating in excess of $100,000.00 shall be rendered against the Borrower and the same shall remain undischarged for a period of thirty (30) days or execution thereof shall not be effectively stayed;

(i)     If the Borrower incurs any Indebtedness, other than Permitted Financial Indebtedness, without the prior written consent of the Lender; or

(j)     The death of any Guarantor if such death occurs prior to the delivery to Lender of the Key Man Insurance Policy applicable to such Guarantor, or the incapacity of any Guarantor if a replacement Guarantor acceptable to Lender (at Lender's commercially reasonable discretion) does not execute a guaranty document acceptable to Lender within sixty (60) days of such incapacity.

**6.2     Remedies for Events of Default**

Upon the occurrence of an Event of Default not remedied within ten (10) Business Days of receipt by the Borrower of written notice from the Lender (provided that such written notice shall not be required with respect to any Event of Default described in Section 6.1(a) with respect to any payment of principal, interest or both due hereunder), the Lender may:

(a)     accelerate and forthwith declare due and payable the remaining Loan Amount outstanding and any and all accrued interest, and without demand, protest or other notices of any kind, all of which are hereby expressly waived; and

(b)     exercise any and all rights, powers, remedies and recourses available to the Lender under this Agreement, any of the Transaction Documents at law, in equity or otherwise.

**6.3     Waiver of Default**

The Lender may by written instrument at any time and from time to time waive any breach of this Agreement or Event of Default.

**6.4     No Waiver**

No failure or delay on the part of the Lender in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, and any single or partial exercise of any right, power or

privilege under this Agreement will not preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have under this Agreement, at common law or in equity.  The acceptance by the Lender of any further security or of any payment of or on account of the Loan after a default or of any payment on account of any partial default will not be construed to be a waiver of any right to take advantage of any future default or of any past default not completely cured thereby.  The Lender may exercise any and all rights, powers, remedies and recourses available to it under this Agreement, any related agreements, or any other remedy available to them at law, concurrently or individually without the necessity of an election.

## ARTICLE 7
## COVENANTS

**7.1**   **Borrower's Covenants**

Borrower covenants and agrees with Lender as follows:

(a)   **Perform Obligations**.  Each Credit Party shall fully observe, carry out and perform its obligations under the Transaction Documents, including, without limitation, duly and punctually paying all amounts payable by such Credit Party.

(b)   **Legal Existence**.  Each entity Credit Party shall at all times maintain its corporate existence under the laws of its jurisdiction of organization and qualify and remain duly qualified to do business and own property in each jurisdiction in which such qualification is necessary in order to carry on its business and operations.

(c)   **Compliance with Law**. Each Credit Party shall comply, in all respects, with all Applicable Laws, provided that it shall not be an Event of Default if any non-compliance is immaterial in nature and would not result in a Material Adverse Change.

(d)   **Financial Statements and Reports**.  For so long as there is any Indebtedness of the Borrower owing to the Lenders the Borrower shall deliver or cause to be delivered to the Lender:

(i)   Within fifteen (15) days after the end of each month, (A) the Loan Compliance Package and (B) a completed Loan Compliance Certificate in the form attached as Exhibit E.

(ii)   From time to time such further and other reports and information concerning the Borrower as the Lender may reasonably request and which Borrower may reasonably provide.

All such reports shall be in such form and shall contain such detail as the Lender may reasonably request; provided however, that the Borrower shall have a five (5) Business Day period in which to cure any default in delivering such reports before such default in delivery shall amount to an "Event of Default" under this Agreement.

(e)   **Compliance with Agreement**.  Each Credit Party shall carry out all of its obligations under this Agreement, the other Transaction Documents and any other agreements entered into by it with the Lender, made by it in favour of the Lender or assigned by it to the Lender.

- 27 -

(f) **Material Adverse Change**. Borrower will provide the Lender with prompt written notice and all records, statements or other evidence of any Material Adverse Change.

(g) **Financial Covenants**.

    (i) It shall be deemed an Event of Default if Borrowers' trailing average monthly net income over three (3) months as shown in its Loan Compliance Package is lower than $150,000.00. This covenant shall only apply on the first (1st) Payment Date and each Payment Date thereafter through and including sixth (6th) Payment Date, after which it shall no longer be operative.

    (ii) It shall be deemed an Event of Default if Borrowers' trailing average monthly net income over three (3) months as shown in its Loan Compliance Package is lower than $175,000.00. This covenant shall only on the seventh (7th) Payment Date and each Payment Date thereafter.

    (iii) It shall be deemed an Event of Default if Borrowers' Working Capital as shown in its Loan Compliance Package is lower than $4,000,000.00 for any month.

    (iv) It shall be deemed an Event of Default if Borrowers' cumulative cash balance is less than $250,000.00 at any time.

(h) **Inspection**. The Borrower shall permit the Lender and all other Persons designated by the Lender to visit and inspect its properties and assets during normal business hours upon seventy-two (72) hours (excluding hours on Sunday) prior notice given to it and to examine and make copies of all books and records relating to its properties and assets and shall ensure that the Lender and each such Person has unrestricted access to its property and assets and every part thereof and to such books and records, and that the Lender and each such Person will be provided with such information and data relating to its properties and assets as the Lender or such Person may reasonably request. Any such visitation and inspection will be conducted in a manner that shall not unreasonably interfere with the Borrower's customary business operations.

(i) **Further Assurances**. At any and all times each Borrower will do, execute, acknowledge and deliver all such further acts, deeds, conveyances, mortgages, transfers and assurances as the Lender shall reasonably require for the purpose of giving, clarifying, perfecting and dealing with conflicting claims thereto, the validity, legality or enforceability of the mortgages, hypothecs, charges or security of the nature herein specified upon all property intended to be secured by the Transaction Documents and for the better assuring, conveying, mortgaging, hypothecating, assigning, confirming, pledging, granting security interest, charging and transferring unto the Lender all the hereditaments and premises, estates and property mortgaged, hypothecated, pledged, granted security interest therein and charged under the Transaction Documents, or transferred, or intended to be or which any Borrower may hereafter become bound to mortgage, hypothecate, pledge, grant security interest or charge or transfer in favour of the Lender and all choses in action and other intangibles to be secured in favour of the Lender hereunder.

(j) **Permitted Encumbrances**. Each Borrower will keep and maintain each of the Permitted Encumbrances in good standing and will comply with the terms thereof and will forthwith notify the Lender in writing describing in reasonable detail any defaults thereunder.

(k)    **Statutory Claims**.  Each Borrower shall remit and pay when due, all statutory liens, trust and other claims, any and all rents payable, periodic payments owing to prior secured creditors (if any) and any and all statutory priority claims (including without limitation, all Taxes) when due and payable and shall provide the Lender with proof of such payment and remittance, satisfactory to the Lender, within ten (10) Business Days of the due date thereof, such proof to include, where applicable, copies of correspondence to and from the relevant Tax agency.  Borrower consents to the Lender contacting any Persons, including governmental agencies, necessary to confirm payment of same and agrees to sign any such further instruments, documents and any such further action as may be required to give effect to such consent.

(l)    **Condition of Properties**.  Borrower will keep or cause to be kept all of its properties and assets subject to the Transaction Documents in reasonably good mechanical condition, repair and appearance subject to normal wear and tear.

(m)    **Payment of Obligations**.  Borrower shall pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all their respective debts and liabilities of whatever nature, except when the amount or validity thereof is being contested and adequate reserves with respect thereto are maintained by such Credit Party in accordance with GAAP.

(n)    **Maintenance of Existence and Conduct of Business**.  Each entity Credit Party shall preserve and keep in full force and effect its legal existence; make all governmental and regulatory filings promptly; engage primarily in business of nature disclosed to the Lender; carry on and conduct its business in a proper, efficient and businesslike manner, in accordance with good business practices; take all reasonable action to obtain and maintain in full force and effect all rights, privileges, franchises and Permits necessary or desirable in the conduct of its business; and comply with all contractual obligations and Applicable Law except to the extent that the failure to comply therewith would not, in the aggregate, cause or have a reasonable probability of causing a Material Adverse Change.

(o)    **Deposit Account Control Agreements**. No later than thirty (30) calendar days following the Closing Date, the Borrower shall delivery Deposit Account Control Agreements for all Blocked Accounts.

(p)    **Insurance**.  No later than forty-five (45) calendar days following the Closing Date, the Borrower shall take such actions with its insurer as are necessary to (i) designate the Lender as the first loss payee under the Risk Insurance Policies and deliver written evidence of such designation to the Lender and (ii) designate the Lender as the first loss payee under the Key-Man Insurance Policy and deliver written evidence of such designation to the Lender.  In the event of receipt of any proceeds under the Key-Man Insurance by the Lender, as first loss payee pursuant to such designation, the Lender may utilize only such proceeds as are necessary to satisfy any unpaid fees, expenses, principal and interest on the Loan Amount then due and owing to Lender under this Agreement and shall promptly remit the remainder of such insurance proceeds to the Borrower.  In the event of receipt of any proceeds under any Risk Insurance Policies by the Lender, as loss payee pursuant to such designation: if an Event of Default has occurred and is continuing, the Lender may utilize the amount of such proceeds as is necessary to satisfy any unpaid fees, expenses, principal and interest on the Loan Amount then due and owing to Lender under this Agreement, and shall promptly remit the remainder of such insurance proceeds to the Borrower; or if no Event of Default has occurred or is continuing, the Lender shall promptly remit all of such insurance proceeds received to the Borrower.

- 29 -

(q)     **Further Encumbrance**.  Except for advances or debts secured by the Permitted Encumbrances, each Borrower will not place or secure any debt in addition to the Loan against any of Borrower's properties or assets that are subject to the Transaction Documents, nor will it create, assume or permit to exist any mortgage, charge, hypothec, pledge, lien or other encumbrance or security interest with respect to any of such Borrower's properties or assets charged by the Transaction Documents, without the prior written consent of the Lender, which consent may be unreasonably withheld by the Lender in its sole discretion.

(r)     **Sale and Purchase of Assets/Shares Restricted**.  Subject to the terms and conditions of Subsection (cc) of this Section 7.1, for as long as there is any Indebtedness of Borrower owing to the Lender and unless the prior written consent of the Lender is obtained, which consent may be withheld by it in its sole and absolute discretion, no Credit Party shall sell or purchase any assets from or shares of any Person, other than inventory and equipment in the ordinary course of business.

(s)     **Making of Loans Restricted**.  Subject to the terms and conditions of Subsection (cc) of this Section 7.1, Borrower shall not make any loans to any Person, except with the prior written consent of the Lender, which consent may be withheld in its sole and absolute discretion.

(t)     **Payments to Non-Arm's Length Persons**.  Subject to the terms and conditions of Subsection (cc) of this Section 7.1, Borrower shall not advance to or repay any amounts owing to any Affiliate, Subsidiary, parent entity or owner of any of them, except for: (i) compensation and bonuses to employees in amounts disclosed to and approved by Lender in advance; or (ii) repayment of Permitted Financial Indebtedness indicated on the Disclosure Schedule to be repaid at Closing, without the prior written consent of Lender, which consent may be withheld by it in its sole and absolute discretion.

(u)     **Agreements with Third Parties**.  Borrower shall not enter into any Material Contract that is not fair market value or on fair market terms, without the prior written consent of the Lender, which consent may be withheld by it in its sole and absolute discretion.

(v)     **Further Indebtedness**.  Except for fees and other amounts owing pursuant to this Agreement and the other Transaction Documents and amounts secured by Permitted Encumbrances, Borrower shall not incur any Indebtedness, except trade debt and professional fees incurred in the ordinary course of business which, for greater certainty, excludes indebtedness for borrowed money.

(w)     **No Guarantees**.  Other than as provided in this Agreement or with the prior written consent of the Lender, no Borrower may guarantee the obligations of any Person other than to the Lender.

(x)     **No Change in Name**.  No entity Credit Party shall change its name without the prior written consent of the Lender which consent will not be unreasonably withheld, conditioned or delayed.

(y)     **No Merger; Etc**.  Borrower shall not enter into any transaction of amalgamation or consolidation or merger without the prior written consent (not to be unreasonably withheld, conditioned, or delayed) of the Lender and shall not liquidate, wind-up or dissolve itself (or suffer any liquidation, winding-up or dissolution or any proceedings therefor) or continue itself under the laws of any other statute or jurisdiction.

(z)     **Restricted Payments**.  No Borrower shall make any Restricted Payment without the prior written consent of the Lender, which consent may be withheld by Lender in its sole discretion.

(aa)    **Amendments**.  No Borrower shall materially amend any of its Organizational Documents without Lender's prior written consent, which consent may be withheld in Lender's commercially reasonable discretion.  Additionally, Borrower shall not amend, modify or terminate the Non-Compete and Non-Solicitation Agreements dated as of even date herewith and executed by Guarantors without Lender's prior written consent, which consent may be withheld in Lender's sole and absolute discretion.

(bb)    **Depository Accounts**.  Borrower shall not open any depository or disbursement account without the prior written consent of the Lender.  As long as Borrower enters into a Deposit Account Control Agreement in form and substance to Lender covering the new account, Lender's consent shall not be unreasonably withheld, conditioned or delayed.

(cc)    **Use of Proceeds**.  Borrower shall only use the proceeds of the Loan to repay existing Indebtedness of the Borrower, including any debt identified in the Exhibit A disclosure, and for working capital and general corporate purposes for the Business unless otherwise agreed by Lender.  Notwithstanding the foregoing and anything else in this Agreement to the contrary, Borrower may also use the proceeds of the Loan to (i) make loan(s) to one or more Affiliates of the Borrower; or (ii) make equity investment(s) in one or more Affiliates of the Borrower, provided that Borrower satisfies the following requirements:

(i)     Borrower shall deliver to Lender a detailed description of the intended use of the Loan proceeds by the applicable Affiliate(s) of the Borrower together with such supporting documentation;

(ii)    If Affiliate is in the Borrower's Industry, as determined by Lender in its reasonable discretion, Lender consent shall not be required (for the avoidance of doubt, the written consent of Lender shall be required in the event Lender determines, in its reasonable discretion, that the Affiliate is not in the Borrower's Industry);

(iii)   Borrower shall cause the Affiliate(s) of the Borrower that it intends to make loan(s) to or equity investment in to become a "Borrower" under this Agreement, making all the representations, warranties and covenants of the Borrower as of the date the Affiliate joins this Agreement and shall deliver to Lender completed copies of the forms of joinder and other security documents attached as <u>Exhibit G</u> to this Agreement, executed by the applicable Affiliate(s) of the Borrower.

(iv)    In the event that any Loan proceeds are to be used by Borrower or any Affiliate of Borrower to purchase real property or any equipment or other personal property subject to a title registration act under Applicable Law, Borrower shall deliver such additional security documentation as Lender may require to perfect Lender's first priority lien on such collateral (in the case of real property) prior to closing on the purchase of such real property or (in the case of titled equipment or other personal property) within ten (10) days after closing on the purchase of such property.

## ARTICLE 8
## INDEMNIFICATION

**8.1     Indemnity**

The Borrower will jointly and severally indemnify and defend and hold harmless the Lender, its Affiliates, successors and assigns and each of their respective officers, directors, and employees (a "**Lender Indemnified Party**" or collectively the "**Lender Indemnified Parties**") from and against, and agrees to pay or cause to be paid to the Lender Indemnified Parties all amounts equal to the sum of, any and all claims, demands, costs, expenses, losses and other liabilities of any kind, other than loss of profits of such Lender Indemnified Parties or consequential damages ("**Losses**") that the Lender Indemnified Parties may incur or suffer (including all reasonable legal fees and expenses), which arise or result from any breach by any Credit Party of any of its representations or warranties, or failure by any Credit Party to perform any of its covenants or agreements, in any Transaction Document or in any certificate or document delivered pursuant to any Transaction Document, including any third party claims arising or resulting from such breach or failure, except to the extent such Losses arise solely out of the intentional or gross fault, gross negligence or willful misconduct of any Lender Indemnified Party. The rights of the Lender Indemnified Parties hereunder shall be in addition to, and not in lieu of, any other rights and remedies which may be available to them by Law or under the Transaction Documents.

Each Credit Party acknowledges and agrees that its liability to any Lender Indemnified Party in connection with the matters specified above shall not be limited to the Loan Amount, and that such Credit Party's liability in respect thereof is unrelated to and independent of the amount of any loss that any Lender Indemnified Party may suffer as a result of the failure of the Loan to be repaid in full and shall not be determined by reference to the amount of any such loss. This clause shall survive repayment in full and performance of the Loan and termination of this Agreement.

**8.2     Procedures**

    (a)    If a third party shall notify a Lender Indemnified Party (an "**Indemnified Party**") with respect to any matter that may give rise to a claim for indemnification under the indemnities set out above in Section 8.1, the procedure set out below shall be followed.

        (i)    **Notice**. The respective Indemnified Party shall give to the Party providing indemnification (the "**Indemnifying Party**") written notice of any claim, suit, judgment or matter for which indemnity may be sought under Section 8.1 promptly but in any event within thirty (30) days after the Indemnified Party receives notice thereof; provided, however, that failure by the Indemnified Party to give such notice shall not relieve the Indemnifying Party from any liability it shall otherwise have pursuant to this Agreement except to the extent that the Indemnifying Party is actually prejudiced by such failure. Such notice shall set out in reasonable detail:

            (A)    the basis for such potential claim;

            (B)    the dollar amount of such claim; and

            (C)    all documentation and information Lender has received in connection with such potential claim.

        The Indemnifying Party shall have a period of twenty (20) Business Days within which to respond thereto. If the Indemnifying Party does not respond within such

20-Business Day period, the Indemnifying Party shall be deemed to have accepted responsibility for such indemnity.

(ii)    **Defense of Claim**. With respect to a claim by a third party against an Indemnified Party for which indemnification may be sought under this Agreement, the Indemnifying Party shall have the right, at its option, to be represented by counsel of its choice and to assume the defense or otherwise control the handling of any claim, suit, judgment or matter for which indemnity is sought, which is set out in the notice sent by the Indemnified Party, by notifying the Indemnified Party in writing to such effect within thirty (30) days of receipt of such notice; provided, however, that the Indemnified Party shall have the right to employ counsel to represent it if, in the Indemnified Party's reasonable judgment based upon the advice of counsel, it is advisable in light of the separate interests of the Indemnified Party and the Indemnifying Party, to be represented by separate counsel, and in that event the reasonable fees and expenses of such separate counsel shall be paid by the Indemnifying Party but only in respect of one counsel (chosen by the Lender) plus appropriate local counsel, if applicable, for all Indemnified Parties. If the Indemnifying Party does not give timely notice in accordance with the preceding sentence, the Indemnifying Party shall be deemed to have given notice that it does not wish to control the handling of such claim, suit or judgment. In the event the Indemnifying Party elects (by notice in writing within such 30-day period) to assume the defense of or otherwise control the handling of any such claim, suit, judgment or matter for which indemnity is sought, the Indemnifying Party shall indemnify and hold harmless the Indemnified Party from and against any and all reasonable professional fees (including all legal fees, accountants, consultants and engineering fees) and investigation expenses incurred by the Indemnified Party after it provides notice under Section 8.2(a)(i) and prior to such election, notwithstanding the fact that the Indemnifying Party may not have been so liable to the Indemnified Party had the Indemnifying Party not elected to assume the defense of or to otherwise control the handling of such claim, suit, judgment or other matter. In the event that the Indemnifying Party does not assume the defense or otherwise control the handling of such matter, the Indemnified Party may retain counsel, as an indemnification expense, to defend such claim, suit, judgment or matter.

(iii)    **Final Authority**. The Parties shall cooperate in the defense of any such claim or litigation and each shall make available all books and records which are relevant in connection with such claim or litigation. In connection with any claim, suit or other proceeding with respect to which the Indemnifying Party has assumed the defense or control, the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to any matter which does not include a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed. In connection with any claim, suit or other proceeding with respect to which the Indemnifying Party has not assumed the defense or control, the Indemnified Party may not compromise or settle such claim without the consent of the Indemnifying Party, which shall not be unreasonably withheld.

(b)    Any claim for indemnification under this Agreement shall be asserted by written notice given by the Indemnified Party to the Indemnifying Party and, except in the case of a claim

- 33 -

by a third party, the Indemnifying Party shall have a period of twenty (20) Business Days to respond thereto.

## ARTICLE 9
## MISCELLANEOUS

### 9.1    Currency

Any reference in this Agreement to "$" will mean United States dollars.

### 9.2    Waivers and Amendments

Unless otherwise provided, any provision of this Agreement may be amended or modified upon the written consent of the Borrower and the Lender. Any provision of this Agreement may only be waived by the Party in whose favour such provision is intended to benefit, such waiver to be evidenced by a notice in writing by the waiving Party to the other Party.

### 9.3    Governing Law

This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflict of laws provisions thereof.

### 9.4    Exclusive Jurisdiction

Any action or proceeding brought by a Party arising out of or in connection with this Agreement or any other Transaction Document, shall be brought in a court of competent jurisdiction located in the State of Florida. Borrower agrees not to contest such jurisdiction or seek to transfer any action relating to such dispute brought in the State of Florida to any other jurisdiction.

### 9.5    Entire Agreement and Paramountcy

The Transaction Documents constitute the full and entire understanding and agreement between the Parties with regard to the subject matters hereof and thereof. If there is any conflict between the provisions of this Agreement and the provisions of any other Transaction Documents, the provisions of this Agreement shall govern.

### 9.6    Notices

Any notice, consent, waiver, direction or other communication required or permitted to be given under this Agreement by any Party to the other shall be in writing and may be given by delivering same or sending same by email transmission addressed to the Party to which the notice is to be given at its address or email address for service herein. Any notice, consent, waiver, direction or other communication aforesaid shall, if delivered, be deemed to have been given and received on the date on which it was delivered to the address provided herein (if a Business Day and if not, the next succeeding Business Day) and if sent by email transmission be deemed to have been given and received at the time of receipt unless actually received after 5:00 p.m. Eastern Time or on a date that does not fall on a Business Day at the point of delivery in which case it shall be deemed to have been given and received on the next business day.

The address, facsimile or email address for service of each of Parties shall be as follows or at such other address as a Party may designate by ten (10) days' advance written notice to the other Party:

- 34 -

(a)     If to Borrower:

Comtel Direct, LLC, and/or Varsatel Corporation
1820 N. Corporate Lakes Blvd.
Suite 101
Weston, Fl. 33326
Attention:  Harrison Vargas and Ginna Paulsen
Emails: hvs@cht-holdings.com;
gpaulsen@cht-holdings.com

with a copy to (which shall not constitute notice):

George Pazuniak
c/o O'Kelly Ernst & Joyce, LLC
901 N. Market St. Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
gp@del-iplaw.com

(b)     If to Lender:

c/o R.C. Morris Capital Management Ltd.
Suite 810 – 570 Granville Street
Vancouver, British Columbia V6C 3P1
Canada

Attention:     Conrad Krebs
Phone:         (604) 639-8196
Email:         ckrebs@rcmorris.com

with a copy to (which shall not constitute notice):

Dickinson Wright PLLC
424 Church Street, Suite 800
Nashville, Tennessee 37219


Attention:     James B. Cunningham
Phone:         (248) 433-7540
Email:         jcunningham@dickinsonwright.com

**9.7     Validity**

If any provision of this Agreement or any of the other Transaction Documents shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions thereof shall not in any way be affected or impaired thereby.

**9.8     Counterparts**

This Agreement may be executed in any number of counterparts. This Agreement, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by

PDF, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in Person. At the request of any Party hereto or to any such agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or a PDF document to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or a PDF document as a defense to the formation or enforceability of a contract and each such Party forever waives any such defense.

**9.9      Publicity**

None of the Credit Parties nor Lender shall issue any press release or make any public disclosure regarding the transactions contemplated hereby unless such press release or public disclosure is approved by those Parties mentioned in such press release or public disclosure in advance; provided that such consent shall not be necessary if otherwise required by Applicable Law, a Governmental Authority or a securities exchange in the judgment of the disclosing Party, based on the advice of counsel, so long as prior to such disclosure, such Party consults with the other Party hereto on the contents of such press release or public disclosure. For avoidance of doubt, the transaction may be disclosed in confidence to such Persons who have a need to know of this transaction, as provided in Section 9.10, infra.

**9.10      Confidentiality**

The contents of this Agreement and the other Transaction Documents are confidential and neither the Borrower, on the one hand, nor the Lender, on the other, will disclose any of the contents hereof and thereof to any other party other than its officers, directors, managers, employees, consultants, advisors, and legal counsel, without the express written consent of the other, non-disclosing party. The Lender agrees to hold all Confidential Information (as defined below) obtained by it from any Credit Party in strict confidence, to prevent the Confidential Information from being disclosed to third parties, and to refrain from using the Confidential Information for any purpose, except in connection with any enforcement of the Transaction Documents. The term "**Confidential Information**" means any and all knowledge, data or information of a business or technical nature relating to the Business, the Credit Parties, or their respective businesses, including without limitation (a) trade secrets, copyrights, patents, ideas, inventions, know-how, source code, object code, data and processes; (b) marketing techniques and materials, pricing information, cost information, margin information, client and vendor information of any type (including client identities, project information and terms of engagement), business plans, business strategy, financial statements, projections, budgets and financial information of any type, and (c) information regarding the skills and compensation of employees and independent contractors. Confidential Information does not include information which is (x) publicly known through no fault of the Lender, (y) independently developed by the Lender without reference to the Confidential Information, or (z) rightfully received by the Lender from a third party without violating a duty of confidentiality known to such Lender. Notwithstanding anything in this Section 9.10, the Lender may disclose any Confidential Information obtained by it from any Credit Party to any prospective assignee of the Loan (to the extent permitted hereunder) and their respective officers, directors, managers, employees, consultants, advisors, and legal counsel; and the Credit Parties may disclose information regarding the contents of this Agreement and the other Transaction Documents in confidence to such Persons who have a need to know the information.

**9.11      Succession and Assignment**

Except as otherwise expressly provided in this Agreement and subject to the other Transaction Documents and Applicable Laws, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, permitted transferees, heirs, executors and administrators of the Parties hereto. This Agreement may not be assigned by the Borrower without the prior written consent of the Lender; but the

Lender shall have the right to assign its rights under this Agreement so long as the Lender provides the Borrower ten (10) Business Days' prior notice of such assignment.  No assignment contemplated by this Section 9.11 shall be or shall be deemed to be a discharge, rescission, extinguishment, novation or substitution of this Agreement and this Agreement shall continue to be the same obligation and not a new obligation.

**9.12    Further Assurances**

Each of the Parties shall promptly do, make, execute, deliver, or cause to be done, made, executed or delivered, all such further acts, documents and things as the other Parties may require, acting reasonably, from time to time, for the purpose of giving effect to this Agreement and shall take such steps as may be reasonably within its power to implement the full extent of this Agreement.

**9.13    Independent Legal Advice**

Each of the Parties acknowledge and agree that Dickinson Wright PLLC ("**DW**") has acted as counsel only to Lender, and that DW is not protecting the rights and interests of any other party to this Agreement. The other parties to this Agreement acknowledge and agree that DW and the Lender have given them the opportunity to seek, and have recommended that such parties obtain, independent legal advice with respect to the subject matter of this Agreement and the other Transaction Documents and, further, each of the other parties hereby represent and warrant to DW and the Lender that such party has sought independent legal advice or waives such advice.

**9.14    Joint and Several Liability**

The term "Borrower" as used herein means Comtel Direct, LLC and Varsatel Corporation, on a joint and several basis.  Each of Comtel Direct, LLC and Varsatel Corporation acknowledges and agrees that it is obligated hereunder as Borrower and each is jointly and severally liable as such.

**9.15    Usury Ceiling**

At no time shall any provision of this Agreement or the other Transaction Documents obligate Borrower to make any payment of interest or other amount payable to the Lender in an amount or calculated in excess of the highest applicable usury ceiling (the "**Maximum Rate**").  In the event any interest is charged or received by the Lender in excess of the Maximum Rate, Borrower acknowledges that the amount or rate shall be deemed to have been immediately adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, so as not to be so prohibited by law or result in a receipt by the Lender of interest at an unlawful rate, and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due under this Agreement and the other Transaction Documents. Provided that the adjustment shall be effected, to the extent necessary and in accordance with Applicable Law, as follows: (i) first, by reducing the amount or rate of interest required to be paid to the Lender under this Agreement or the other Transaction Documents, and (ii) second, by reducing any fees, commissions, premiums and other amounts required to be paid to the Lender that would constitute interest.

**9.16    Waiver of Jury Trial**

**EACH BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY AND HAS CONSULTED WITH COUNSEL OF ITS CHOICE, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR**

**RELATING TO THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY OBLIGORS.**

**9.17    Waiver of Notices**

**EACH BORROWER HEREBY EXPRESSLY WAIVES, AND SHALL NOT BE ENTITLED TO, ANY NOTICES OF ANY NATURE WHATSOEVER FROM LENDER EXCEPT WITH RESPECT TO MATTERS FOR WHICH THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS SPECIFICALLY AND EXPRESSLY PROVIDE FOR THE GIVING OF NOTICE BY LENDER TO SUCH BORROWER AND EXCEPT WITH RESPECT TO MATTERS FOR WHICH BORROWERS ARE NOT, PURSUANT TO APPLICABLE LEGAL REQUIREMENTS, PERMITTED TO WAIVE THE GIVING OF NOTICE.**

**9.18    Release of the Mortgage**

Notwithstanding anything in this Agreement to the contrary, Lender shall release the lien of the Mortgage and file a discharge document reflecting the same in the appropriate recording office promptly following the date on which the principal balance of the Loan is equal to or less than $5,000,000.00, provided that no Event of Default has occurred and is continuing as of such date.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date and year first written above.

COMTEL DIRECT, LLC

By: _____
Name: Ginna Paulsen
Title:  President


VARSATEL CORPORATION

By: _____
Name: Harrison Vargas
Title:  Chief Executive Officer

**WBDH-BC HOLDINGS LTD.**

By: _____
Name: Christopher Morris
Title:  President

**EXHIBIT A**

**Disclosure Statement**

**Section 1.1(oo)(v) Permitted Encumbrances:**
**Section 1.1(pp)(ii) Permitted Financial Indebtedness:**

      **Borrowers have the following debt and encumbrance:**

Creditor:      Prestige Capital Corporation
Amount Due:
      **The instant loan will be used to immediately pay off the debt to Prestige Capital Corporation.**

**4.16(c)  Property and Interests**

      Existing Lease:

      "Florida Commercial Lease Agreement" dated December l5, 2017 by and between Landlord (CHT Homes 2, LLC) and Comtel Direct, LLC, for office space at 1820 N. Corporate Lakes Blvd. Suite 101, Weston, Fl. 33326.  The term of this Lease began on the commencement date and shall terminate on December 31, 2020.

**4.19(a-c)      Related Party Transactions**

      **(i)      The Lease Agreement referenced with respect to § 4.16(c), supra.**

      **(ii)      A transaction is contemplated subject to the terms and conditions of Subsection (cc) of Section 7.1.**

**4.20      Insurance**

      **See Exhibit B, infra.**

**EXHIBIT B**

**Risk Insurance Policies**

| Insured | Insurer | Policy Number |
|---|---|---|
| Comtel Direct, LLC | Coface North America Insurance Company | 921156242 |
| Comtel Direct, LLC<br><br>(worker's comp) | The Charter Oak Fire Insurance Company, part of Traveler group | 2J947957 |
| CHT Holdings LLC<br><br>(all Borrower employees are also employees of CHT Holdings LLC, and are covered under the CHT policy | Humana Medical Plan, Inc. | 783258 |
| | | |

**EXHIBIT C**

**Principal Payment Amortization**

(see attached)

Loan Amortization Schedule
Varsatel Corp.

| Month # | Month | Beginning Balance | Interest | Payments | Principal | Ending Balance | Monthly Rate |
|---|---|---|---|---|---|---|---|
| | 07-Dec-18 | 10,000,000 | | | | 10,000,000 | |
| 1 | 31-Dec-18 | 10,000,000 | 114,247.31 | $114,247.31 | - | 10,000,000 | 1.42% |
| 1 | 31-Jan-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 2 | 28-Feb-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 3 | 31-Mar-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 4 | 30-Apr-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 5 | 31-May-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 6 | 30-Jun-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 7 | 31-Jul-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 8 | 31-Aug-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 9 | 30-Sep-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 10 | 31-Oct-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 11 | 30-Nov-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 12 | 31-Dec-19 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 13 | 31-Jan-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 14 | 29-Feb-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 15 | 31-Mar-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 16 | 30-Apr-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 17 | 31-May-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 18 | 30-Jun-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 19 | 31-Jul-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 20 | 31-Aug-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 21 | 30-Sep-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 22 | 31-Oct-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 23 | 30-Nov-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 24 | 31-Dec-20 | 10,000,000 | 141,666.67 | $141,666.67 | - | 10,000,000 | 1.42% |
| 25 | 31-Jan-21 | 10,000,000 | 141,666.67 | $248,525.76 | 106,859.09 | 9,893,141 | 1.42% |
| 26 | 28-Feb-21 | 9,893,141 | 140,152.83 | $248,525.76 | 108,372.93 | 9,784,768 | 1.42% |
| 27 | 31-Mar-21 | 9,784,768 | 138,617.55 | $248,525.76 | 109,908.21 | 9,674,860 | 1.42% |
| 28 | 30-Apr-21 | 9,674,860 | 137,060.51 | $248,525.76 | 111,465.24 | 9,563,395 | 1.42% |
| 29 | 31-May-21 | 9,563,395 | 135,481.42 | $248,525.76 | 113,044.34 | 9,450,350 | 1.42% |
| 30 | 30-Jun-21 | 9,450,350 | 133,879.96 | $248,525.76 | 114,645.80 | 9,335,704 | 1.42% |
| 31 | 31-Jul-21 | 9,335,704 | 132,255.81 | $248,525.76 | 116,269.95 | 9,219,434 | 1.42% |
| 32 | 31-Aug-21 | 9,219,434 | 130,608.65 | $248,525.76 | 117,917.10 | 9,101,517 | 1.42% |
| 33 | 30-Sep-21 | 9,101,517 | 128,938.16 | $248,525.76 | 119,587.60 | 8,981,930 | 1.42% |
| 34 | 31-Oct-21 | 8,981,930 | 127,244.00 | $248,525.76 | 121,281.75 | 8,860,648 | 1.42% |
| 35 | 30-Nov-21 | 8,860,648 | 125,525.85 | $248,525.76 | 122,999.91 | 8,737,648 | 1.42% |
| 36 | 31-Dec-21 | 8,737,648 | 123,783.35 | $248,525.76 | 124,742.41 | 8,612,906 | 1.42% |
| 37 | 31-Jan-22 | 8,612,906 | 122,016.16 | $248,525.76 | 126,509.59 | 8,486,396 | 1.42% |
| 38 | 28-Feb-22 | 8,486,396 | 120,223.94 | $248,525.76 | 128,301.81 | 8,358,094 | 1.42% |
| 39 | 31-Mar-22 | 8,358,094 | 118,406.34 | $248,525.76 | 130,119.42 | 8,227,975 | 1.42% |
| 40 | 30-Apr-22 | 8,227,975 | 116,562.98 | $248,525.76 | 131,962.78 | 8,096,012 | 1.42% |
| 41 | 31-May-22 | 8,096,012 | 114,693.50 | $248,525.76 | 133,832.25 | 7,962,180 | 1.42% |
| 42 | 30-Jun-22 | 7,962,180 | 112,797.55 | $248,525.76 | 135,728.21 | 7,826,452 | 1.42% |
| 43 | 31-Jul-22 | 7,826,452 | 110,874.73 | $248,525.76 | 137,651.03 | 7,688,801 | 1.42% |
| 44 | 31-Aug-22 | 7,688,801 | 108,924.67 | $248,525.76 | 139,601.08 | 7,549,199 | 1.42% |
| 45 | 30-Sep-22 | 7,549,199 | 106,946.99 | $248,525.76 | 141,578.76 | 7,407,621 | 1.42% |
| 46 | 31-Oct-22 | 7,407,621 | 104,941.29 | $248,525.76 | 143,584.46 | 7,264,036 | 1.42% |
| 47 | 30-Nov-22 | 7,264,036 | 102,907.18 | $248,525.76 | 145,618.58 | 7,118,418 | 1.42% |
| 48 | 31-Dec-22 | 7,118,418 | 100,844.25 | $248,525.76 | 147,681.51 | 6,970,736 | 1.42% |
| 49 | 31-Jan-23 | 6,970,736 | 98,752.10 | $248,525.76 | 149,773.66 | 6,820,963 | 1.42% |
| 50 | 28-Feb-23 | 6,820,963 | 96,630.30 | $248,525.76 | 151,895.46 | 6,669,067 | 1.42% |
| 51 | 31-Mar-23 | 6,669,067 | 94,478.45 | $248,525.76 | 154,047.31 | 6,515,020 | 1.42% |
| 52 | 30-Apr-23 | 6,515,020 | 92,296.11 | $248,525.76 | 156,229.64 | 6,358,790 | 1.42% |
| 53 | 31-May-23 | 6,358,790 | 90,082.86 | $248,525.76 | 158,442.90 | 6,200,347 | 1.42% |
| 54 | 30-Jun-23 | 6,200,347 | 87,838.25 | $248,525.76 | 160,687.51 | 6,039,660 | 1.42% |
| 55 | 31-Jul-23 | 6,039,660 | 85,561.85 | $248,525.76 | 162,963.91 | 5,876,696 | 1.42% |
| 56 | 31-Aug-23 | 5,876,696 | 83,253.19 | $248,525.76 | 165,272.57 | 5,711,423 | 1.42% |
| 57 | 30-Sep-23 | 5,711,423 | 80,911.83 | $248,525.76 | 167,613.93 | 5,543,809 | 1.42% |
| 58 | 31-Oct-23 | 5,543,809 | 78,537.30 | $248,525.76 | 169,988.46 | 5,373,821 | 1.42% |
| 59 | 30-Nov-23 | 5,373,821 | 76,129.13 | $5,449,949.97 | 5,373,820.84 | 0 | 1.42% |
| | | | 7,414,073.04 | 17,414,073.04 | 10,000,000.00 | | |

**EXHIBIT D**

**LOAN COMPLIANCE PACKAGE**

**Financial Statements and Reports**. For so long as there is any amount owing from the Borrower to the Lender in connection with Loan Agreement, the Borrower shall deliver or cause to be delivered to the Lender:

1.    Monthly bank  statements and bank reconciliations as may be reasonably requested by the Lender from time to time;

2.    Year-to-date general ledger, in Excel;

3.    A copy of the Borrower's internal month-end financial reporting package, which includes, but is not limited to:

    (a)    the Borrower's budget to actuals variance analysis with commentary for the month and year to date;

    (b)    the Borrower's month end aged accounts payable and accounts receivable listing;

    (c)    Monthly trial balances; and

    (d)    Monthly and year-to-date sales analysis contained therein;

4.    A completed Loan Compliance Certificate, which shall include a completed monthly compliance report containing information regarding, *inter alia*:

    (a)    the Borrower's month end closing cash balance;

    (b)    reconciled net cash balance and bank account statements; and

    (c)    Net working capital balance; and

5.    A consolidated monthly forecast model containing the projected statement of cash flows, income statement, and balance sheet for the Borrower for the term of the Loan, inputted with the most recent month-end results.

6.    A summary from Harrison Vargas of the near-term strategy of the company which includes, but is not limited to:

    (a)    A review of the deals they are aware of and currently negotiating including what new markets they are entering.

    (b)    An update on the status of the Borrower's side projects.

    (c)    A detailed summary of the deals they described in the month prior, what deals they were able to win and the reasons why and what deals they were not able to win and the reasons why.

**EXHIBIT E**

**FORM OF LOAN COMPLIANCE CERTIFICATE**

**COMPLIANCE CERTIFICATE**

_____, 20__

WBDH-BC Holdings Ltd.
Suite 810 – 570 Granville Street
Vancouver, British Columbia, V6C 3P1

Attention: Conrad Krebs

Dear Sirs/Mesdames:

Re:     Comtel Direct, LLC and Varsatel Corporation (the "**Borrower**")
         Month ended _____.

        I, _____, in my capacity as _____ of the Borrower, hereby certify for and on behalf of the Borrower, and without personal liability that:

I am familiar with and have examined the provisions of the loan agreement dated as of _____, 20___ between the Borrower, as borrower, WBDH-BC Holdings Ltd., as lender (as may be amended, restated, supplemented and otherwise modified from time to time, the "**Loan Agreement**") and have made such reasonable investigations of corporate records and reasonable inquiries of other officers and senior personnel of the Borrower, respectively, as are sufficient to enable me to make an informed statement herein. Capitalized terms used and not defined in this certificate shall have the meanings given to them in the Loan Agreement and all section references, unless stated otherwise, shall be references to sections of the Loan Agreement.

1.      Based on the foregoing and as of the date of this certificate:

        (a)      no Event of Default has occurred and is continuing;

        (b)      the covenants contained in the Loan Agreement have not been breached during the month ended and I am not aware of any financial or other information which leads me to believe that any of such covenants will be breached during the next month; and

        (c)      no Material Adverse Change (as defined in the Loan Agreement) has occurred during the month ended.

2.      Attached as Schedule "A" hereto is a copy of the required financial reporting sheet for Borrower for the month ended _____, 20___.

**COMTEL DIRECT, LLC**                    **VARSATEL CORPORATION**

By:_____        By:_____
Name:                                Name:
Title:                               Title:

**SCHEDULE "A"**

**TO THE LOAN COMPLIANCE CERTIFICATE**

The form shall be the form in Excel form as agreed upon by Lender and Borrower.

**EXHIBIT F**

**BORROWER OWNERSHIP**

(See attached)

<u>Comtel Direct. LLC:</u>

Harrison Vargas and Ginna Paulsen
1820 N. Corporate Lakes Blvd.
Suite 101
Weston, Fl. 33326

Varsatel Corporation

Harrison Vargas
1820 N. Corporate Lakes Blvd.
Suite 101
Weston, Fl. 33326

**EXHIBIT G**

**FORM SECURITY DOCUMENTS**

(See attached)

## NON-REVOLVING LINE OF CREDIT NOTE

**DATE OF ISSUE: December 5, 2018**

FOR VALUE RECEIVED, **COMTEL DIRECT, LLC**, a Florida limited liability company, and **VARSATEL CORPORATION**, a Florida corporation (individually and collectively, jointly and severally, the "**Borrower**") promises to pay to or to the order of **WBDH-BC HOLDINGS LTD.** (the "**Lender**") the outstanding principal sum of up to $10,000,000.00 or such lesser amount as shall equal the current balance of the Borrower's loan account with Lender for advances made hereunder as evidenced by Lender's ledger records on the outstanding principal balance in lawful currency of the United States (the "**Principal Sum**") and interest thereon upon and subject to the terms and conditions set out in that certain loan agreement dated as of the same date hereof between the Borrower and the Lender (the "**Loan Agreement**") at the address set out in Loan Agreement and due as set out in the Loan Agreement (capitalized terms used in this Note and not otherwise defined herein shall have the meanings given in the Loan Agreement) and subject to the following additional terms and conditions:

1.      **Maturity Date** – All unpaid principal, together with any accrued and unpaid interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) the date that is sixty (60) months from the date of issuance of this Note (the "**Maturity Date**") or (ii) the date on which such amounts are declared due and payable by the Lender upon or after the occurrence of an Event of Default under the Loan Agreement.

2.      **Issuance of Replacement Note** – The Borrower hereby covenants and agrees with the Lender that if this promissory note ("**Note**") becomes mutilated, lost, destroyed or stolen, the Borrower shall, upon receipt of a declaration of loss from the Lender in a form reasonably satisfactory to the Borrower, issue and deliver to the Lender a new promissory note of like date and tenor as the one mutilated, lost, destroyed or stolen, in exchange for and in place of and upon cancellation of such mutilated, lost, destroyed or stolen promissory note.

3.      **Lender's Non-Waiver of Rights** – Failure of the Lender to enforce any of its rights or remedies under this Note will not constitute a waiver of the rights of the Lender to enforce such rights and remedies thereafter.

4.      **Borrower's Waiver** – The Borrower hereby waives demand and presentment for payment, notice of non-payment, protest and notice of protest of this Note.

5.      **Security** – This Note shall be secured by the Security Agreements (as defined in the Loan Agreement) and the failure of the Borrower to pay the Principal Sum and accrued interest in accordance with the terms of the Loan Agreement shall constitute an "Event of Default" under the Loan Agreement.

6.      **Usury** – If the effective rate of interest, calculated in accordance with generally accepted actuarial practices and principles, would exceed the highest rate allowed by Applicable Law, then:

    (a)      the elements of return which fall within the term "interest" shall be reduced to the extent necessary to eliminate such excess; and

- 2 -

    (b)    any remaining excess that has been paid will be credited towards prepayment of the Principal Sum and otherwise as provided in the Loan Agreement.

7.    **Governing Law** – This Note (and any transactions, documents, instruments or other agreements contemplated in this Note) shall be construed and governed exclusively by the laws in force in Florida.

[*Signatures Appear on Following Page*]

- 3 -

**IN WITNESS WHEREOF** the Borrower has caused its duly authorized signatory to execute and deliver this Note to the Lender as of the day and year first above written.

**COMTEL DIRECT, LLC,**
a Florida limited liability company

By: _____

Name:  Ginna Paulsen

Title:  President


**VARSATEL CORPORATION,**
a Florida corporation

By: _____

Name:  Harrison Vargas

Title:  Chief Executive Officer

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of December 5, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time, this "**Security Agreement**"), is between **COMTEL DIRECT, LLC**, a Florida limited liability company, and **VARSATEL CORPORATION**, a Florida corporation (collectively and individually, jointly and severally, the "**Grantor**"), and **WBDH-BC HOLDINGS LTD**., as secured party (the "**Lender**") under the Loan Agreement referred to herein.

### PREMISES

WHEREAS, this Security Agreement is entered into in connection with that certain Loan Agreement, dated as of even date herewith (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Loan Agreement**"), between Grantor and Lender; and

WHEREAS, Grantor is required to execute and deliver this Security Agreement; and

WHEREAS, it is in the best interests of Grantor to execute this Security Agreement as Grantor will derive substantial direct and indirect benefits from the transactions contemplated by the Loan Agreement, and Grantor is willing to execute, deliver and perform its obligations under this Security Agreement to secure its obligations, under the Loan Agreement, and any other Transaction Document;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees, for the benefit of the Lender, as follows:

### ARTICLE I

SECTION 1.1.        Certain Terms.  The following terms, when used in this Security Agreement, including its preamble and recitals, shall have the following meanings (such definitions to be equally applicable to the singular and plural forms thereof):

(a)        "**Collateral**" has the meaning set forth in Section 2.1.

(b)        "**Computer Hardware and Software Collateral**" means (a) all computer and other electronic data processing hardware, integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories and all peripheral devices and other related computer hardware, including all operating system software, utilities and application programs in whatsoever form, (b) software programs (including both source code, object code and all related applications and data files), designed for use on the computers and electronic data processing hardware described in clause (a) above, (c) all firmware associated therewith, (d) all documentation (including flow charts, logic diagrams, manuals, guides, specifications, training materials, charts and pseudo codes) with respect to such hardware, software and firmware described in the preceding clauses (a) through (c), and (e) all rights with respect to all of the foregoing, including copyrights,

1

licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, improvements, error corrections, updates, additions or model conversions of any of the foregoing, in each case, to the extent Grantor holds any assignable interest therein.

(c)     "**Control Agreement**" means an authenticated record in form and substance reasonably satisfactory to the Lender that provides for the Lender to have "control" (as contemplated in the UCC) over certain Collateral.

(d)     "**Copyright Collateral**" means all copyrights of the Grantor, registered or unregistered and whether published or unpublished, now or hereafter in force in the United States including all of Grantor's rights, titles and interests in and to all copyrights registered in the United States Copyright Office (the "**U.S. Copyright Office**") or anywhere else in the world, including without limitation those copyrights referred to on Schedule III hereto, and registrations and recordings thereof and all applications for registration thereof, whether pending or in preparation, all copyright licenses, the right to sue for past, present and future infringements of any of the foregoing, all rights corresponding thereto, all extensions and renewals of any thereof and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and Proceeds of suit, which are owned or licensed by Grantor.

(e)     "**Transaction Document**" shall have the meaning set forth in the Loan Agreement.

(f)     "**Distributions**" means all cash, cash dividends, stock dividends, other distributions, liquidating dividends, shares of stock resulting from (or in connection with the exercise of) stock splits, reclassifications, warrants, options, non-cash dividends, and all other distributions or payments (whether similar or dissimilar to the foregoing) on or with respect to, or on account of, any Pledged Share or Pledged Interest or other rights or interests constituting Collateral.

(g)     "**Equipment**" has the meaning set forth in Section 2.1.

(h)     "**Equity Interest**" means any shares, interests, participation, or other equivalents (however designated) of corporate stock, membership interests or partnership interests (or any other ownership interests) of Grantor in any other person.

(i)     "**General Intangibles**" means all "general intangibles" and all "payment intangibles", each as defined in the UCC, and shall include all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations and all Intellectual Property Collateral (in each case, regardless of whether characterized as general intangibles under the UCC).

(j)     "**Governmental Approval**" has the meaning set forth in Section 2.1.

(k)     "**Indemnified Parties**" has the meaning set forth in Section 6.3.

2

(l)      "**Intellectual Property Collateral**" means, collectively, the Computer Hardware and Software Collateral, the Copyright Collateral, the Patent Collateral, the Trademark Collateral and the Trade Secrets Collateral.

(m)      "**Inventory**" has the meaning set forth in Section 2.1.

(n)      "**Loan Agreement**" has the meaning set forth in the first recital.

(o)      "**Patent Collateral**" means (a) all inventions and discoveries, whether patentable or not, all letters patent and applications for letters patent in the United States, including without limitation those patents referred to on Schedule II hereto, and any patent applications in preparation for filing, (b) all reissues, divisions, continuations, continuations in part, extensions, renewals and reexaminations of any of the items described in clause (a), (c) all patent licenses, and other agreements providing the Grantor with the right to use any items of the type referred to in clauses (a) and (b) above, and (d) all proceeds of, and rights associated with, the foregoing (including licenses, royalties income, payments, claims, damages and proceeds of infringement suits), the right to sue third parties for past, present or future infringements of any patent or patent application, and for breach or enforcement of any patent license.

(p)      "**person**" or "**Person**" includes a natural person, a partnership, a joint venture, a trust, a fund, an unincorporated organization, a limited liability company, a corporation, an association, a Governmental Entity, and any other incorporated or unincorporated entity.

(q)      "**Pledged Interests**" means all Equity Interests or other ownership interests of any Pledged Interests Issuer held by Grantor; all registrations, certificates, articles, by-laws, regulations, limited liability company agreements or constitutive agreements governing or representing any such interests; all options and other rights, contractual or otherwise, at any time existing with respect to such interests, as such interests are amended, modified, or supplemented from time to time, and together with any interests in any Pledged Interests Issuer taken in extension or renewal thereof or substitution therefor.

(r)      "**Pledged Interests Issuer**" means each person that is an issuer of Pledged Shares or Pledged Interests.

(s)      "**Pledged Property**" means all Pledged Interests, Pledged Shares, all assignments of any amounts due or to become due with respect to the Pledged Interests or the Pledged Shares, all other instruments which are now being delivered by the Grantor to the Lender or may from time to time hereafter be delivered by the Grantor to the Lender for the purpose of pledging under this Security Agreement or any other Transaction Document, and all proceeds of any of the foregoing.

(t)      "**Pledged Shares**" means all Equity Interests of any Pledged Interests Issuer held by Grantor which are evidenced by a certificate delivered by Grantor to the Lender as Pledged Property hereunder.

(u)      "**Receivables**" has the meaning set forth in Section 2.1.

3

(v)      "**Related Contracts**" has the meaning set forth in Section 2.1.

(w)      "**Secured Obligations**" has the meaning set forth in Section 2.2.

(x)      "**Security Agreement**" has the meaning set forth in the preamble.

(y)      "**Termination Date**" means the date that all Secured Obligations have been paid in full in cash other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted.

(z)      "**Trademark Collateral**" means (a) (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos and other source or business identifiers, and all goodwill of the business associated therewith, now existing or hereafter adopted or acquired, including without limitation those trademarks referred to on Schedule II hereto, whether currently in use or not, all registrations and recordings thereof and all applications in connection therewith, whether pending or in preparation for filing, including registrations, recordings and applications in the United States Patent and Trademark Office ("**USPTO**") or in any office or agency of the United States of America, or any state thereof or any other country or political subdivision thereof or otherwise, and all common law rights relating to the foregoing, and (ii) the right to obtain all reissues, extensions or renewals of the foregoing (collectively referred to as the "**Trademarks**" and each, a "**Trademark**"), (b) all Trademark licenses for the grant by or to the Grantor of any right to use any Trademark, (c) all of the goodwill of the business connected with the use of, and symbolized by the items described in, clause (a), and to the extent applicable clause (b), (d) the right to sue third parties for past, present and future infringements of any Trademark Collateral described in clause (a) and, to the extent applicable, clause (b), and (e) all Proceeds of, and rights associated with, the foregoing, including any claim by the Grantor against third parties for past, present or future infringement or dilution of any Trademark, Trademark registration or Trademark license, or for any injury to the goodwill associated with the use of any such Trademark or for breach or enforcement of any Trademark license and all rights corresponding thereto throughout the world.

(aa)      "**Trade Secrets Collateral**" means all common law and statutory trade secrets and all other confidential, proprietary or useful information and all know how obtained by or used in or contemplated at any time for use in the business of Grantor, (all of the foregoing being collectively called a "**Trade Secret**"), including all Documents and things embodying, incorporating or referring in any way to such Trade Secret, all Trade Secret licenses, and including the right to sue for and to enjoin and to collect damages for the actual or threatened misappropriation of any Trade Secret and for the breach or enforcement of any such Trade Secret license.

(bb)      "**UCC**" means the Uniform Commercial Code, as in effect in the State of Florida or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests, in each case, as the same may be amended from time to time.

4

(cc)     "**Event of Default**" shall have the same meaning as provided in the Loan Agreement.

SECTION 1.2.     <u>Loan Agreement Definitions</u>.  Unless otherwise defined herein or the context otherwise requires, capitalized terms used in this Security Agreement, including its preamble and recitals, have the meanings provided in the Loan Agreement.

SECTION 1.3.     <u>UCC Definitions</u>.  Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the UCC are used in this Security Agreement, including its preamble and recitals, with such meanings.

SECTION 1.4.     <u>Miscellaneous</u>.  Article, Section, Schedule, and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Security Agreement, unless otherwise specified.  All references to instruments, documents, contracts, and agreements (including this Security Agreement) are references to such instruments, documents, contracts, and agreements as the same may be amended, supplemented, and otherwise modified from time to time, unless otherwise specified and shall include all schedules and exhibits thereto unless otherwise specified.  The words "hereof", "herein", and "hereunder" and words of similar import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement.  The term "including" means "including, without limitation".  Paragraph headings have been inserted in this Security Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Security Agreement and shall not be used in the interpretation of any provision of this Security Agreement.

ARTICLE II

SECTION 2.1.     <u>Grant of Security Interest</u>.  As collateral security for the payment and performance of the Secured Obligations (as defined below) Grantor hereby pledges, hypothecates, assigns, charges, mortgages, delivers, and transfers to the Lender, and hereby grants to the Lender, a continuing security interest in all of Grantor's right, title and interest in, to and under, all of the following, whether now owned or hereafter acquired by Grantor, and wherever located and whether now owned or hereafter existing or arising (collectively, the "**Collateral**"):

(a)     all equipment in all of its forms (including, but not limited to vehicles, titled motor vehicles, rolling stock, vessels, wherever located, and all machinery, equipment, facilities, supplies (including software that is imbedded in and part of the equipment), and similar items which relate to the above, any and all additions, substitutions and replacements of any of the foregoing, wherever located together with all improvements thereon and all attachments, components, parts, equipment and accessories installed thereon or affixed thereto, and any other item constituting "equipment" under the UCC (any and all of the foregoing being the "**Equipment**");

(b)     all inventory in all of its forms of Grantor, wherever located, and all accessions thereto, products thereof and documents therefor, and any other item constituting "inventory" under the UCC (any and all of the foregoing being the "**Inventory**");

5

(c)     all accounts, money, payment intangibles, deposit accounts (including the Blocked Accounts and all amounts on deposit therein and all cash equivalent investments carried therein and all proceeds thereof), contracts, contract rights, all rights constituting a right to the payment of money, chattel paper, documents, documents of title, instruments, letters of credit, letter of credit rights and General Intangibles of Grantor, whether or not earned by performance or arising out of or in connection with the sale or lease of goods or the rendering of services, including all moneys due or to become due in repayment of any loans or advances, all rights of Grantor now or hereafter existing in and to all security agreements, guaranties, leases, agreements and other contracts securing or otherwise relating to any such accounts, money, payment intangibles, deposit accounts, contracts, contract rights, rights to the payment of money, chattel paper, documents, documents of title, instruments, letters of credit, letter of credit rights and General Intangibles, and any other item constituting "accounts" under the UCC (any and all of the foregoing being the "**Receivables**", and any and all such security agreements, guaranties, leases, agreements and other contracts being the "**Related Contracts**");

(d)     all Intellectual Property Collateral of Grantor;

(e)     all governmental approvals, permits, licenses, authorizations, consents, rulings, tariffs, rates, certifications, waivers, exemptions, filings, claims, orders, judgments and decrees (each a "**Governmental Approval**"), to the extent a security interest may be granted therein; provided that any Governmental Approval that by its terms or by operation of law would be void, voidable, terminable or revocable if mortgaged, pledged or assigned hereunder is expressly excepted and excluded from the liens and terms of this Security Agreement, including the grant of security interest in this Section 2.1;

(f)     all interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect Grantor against fluctuations in interest rates or currency exchange rates and all commodity hedge, commodity swap, exchange, forward, future, floor, collar or cap agreements, fixed price agreements and all other agreements or arrangements designed to protect Grantor against fluctuations in commodity prices (including, without limitation, any hedging arrangement);

(g)     to the extent not included in the foregoing, all bank accounts, investment property, fixtures and supporting obligations;

(h)     all Pledged Interests, whether now or hereafter delivered to the Lender in connection with this Security Agreement, interest, and other payments and rights with respect to such Pledged Interests;

(i)     (A) all policies of insurance now or hereafter held by or on behalf of Grantor, including casualty, foreign credit insurance, and any title insurance but excluding liability insurance, and director and officer insurance, (B) all proceeds of such insurance, and (C) all rights, now or hereafter held by Grantor to any warranties of any manufacturer or contractor of any other person;

(j)     all accessions, substitutions, replacements, products, offspring, rents, issues, profits, returns, income and proceeds of and from any and all of the foregoing Collateral

(including proceeds which constitute property of the types described in this Section 2.1 and proceeds deposited from time to time in any lock boxes of Grantor, and, to the extent otherwise included, all payments and proceeds under insurance (whether or not the Lender is the loss payee thereof), or any condemnation award, indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the Collateral);

(k)     any and all liens and security interests (together with the documents evidencing such security interests) granted to Grantor by an obligor to secure such obligor's obligations owing under any account, instrument, chattel paper, general intangible or contract that is pledged hereunder or with respect to which a security interest in Grantor's rights in such account Instrument, Chattel Paper, general intangible or contract is granted hereunder;

(l)     any and all guaranties given by any person for the benefit of such Grantor which guarantees the obligations of an obligor under any account, Instrument, Chattel Paper, general intangible or contract which is pledged hereunder;

(m)     all of Grantor's other personal property, fixtures and rights of every kind and description and interests therein, including without limitation, all other "Accounts", "Certificated Securities", "Chattel Paper", "Commercial Tort Claims", "Commodity Accounts", "Commodity Contracts", "Deposit Accounts", "Documents", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter of Credit Rights", "Letters of Credit", "Money", "Payment Intangibles", "Proceeds", "Securities", "Securities Account", "Security Entitlements", "Supporting Obligations" and "Uncertificated Securities" as such terms are defined in the UCC;

(n)     all books, correspondence, credit files, records, invoices, tapes, cards, computer runs, writings, data bases, information in all forms, paper and documents and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing in this Section 2.1; and

(o)     all proceeds and products of any of the foregoing in this Section 2.1.

SECTION 2.2.     Security for Obligations.

(a)     This Security Agreement, and the Collateral in which the Lender is granted a security interest hereunder by Grantor, secures the prompt and indefeasible payment in full of the Indebtedness of all Credit Parties incurred in connection with the Loan and the performance of all Credit Parties' obligations, whether for principal, interest, costs, fees, expenses or otherwise, howsoever created, arising or evidenced, whether direct or indirect, primary or secondary, fixed or absolute or contingent, joint or several, or now or hereafter existing under the Loan Agreement, this Security Agreement and each other Transaction Document (all such obligations being the "**Secured Obligations**").

(b)     Notwithstanding anything contained herein to the contrary, it is the intention of Grantor and the Lender that the amount of the Secured Obligations secured by Grantor's interests in any of its Collateral shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer and other similar law, rule or regulation of any Governmental Authority applicable to Grantor. Accordingly, notwithstanding anything to

the contrary contained in this Security Agreement or in any other agreement or instrument executed in connection with the payment of any of the Secured Obligations, the amount of the Secured Obligations secured by Grantor's interests in any of its Collateral pursuant to this Security Agreement shall be limited to an aggregate amount equal to the largest amount that would not render Grantor's obligations hereunder or the liens and security interest granted to the Lender hereunder subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provision of any other applicable law.

SECTION 2.3.        Continuing Security Interest; Transfer of Loans; **Reinstatement**. This Security Agreement shall create continuing security interests in the Collateral and shall (a) remain in full force and effect until the Termination Date, (b) be binding upon Grantor and its successors, transferees and assigns as permitted under the Loan Agreement, and (c) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the Lender and its successors, transferees and assigns, subject to the limitations as set forth in the Loan Agreement.  Without limiting the generality of the foregoing clause (c), Lender may assign or otherwise transfer (in whole or in part) any of the Secured Obligations to the extent provided in the Loan Agreement, and any successor or assignee thereof shall thereupon become vested with all the rights and benefits in respect thereof granted to Lender under any Transaction Document (including this Security Agreement), or otherwise, subject, however, to any contrary provisions in such assignment or transfer, and as applicable to the provisions of the Loan Agreement.  **If at any time all or any part of any payment theretofore applied by Lender to any of the Secured Obligations is or must be rescinded or returned by Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy, reorganization or other similar proceeding of Grantor or any other person), such Secured Obligations shall, for purposes of this Security Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued to be in existence, notwithstanding any application by Lender or any termination agreement or release provided to the Grantor, and this Security Agreement shall continue to be effective or reinstated, as the case may be, as to such Secured Obligations, all as though such application by the Lender had not been made**.

SECTION 2.4.        Grantors Remain Liable.        Anything herein to the contrary notwithstanding, (a) Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and will perform all of its duties and obligations under such contracts and agreements to the same extent as if this Security Agreement had not been executed except to the extent the failure to do so perform could not reasonably be expected to result in a material adverse effect, (b) the exercise by the Lender of any of its rights hereunder shall not release Grantor from any of its duties or obligations under any such contracts or agreements included in the Collateral, and (c) the Lender shall not have any obligation or liability under any contracts or agreements included in the Collateral by reason of this Security Agreement, nor shall the Lender be obligated to perform any of the obligations or duties of Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

SECTION 2.5.        Delivery of Pledged Property.

(a)     Other than as provided in the last sentence of Section 4.5 below, all certificates or instruments representing or evidencing any Collateral shall be delivered to and held by or on behalf of the Lender pursuant hereto, shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary endorsements or instruments of transfer or assignment, duly executed in blank.

(b)     To the extent any of the Collateral constitutes an "uncertificated security" (as defined in the UCC) or a "security entitlement" (as defined in the UCC), Grantor shall take and cause the appropriate person (including any issuer, entitlement holder or securities intermediary thereof) to take all actions necessary to grant "control" (as defined in the UCC) to the Lender over such Collateral.

SECTION 2.6.     Distributions.  In the event that any Distribution with respect to any Pledged Shares or Pledged Interests pledged hereunder is permitted to be paid (in accordance with the Loan Agreement), such Distribution or payment may be paid directly to Grantor.  If any Distribution is made in contravention of the Loan Agreement, Grantor shall hold the same segregated and in trust for the Lender and immediately pay over such Distribution to the Lender to be applied as payment for part or all of the Secured Obligations as determined by the Lender in its sole discretion.

SECTION 2.7.     Security Interest Absolute, etc.  This Security Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest, and shall remain in full force and effect until the Termination Date.  All rights of the Lender and the security interests granted to the Lender hereunder, and all obligations of Grantor hereunder, shall, in each case, be absolute, unconditional and irrevocable irrespective of (a) any lack of validity, legality or enforceability of any Transaction Document, (b) the failure of the Lender (i) to assert any claim or demand or to enforce any right or remedy against the Grantor or any other person under the provisions of any Transaction Document or otherwise, or (ii) to exercise any right or remedy against any other guarantor of, or collateral securing, any Secured Obligations, (c) any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other extension, compromise or renewal of any Secured Obligations, (d) any reduction, limitation, impairment or termination of any Secured Obligations (except in the case of the occurrence of the Termination Date) for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and Grantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations or otherwise, (e) any amendment to, rescission, waiver, or other modification of, or any consent to or departure from, any of the terms of any Transaction Document, (f) any addition, exchange or release of any Collateral of the Secured Obligations, or any surrender or non-perfection of any collateral, or any amendment to or waiver or release or addition to, or consent to or departure from, any other guaranty held by the Lender securing any of the Secured Obligations, or (g) any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Grantor, any surety or any guarantor.

SECTION 2.8.     Election of Remedies.  Except as otherwise provided in the Loan Agreement, if Lender may, under applicable law, proceed to realize its benefits under this

Security Agreement or the other Transaction Documents giving Lender a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Security Agreement.  If, in the exercise of any of its rights and remedies Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against Grantor or any other person, whether because of any applicable laws pertaining to "election of remedies" or the like, Grantor hereby consents to such action by Lender and waives any claim based upon such action, even if such action by Lender shall result in a full or partial loss of any rights of subrogation that Grantor might otherwise have had but for such action by Lender.

ARTICLE III

In order to induce the Lender to enter into the Loan Agreement and make Loans thereunder Grantor represents and warrants unto Lender as set forth in this Article (which representations and warranties shall be true and correct in all material respects on the date hereof).

SECTION 3.1.        Validity, etc.  This Security Agreement and the other Transaction Documents to which Grantor is a party constitute the legal, valid and binding obligations of Grantor, enforceable against Grantor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 3.2.        Ownership, No Liens, etc.  Grantor is the legal and beneficial owner of, and has good and marketable title to (and has full right and authority to pledge, grant and assign) the Collateral, free and clear of all liens, except Permitted Encumbrances (as defined in the Loan Agreement).  No effective UCC financing statement or other filing similar in effect covering all or any part of the Collateral is on file in any recording office, except those filed in favor of Lender relating to this Security Agreement, Permitted Encumbrances, or as to which a duly authorized termination statement relating to such UCC financing statement or other instrument has been delivered to Lender on the Effective Date or as to which Lender is otherwise authorized to file termination statements.  This Security Agreement creates a valid security interest in the Collateral, securing the payment of the Secured Obligations, and, except for the proper filing of the applicable financing statements and applications for certificates of title with the filing offices listed on Schedule I attached hereto, Lender taking possession of titles to titled vehicles and equipment and the execution and delivery of Control Agreements, all filings and other actions necessary to perfect and protect such security interest, in those portions of Collateral that can be perfected by, amongst other things, the (i) filing of a financing statement or other recorded document, (ii) taking possession to titles to titled vehicles or equipment or (iii) entering into of a Control Agreement, have been duly taken and such security interest shall be a first priority security interest subject to Permitted Encumbrances which by their nature have priority over the lien in favor of Lender.

SECTION 3.3.        As to Investment Property.  All Transaction Documents have been duly authorized, executed, endorsed, issued and delivered, and are the legal, valid and binding obligation of the issuers thereof, and, as of the date hereof.

SECTION 3.4.       Grantor's Name, Location, etc.

(a)       Other than as otherwise permitted pursuant to any Transaction Document, (i) the jurisdiction in which Grantor is located for purposes of Sections 9-301 and 9-307 of the UCC is set forth on Schedule I hereto, (ii) the place of business of Grantor or, if Grantor has more than one place of business, the chief executive office of Grantor and the office where Grantor keeps its records concerning the Receivables, and all originals of all Chattel Paper which evidence Receivables, is set forth on Schedule I hereto, and (iii) Grantor's federal taxpayer identification number is set forth on Schedule I hereto.

(b)       Grantor has not been known by any legal name different from the one set forth on the signature page hereto, nor has Grantor been the subject of any merger or other corporate reorganization, except as set forth on Schedule I hereto.

(c)       Grantor does not maintain any Deposit Accounts, Securities Accounts or Commodity Accounts with any person, in each case, except as set forth on Schedule II or as otherwise disclosed to Lender.

(d)       None of the Receivables is evidenced by a promissory note or other instrument unless such promissory note or instrument has been delivered to the Lender (with appropriate endorsements).

(e)       Grantor is not the beneficiary of any Letters of Credit except as set forth on Item D of Schedule I, and as subsequently disclosed to Lender by written notification.

(f)       Grantor does not have Commercial Tort Claims except as set forth on Item E of Schedule I, and as subsequently disclosed to Lender by written notification.

(g)       Grantor has not consented to, and is otherwise unaware of, any person (other than the Lender) having control (within the meaning of Section 9-104 of the UCC) over, or any other interest in any of Grantor's rights in respect of the foregoing, other than Permitted Encumbrances.

SECTION 3.5.       Possession of Inventory, Control; etc.  Grantor (a) has exclusive possession, subject to Permitted Encumbrances, of the Equipment and Inventory except as permitted under the Transaction Documents, and (b) is the sole owner of its Accounts and no other person (other than the Lender) has "ownership" of, or any other interest in, any of its Accounts or any other securities or property credited thereto except as permitted pursuant to the Transaction Documents, including a Control Agreement and other Permitted Encumbrances.

SECTION 3.6.       Negotiable Documents, Instruments and Chattel Paper.  Grantor has, contemporaneously herewith, delivered to the Lender possession of all originals of all Documents, Instruments, promissory notes and tangible Chattel Paper owned or held by Grantor (duly endorsed, in blank, if requested by the Lender).

SECTION 3.7.       Intellectual Property Collateral. Grantor represents that except for any Patent Collateral, Trademark Collateral, and Copyright Collateral specified on Schedule II hereto, and any and all Trade Secrets Collateral, Grantor does not own and has no interests in

11

any Intellectual Property Collateral as of the date hereof, other than the Computer Hardware and Software Collateral.  Grantor further represents and warrants that, with respect to all Intellectual Property Collateral, except as set forth on Schedule II hereto, (a) such Intellectual Property Collateral is valid, unexpired and enforceable and has not been abandoned or adjudged invalid or unenforceable, in whole or in part, unless such Intellectual Property Collateral is not necessary or useful in the Grantor's business, (b) Grantor is the sole and exclusive owner or a licensee of the entire and unencumbered right, title and interest in and to such Intellectual Property Collateral, subject to Permitted Encumbrances, and to the knowledge of Grantor, no claim has been made that the use of such Intellectual Property Collateral does or may, infringe, misappropriate, or otherwise violate any of the rights of any third party in any material respects, (c) with respect to federally registered Intellectual Property Collateral, Grantor has made all necessary filings and recordations to protect its interest in such material Intellectual Property Collateral,  in the USPTO or U.S. Copyright Office, as applicable, (d) Grantor has taken all reasonable steps to safeguard its Trade Secrets and to its knowledge none of the Trade Secrets of Grantor has been, divulged, disclosed or appropriated for the benefit of any person other than Grantor or any Affiliate, (e) to Grantor's knowledge, no third party is infringing upon any material Intellectual Property Collateral owned or used by Grantor in any material respect, or any of its licensees, (f) no settlement, covenants not to sue, nonassertion assurances, or releases have been entered into by Grantor or to which Grantor is bound that adversely affects its rights to own or use any material Intellectual Property Collateral, (g) Grantor has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale or transfer of any Intellectual Property Collateral for purposes of granting a security interest or as Collateral that has not been terminated or released, (h) Grantor uses adequate standards of quality in the provision of all services rendered under or in connection with any Trademarks and has taken all commercially reasonable action necessary to insure that any licensees of any Trademarks owned by Grantor use such adequate standards of quality, (i) the consummation of the transactions contemplated by the Loan Agreement and this Security Agreement will not result in the termination or material impairment of any material portion of the Intellectual Property Collateral, and (j) Grantor owns directly or is entitled to use by license or otherwise, any patents, Trademarks, tradenames, Trade Secrets, and copyrights with respect to any of the foregoing used in, and necessary for the conduct of Grantor's business in any material respect.  The foregoing is not a representation by Grantor that any such collateral in fact exists, except as expressly identified.

SECTION 3.8.      Authorization, Approval, etc.  Except as have been obtained or made and are in full force and effect, no Governmental Approval, authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required either (a) for the grant by Grantor of the security interest granted hereby or for the execution, delivery and performance of this Security Agreement by Grantor, or (b) for the perfection or maintenance of the security interests hereunder including the first priority (subject to Permitted Encumbrances) nature of such security interest (except with respect to the recordation of applicable filing statements and notices) or the exercise by the Lender of its rights and remedies hereunder.

SECTION 3.9.      Best Interests.  Grantor will, as a result of being a Borrower or Affiliate of the Borrower (as such term is defined in the Loan Agreement), derive substantial direct and indirect benefits from the Loans and other extensions of credit made from time to time

to Grantor by the Lender, and Grantor agrees that the Lender is relying on this representation in agreeing to make such Loans and other extensions of credit pursuant to the Loan Agreement.

ARTICLE IV

Grantor covenants and agrees that, until the Termination Date, it will perform, comply with and be bound by the obligations set forth below.

SECTION 4.1.  As to Accounts.

(a)  It is hereby confirmed and agreed that (i) deposits in any of Grantor's accounts (including the Blocked Accounts) are subject to a security interest as contemplated hereby and (ii) such accounts for which Lender has a Control Agreement in place pursuant to this Agreement or any other Transaction Document (including the Blocked Accounts) shall be under the "control" of the Lender pursuant to Section 9-104 of the UCC.

(b)  Grantor shall not adjust, settle, or compromise the amount or payment of any Receivable, nor release wholly or partly any account debtor or obligor thereof, nor allow any credit or discount thereon, except as permitted by the Loan Agreement; provided that, the Grantor may make such adjustments, settlements or compromises and release wholly or partly any account debtor or obligor thereof and allow any credit or discounts thereon so long as (i) no Event of Default has occurred and is continuing, (ii) such action is taken in the ordinary course of business and consistent with past practices, and (iii) such action is, in Grantor's good faith business judgment, commercially reasonable.

SECTION 4.2.  As to Grantor's Use of Collateral.

(a)  Subject to the Loan Agreement and clause (b) below, Grantor (i) may in the ordinary course of its business, at its own expense use and operate the Collateral, (ii) shall, at its own expense, endeavor to collect in the ordinary course of business consistent with past practices, as and when due, all amounts due with respect to any of the Collateral, including the taking of such action with respect to such collection as the Lender may reasonably request following the occurrence and during the continuance of an Event of Default, and (iii) may grant, in the ordinary course of business, to any party obligated on any of the Collateral, any rebate, refund or allowance to which such party may be lawfully entitled.

(b)  At any time following the occurrence and during the continuance of an Event of Default, whether before or after the maturity of any of the Secured Obligations, Lender may (i) revoke any or all of the rights of Grantor set forth in clause (a), (ii) notify any parties obligated on any of the Collateral to make payment to the Lender of any amounts due or to become due thereunder, and (iii) enforce collection of any of the Collateral by suit or otherwise and surrender, release, or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby.

(c)  Upon request of the Lender following the occurrence and during the continuance of an Event of Default, Grantor will, at its own expense, notify any parties obligated

13

on any of the Collateral to make payment to the Lender of any amounts due or to become due thereunder.

(d)     At any time following the occurrence and during the continuation of an Event of Default, the Lender may endorse, in the name of the Grantor, any item, howsoever received by the Lender, representing any payment on or other Proceeds of any of the Collateral.

SECTION 4.3.     <u>As to Equipment and Inventory</u>.  Grantor hereby agrees that it shall (a) keep all of the Equipment and Inventory located in a jurisdiction within the United States of America and Canada where all representations and warranties set forth in Article III shall be true and correct in all material respects with respect to such Collateral, and (b) pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory, except to the extent the validity thereof is being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside.

SECTION 4.4.     <u>As to Intellectual Property Collateral</u>.  Grantor covenants and agrees to comply with the following provisions as such provisions relate to any Intellectual Property Collateral material to the operations or business of Grantor:

(a)     Grantor will not (i) do or fail to perform any act whereby any material Patent Collateral may lapse or become abandoned or dedicated to the public, (ii) permit any of its licensees to (A) fail to continue to use any of the Trademark Collateral in order to maintain all of the Trademark Collateral in full force free from any claim of abandonment for non-use, (B) fail to employ all of the Trademark Collateral registered with any federal authority with an appropriate notice of such registration, (C) use any of the Trademark Collateral registered with any federal, state or foreign authority except in material compliance with the uses for which registration or application for registration of all of the Trademark Collateral has been made, or (D) do or permit any act or knowingly omit to do any act whereby any of the federally registered Trademark Collateral may lapse or become invalid, or (iii) do or permit any act or knowingly omit to do any act whereby any of the Copyright Collateral or any of the Trade Secrets Collateral may lapse or become invalid or placed in the public domain except upon expiration of the end of an unrenewable term of a registration thereof, unless, in the case of any of the foregoing requirements in clauses (i), (ii) and (iii), Grantor shall reasonably and in good faith determine that any of such Intellectual Property Collateral is of negligible economic value to Grantor is no longer used or useful in Grantor's business;

(b)     Grantor shall promptly notify the Lender if it knows that any application or registration relating to any material item of federally registered Intellectual Property Collateral has become abandoned or dedicated to the public or placed in the public domain or invalid or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the USPTO, the U.S. Copyright Office) regarding Grantor's ownership of any of the Intellectual Property Collateral, its right to register the same or to keep and maintain and enforce the same;

(c)     in no event will Grantor or any of its agents, employees, designees or licensees file an application for the registration of any material Intellectual Property Collateral

with the USPTO, or the U.S. Copyright Office, unless it promptly informs the Lender, and upon request of the Lender (subject to the terms of the Loan Agreement), executes and delivers all agreements, instruments and documents as the Lender may reasonably request to evidence the Lender's security interest in such Intellectual Property Collateral;

(d)     Grantor will take all necessary steps, including in any proceeding before the USPTO, or the U.S. Copyright Office (subject to the terms of the Loan Agreement), to maintain and pursue any application (and to obtain the relevant registration) filed with respect to, and to maintain any registration of, each material Intellectual Property Collateral, including the filing of applications for renewal, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and the payment of fees and taxes (except to the extent that dedication, abandonment or invalidation is permitted under the foregoing clause (a) or (b));

(e)     following the obtaining of an interest in any material Intellectual Property Collateral by Grantor, Grantor shall deliver a supplement to Schedule II identifying new Intellectual Property Collateral; and

(f)     following the obtaining of an interest in any material Intellectual Property Collateral by Grantor or, following the occurrence and during the continuance of an Event of Default, upon the request of the Lender, Grantor shall deliver all agreements, instruments and documents the Lender may reasonably request to evidence the Lender's security interest in such Intellectual Property Collateral and as may otherwise be required to acknowledge or register or perfect the Lender's interest in any part of such item of Intellectual Property Collateral unless Grantor shall determine in good faith (with the consent of the Lender) that any Intellectual Property Collateral is of negligible economic value to Grantor.

SECTION 4.5.        As to Letter of Credit Rights.

(a)     Grantor, by granting a security interest in its Letter of Credit Rights to the Lender, intends to (and hereby does) collaterally assign to the Lender its rights (including its contingent rights) to the Proceeds of all Letter of Credit Rights of which it is or hereafter becomes a beneficiary or assignee. Grantor will comply with the reporting requirements in the Loan Agreement. With respect to letters of credit, Grantor will, upon request of Lender, request that the issuer and each nominated person (if any) with respect thereto consent to an assignment of the Proceeds thereof in a consent agreement in form and substance reasonably satisfactory to the Lender.

(b)     After the occurrence of an Event of Default, Grantor will, promptly upon request by the Lender, (i) notify (and Grantor hereby authorizes the Lender to notify) the issuer and each nominated person with respect to each of the Letters of Credit that the Proceeds thereof have been assigned to the Lender hereunder and any payments due or to become due in respect thereof are to be made directly to the Lender and (ii) arrange for the Lender to become the transferee beneficiary of each Letter of Credit.

SECTION 4.6.        As to Commercial Tort Claims.  Grantor covenants and agrees that, until the Termination Date, it shall deliver to the Lender a supplement to Schedule I in form and substance reasonably satisfactory to the Lender, identifying such new Commercial Tort Claims.

15

SECTION 4.7.    As to Electronic Chattel Paper and Transferable Records.    If Grantor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the U.S. Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the U.S. Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, Grantor shall promptly notify the Lender thereof and, at the request of the Lender, shall take such action as the Lender may request to vest in the Lender control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  The Lender agrees with Grantor that the Lender will arrange, pursuant to procedures reasonably satisfactory to the Lender and so long as such procedures will not result in the Lender's loss of control, for Grantor to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the U.S. Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the U.S. Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Grantor with respect to such electronic chattel paper or transferable record.

SECTION 4.8.    Transfers and Other Liens. The Grantor shall not: (a) sell, assign, (by operation of law or otherwise), abandon or otherwise dispose of any of the Collateral, except Inventory in the ordinary course of business or Inventory or Collateral as specifically permitted by the Loan Agreement, or (b) create or suffer to exist any lien or other charge or encumbrance upon or with respect to any of the Collateral to secure Indebtedness of any person or entity, except for the security interest created by this Security Agreement and except for Permitted Encumbrances.

SECTION 4.9.    Further Assurances, etc.  Grantor warrants and shall defend the right and title herein granted unto the Lender in and to the Collateral (and all right, title and interest represented by the Collateral) against the claims and demands of all persons whomsoever, subject to Permitted Encumbrances.  Grantor agrees that, from time to time at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Lender may reasonably request, in order to perfect, preserve and protect any security interest granted or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral subject to the terms hereof.  Grantor agrees that, upon the acquisition after the date hereof by Grantor of any Collateral, with respect to which the security interest granted hereunder is not perfected automatically upon such acquisition, to take such actions with respect to such Collateral or any part thereof as required by the Transaction Documents. Without limiting the generality of the foregoing, Grantor will:

(a)    if any Collateral shall be evidenced by an Instrument, negotiable Document, promissory note or tangible Chattel Paper, deliver and pledge to the Lender hereunder such Instrument, negotiable Document, promissory note, Pledged Note or tangible Chattel Paper duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Lender;

16

(b)     authorize and hereby does authorize the Lender to file such filing statements or continuation statements, or amendments thereto, and such other instruments or notices (including any assignment of claim form under or pursuant to the federal assignment of claims statute, 31 U.S.C. § 3726, any successor or amended version thereof or any regulation promulgated under or pursuant to any version thereof and any application for certificate of title), as may be necessary in order to perfect and preserve the security interests and other rights granted or purported to be granted to the Lender hereby.  **The authorization contained in this Section 4.9 is irrevocable and continuing until the Termination Date**;

(c)     deliver to the Lender and at all times keep pledged to the Lender pursuant hereto, on a first priority, perfected basis (except for Permitted Encumbrances), at the request of the Lender, all Investment Property constituting Collateral, all Distributions permitted by the Loan Agreement with respect thereto and all interest and principal with respect to promissory notes, and all Proceeds and rights from time to time received by or distributable to Grantor in respect of any of the foregoing Collateral;

(d)     not take or omit to take any action the taking or the omission of which would result in any material impairment of any obligation of the maker of any Receivable, Account or other Instrument constituting Collateral, except as provided in Section 4.1 or otherwise permitted by this Security Agreement or Loan Agreement;

(e)     after the date hereof, not create any tangible Chattel Paper without placing a legend on such tangible Chattel Paper reasonably acceptable to the Lender indicating that the Lender has a security interest in such Chattel Paper;

(f)     furnish to the Lender, from time to time at the Lender's reasonable request, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail; and

(g)     do all things reasonably requested by the Lender in accordance with this Security Agreement and the Loan Agreement in order to enable the Lender to have and maintain control over the Collateral consisting of Investment Property, Deposit Accounts, Letter of Credit Rights and Electronic Chattel Paper.

Grantor agrees that a UCC financing statement in the form required by the UCC and describing the Collateral or any part thereof filed with the Secretary of State of Delaware shall be sufficient as a UCC financing statement.  Grantor hereby authorizes the Lender to file financing statements describing as the collateral covered thereby "all of the debtor's personal property or assets" or words to that effect, notwithstanding that such wording may be broader in scope than the Collateral described in this Security Agreement.

ARTICLE V

SECTION 5.1.        Lender Appointed Attorney in Fact.  Grantor hereby irrevocably appoints the Lender its attorney in fact, with full authority in the place and stead of Grantor and in the name of Grantor or otherwise, from time to time in the Lender's discretion, following the occurrence and during the continuance of an Event of Default, to take any action and to execute

17

any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Security Agreement, including (a) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (b) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper, in connection with clause (a) above, (c) to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral, and (d) to perform the affirmative obligations of Grantor hereunder to the extent the Grantor has failed to perform such obligations after being notified by Lender. **GRANTOR HEREBY ACKNOWLEDGES, CONSENTS AND AGREES THAT THE POWER OF ATTORNEY GRANTED PURSUANT TO THIS SECTION 5.1 IS IRREVOCABLE AND COUPLED WITH AN INTEREST AND SHALL BE EFFECTIVE UNTIL THE TERMINATION DATE.**

SECTION 5.2.    Lender May Perform.  If Grantor fails to perform any agreement contained herein, following the expiration of any applicable grace or cure period, the Lender may itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by Grantor and the Lender may after the occurrence and continuance of an Event of Default, from time to time take any other action which the Lender reasonably deems necessary for the maintenance, preservation or protection of any of the Collateral or of its security interest.

SECTION 5.3.    Lender Has No Duty.  The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty on it to exercise any such powers.  Except for reasonable care and custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Investment Property and any other Pledged Property, whether or not the Lender has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

SECTION 5.4.    Reasonable Care.  The Lender is required to exercise reasonable care in the custody and preservation of any of the Collateral in its possession; provided, that the Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral (a) if such Collateral is accorded treatment substantially equal to that which the Lender accords its own personal property and in accordance with applicable law, or (b) if the Lender takes such action for that purpose as the Grantor reasonably requests in writing at times other than upon the occurrence and during the continuance of an Event of Default; provided, further, that failure of the Lender to comply with any such request at any time shall not in itself be deemed a failure to exercise reasonable care.

ARTICLE VI

SECTION 6.1.    Certain Remedies.  If any Event of Default shall have occurred and be continuing:

18

(a)     The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a Lender on default under the UCC (whether or not the UCC applies to the affected Collateral) and also may (i) take possession of any Collateral not already in its possession without demand and without legal process subject to applicable laws, (ii) require Grantor to, and Grantor hereby agrees that it will, at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties, (iii) subject to applicable law or agreements with landlords, enter onto the property where any Collateral is located and take possession thereof without demand and without legal process, and (iv) subject to applicable laws, without notice except as specified below, lease, license, sell or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to Grantor of the time and place of any public sale or the time of any private sale is to be made shall constitute reasonable notification; provided, however, that with respect to Collateral that is (x) perishable or threatens to decline speedily in value, or (y) is of a type customarily sold on a recognized market (including but not limited to, Investment Property), no notice of sale or disposition need be given. For purposes of this Article VI, notice of any intended sale or disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or email, and shall be deemed to have been "sent" upon deposit in the U.S. Mails with adequate postage properly affixed, upon delivery to an express delivery service or upon electronic submission through telephonic or internet services, as applicable. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Grantor agrees and acknowledges that (i) Lender may remove the Collateral or any part thereof from property in accordance with statutory law appertaining thereto without objection, delay, hindrance or interference by Grantor and in such case Grantor will make no claim or demand whatsoever against the Collateral, (ii)  it will (x) cooperate with Lender in its efforts to assemble and/or remove all of the Collateral; (y) permit Lender and its agents to enter upon property and occupy the property at any or all times to conduct an auction or sale, to the extent permitted by Grantor's landlord, and/or to inspect, audit, examine, safeguard, assemble, appraise, display, remove, maintain, prepare for sale or lease, repair, lease, transfer, auction and/or sell the Collateral; and (z) not hinder Lender's actions in enforcing its security interest in the Collateral.

(c)     Grantor agrees and acknowledges that a commercially reasonable disposition of Inventory, Equipment, Goods, Computer Hardware and Software Collateral, or Intellectual Property Collateral may be by lease or license of, in addition to the sale of, such Collateral. Grantor further agrees and acknowledges that the following shall be deemed a reasonable commercial disposition:  (i) a disposition made in the usual manner on any recognized market, (ii) a disposition at the price current in any recognized market at the time of

19

disposition, and (iii) a disposition in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition, in each case, subject to applicable laws.

(d)     All cash Proceeds received by the Lender in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral shall be applied by the Lender against, all or any part of the Secured Obligations as determined by the Lender in its sole discretion. The Lender shall not be obligated to apply or pay over for application noncash proceeds of collection or enforcement unless (i) the failure to do so would be commercially unreasonable, and (ii) the affected party has provided the Lender with a written demand to apply or pay over such noncash proceeds on such basis.

(e)     The Lender may do any or all of the following: (i) transfer all or any part of the Collateral into the name of the Lender or its nominee, with or without disclosing that such Collateral is subject to the lien hereunder, (ii) notify the parties obligated on any of the Collateral to make payment to the Lender of any amount due or to become due thereunder, (iii) withdraw, or cause or direct the withdrawal, of all funds with respect to any accounts for which Lender has a Control Agreement, (iv) enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (v) endorse any checks, drafts, or other writings in Grantor's name to allow collection of the Collateral, (vi) take control of any Proceeds of the Collateral, or (vii) execute (in the name, place and stead of Grantor) endorsements, assignments, stock powers and other instruments of conveyance or transfer with respect to all or any of the Collateral.

SECTION 6.2.     Compliance with Restrictions.  Grantor agrees that in any sale of any of the Collateral whenever an Event of Default shall have occurred and be continuing, the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority or official, and Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Lender be liable nor accountable to Grantor for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

SECTION 6.3.     Indemnity and Expenses.  Grantor hereby indemnifies and holds harmless the Lender, and each of its officers, directors, employees and agents (the "**Indemnified Parties**") from and against any and all claims, damages, losses and liabilities arising out of or resulting from this Security Agreement or any other Transaction Document (including, without limitation, enforcement of this Security Agreement), except claims, losses or liabilities that are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, willful misconduct or fraud.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, Grantor hereby agrees to

make the maximum contribution to the payment and satisfaction of each of the foregoing which is permissible under applicable law.

SECTION 6.4.    <u>Warranties</u>.  The Lender may sell the Collateral without giving any warranties or representations as to the Collateral.  The Lender may disclaim any warranties of title or the like.  Grantor agrees to the extent permitted by applicable law, that this procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

ARTICLE VII

SECTION 7.1.    <u>Transaction Document</u>.  This Security Agreement is a Transaction Document executed pursuant to the Loan Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

SECTION 7.2.    <u>Binding on Successors, Transferees and Assigns; Assignment</u>.  This Security Agreement shall remain in full force and effect until the Termination Date has occurred, shall be binding upon Grantor and its successors, transferees and assigns and, subject to the limitations set forth in the Loan Agreement, shall inure to the benefit of and be enforceable by Lender and its successors, transferees and assigns as permitted by the Loan Agreement; provided that, Grantor shall not assign any of its obligations hereunder (unless otherwise permitted under the terms of the Loan Agreement or this Security Agreement).

SECTION 7.3.    <u>Amendments, etc</u>.  No amendment to or waiver of any provision of this Security Agreement, nor consent to any departure by Grantor from its obligations under this Security Agreement, shall in any event be effective unless the same shall be in writing and signed by the Lender and Grantor and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.4.    <u>Notices</u>.  Except as otherwise provided in this Security Agreement, all notices and other communications provided for hereunder shall be in writing and hand delivered with written receipt, emailed, sent by facsimile (or as otherwise permitted pursuant to the Loan Agreement), sent by a nationally recognized overnight courier, or sent by certified mail, return receipt requested to the appropriate party at the address or facsimile number of such party specified in the Loan Agreement, on the signature pages of this Security Agreement or at such other address or facsimile number as may be designated by such party in a notice to the other party.  Except as otherwise provided in this Security Agreement, all such notices and communications shall be effective when delivered, or if sent by facsimile transmission or e-mail, on the date of transmission unless sent on a day that is not a Business Day or after 5:00 p.m. (local time of the recipient) on a Business Day, in which case it shall be deemed to be effective on the next Business Day following the day of such transmission.

SECTION 7.5.    <u>No Waiver; Remedies</u>.  In addition to, and not in limitation of Section 2.7, no failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 7.6.     Headings.  The various headings of this Security Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provisions thereof.

SECTION 7.7.     Severability.  Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Security Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 7.8.     Counterparts.  This Security Agreement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.  Delivery of an executed counterpart of a signature page to this Security Agreement by facsimile or by electronic transmission in portable document format (PDF) shall be effective as delivery of a manually executed counterpart of this Security Agreement.

SECTION 7.9.     Conflicts with Loan Agreement.  To the fullest extent possible, the terms and provisions of the Loan Agreement shall be read together with the terms and provisions of this Security Agreement so that the terms and provisions of this Security Agreement do not conflict with the terms and provisions of the Loan Agreement; provided, however, notwithstanding the foregoing, in the event that any of the terms or provisions of this Security Agreement conflict with any terms or provisions of the Loan Agreement, the terms or provisions of the Loan Agreement shall govern and control for all purposes; provided that the inclusion in this Security Agreement of terms and provisions, supplemental rights or remedies in favor of the Lender not addressed in the Loan Agreement shall not be deemed to be in conflict with the Loan Agreement and all such additional terms, provisions, supplemental rights or remedies contained herein shall be given full force and effect.

SECTION 7.10.     Waiver of Jury Trial.  GRANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE LENDER IN CONNECTION THEREWITH.  GRANTOR ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER TRANSACTION DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THE TRANSACTION DOCUMENTS.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GRANTOR.

SECTION 7.11.   Governing Law; Service of Process.   This Security Agreement shall be governed by and construed and enforced in all respects, including, without limitation, matters of construction, validity and performance, in accordance with the laws of the State of Florida, except that at all times the provisions for the creation, validity or perfection of the security interests hereunder, or remedies hereunder, in respect of any particular Collateral shall be governed by the laws of a jurisdiction other than the State of Florida pursuant to the provisions of the UCC or other Applicable Laws (it being understood that, to the fullest extent permitted by the laws of such jurisdiction, the laws of the State of Florida shall govern the construction, validity and enforceability of this Security Agreement and the other Transaction Documents and all of the obligations arising hereunder or thereunder).   Grantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable legal requirements, any claim to assert that the law of any other jurisdiction governs this Security Agreement or any of the other Transaction Documents.   Grantor hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to Grantor at its address set forth in this Security Agreement.   Nothing in this Section shall affect the rights of the Lender to serve legal process in any other manner permitted by the law or affect the right of the Lender to bring any action or proceeding against the Grantor or its Collateral in the courts with subject matter jurisdiction of any other jurisdiction.

SECTION 7.12.   Submission to Jurisdiction.   GRANTOR IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS COLLATERAL, TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL COURTS LOCATED IN FLORIDA OR FLORIDA STATE COURTS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.   GRANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

SECTION 7.13.   Waiver of Venue.   GRANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENT, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT IN ANY COURT REFERRED TO IN SECTION 7.12. GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENT, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

SECTION 7.14.   Waiver of Notices.   GRANTOR HEREBY EXPRESSLY WAIVES, AND SHALL NOT BE ENTITLED TO, ANY NOTICES OF ANY NATURE WHATSOEVER FROM LENDER EXCEPT WITH RESPECT TO MATTERS FOR WHICH THIS SECURITY AGREEMENT OR THE OTHER CREDIT DOCUMENTS SPECIFICALLY AND EXPRESSLY PROVIDE FOR THE GIVING OF NOTICE BY LENDER TO GRANTOR

AND EXCEPT WITH RESPECT TO MATTERS FOR WHICH GRANTOR IS NOT, PURSUANT TO APPLICABLE LEGAL REQUIREMENTS, PERMITTED TO WAIVE THE GIVING OF NOTICE.

[Remainder of this page intentionally left blank.  Signature pages to follow.]

24

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR**

**COMTEL DIRECT, LLC,**
a Florida limited liability company

By: _____

Name:  Ginna Paulsen

Title:  President

**VARSATEL CORPORATION,**
a Florida corporation

By: _____

Name:  Harrison Vargas

Title:  Chief Executive Officer

**LENDER**

**WBDH-BC HOLDINGS LTD.**

By: _____

Name: Christopher Morris

Title: President

26

SCHEDULE I
to Security Agreement

Item A-1.  Location of Grantor for purposes of UCC.

1820 N. Corporate Lakes Blvd. Suite 101. Weston, Fl. 33326

Item A-2.  Grantor's place of business or principal office.

1820 N. Corporate Lakes Blvd. Suite 101. Weston, Fl. 33326

Item A-3.  Grantor's Taxpayer ID number.

Comtel Direct LLC EIN:  ████5763

Varsatel Corporation EIN:  ████2103

Item B.  Merger or other corporate reorganization.

None

Item C.  Deposit Accounts and Securities Accounts.

| Account Holder | Bank Name | Bank Address | Account Name | Account Number | Account Type |
|---|---|---|---|---|---|
| Varsatel Corporation | Citibank NA | Weston Town Center 1636 Town Center Circle Weston, FL 33326 | Varsatel Corporation | ████4018 | Business checking |
| Comtel Direct LLC | Citibank NA | Weston Town Center 1636 Town Center Circle Weston, FL 33326 | Comtel Direct LLC | ████4021 | Business checking |

Item D .  Letter of Credit Rights.

None

Item E.  Commercial Tort Claims.

None

SCHEDULE II – A
to Security Agreement

INTELLECTUAL PROPERTY COLLATERAL

<u>Item A.  Patent Collateral</u>.

None

SCHEDULE II – B
to Security
Agreement

<u>Item B.  Trademark Collateral</u>

None

SCHEDULE II – C
to Security Agreement

Item C.  Copyright Collateral.

None registered

30

# EXHIBIT 2

### AMENDED AND RESTATED NON-REVOLVING LINE OF CREDIT NOTE

**DATE OF ISSUE: December 20, 2019**

FOR VALUE RECEIVED, **COMTEL DIRECT, LLC**, a Florida limited liability company, **VARSATEL CORPORATION**, a Florida corporation (collectively, the "**Borrower**"), promises to pay to or to the order of **WBDH-BC HOLDINGS LTD.** (the "**Lender**") the outstanding principal sum of up to $17,000,000.00 or such lesser amount as shall equal the current balance of the Borrower's loan account with Lender for advances made hereunder as evidenced by Lender's ledger records on the outstanding principal balance in lawful currency of the United States (the "**Principal Sum**") and interest thereon upon and subject to the terms and conditions set out in that certain Loan Agreement, dated as of December 5, 2018, as amended by the First Amendment to Loan Agreement dated January 18, 2019, as amended by the Second Amendment to Loan Agreement dated as of even date herewith, between Borrower and Lender (as otherwise amended from time to time, the "**Loan Agreement**") at the address set out in Loan Agreement and due as set out in the Loan Agreement (capitalized terms used in this Note and not otherwise defined herein shall have the meanings given in the Loan Agreement) and subject to the following additional terms and conditions:

1. **Maturity Date** – All unpaid principal, together with any accrued and unpaid interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) the Maturity Date or (ii) the date on which such amounts are declared due and payable by the Lender upon or after the occurrence of an Event of Default under the Loan Agreement.

2. **Issuance of Replacement Note** – The Borrower hereby covenants and agrees with the Lender that if this promissory note ("**Note**") becomes mutilated, lost, destroyed or stolen, the Borrower shall, upon receipt of a declaration of loss from the Lender in a form reasonably satisfactory to the Borrower, issue and deliver to the Lender a new promissory note of like date and tenor as the one mutilated, lost, destroyed or stolen, in exchange for and in place of and upon cancellation of such mutilated, lost, destroyed or stolen promissory note.

3. **Lender's Non-Waiver of Rights** – Failure of the Lender to enforce any of its rights or remedies under this Note will not constitute a waiver of the rights of the Lender to enforce such rights and remedies thereafter.

4. **Borrower's Waiver** – The Borrower hereby waives demand and presentment for payment, notice of non-payment, protest and notice of protest of this Note.

5. **Security** – This Note shall be secured by the Security Agreements and the other Transaction Documents (as defined in the Loan Agreement) and the failure of the Borrower to pay the Principal Sum and accrued interest in accordance with the terms of the Loan Agreement shall constitute an "Event of Default" under the Loan Agreement.

6. **Usury** – If the effective rate of interest, calculated in accordance with generally accepted actuarial practices and principles, would exceed the highest rate allowed by Applicable Law, then:

- 2 -

    (a)    the elements of return which fall within the term "interest" shall be reduced to the extent necessary to eliminate such excess; and

    (b)    any remaining excess that has been paid will be credited towards prepayment of the Principal Sum and otherwise as provided in the Loan Agreement.

**7.**    **Governing Law** – This Note (and any transactions, documents, instruments or other agreements contemplated in this Note) shall be construed and governed exclusively by the laws in force in Florida.

**8.**    **Amendment and Restatement** – This Note amends and restates the Non-Revolving Line of Credit Note executed by Original Borrowers to the order of Lender dated as of December 5, 2018.  To failure of any Borrower to execute and deliver this Note will in any way affect the liabilities and obligations of any other Borrower or the rights of Lender under this Note or any other Transaction Document.

*[Signatures Appear on Following Page]*

- 3 -

**IN WITNESS WHEREOF** the Borrower has caused its duly authorized signatory to execute and deliver this Note to the Lender as of the day and year first above written.

**COMTEL DIRECT, LLC,**
a Florida limited liability company

By: _____

Name:  Ginna Paulsen

Title:  President

**VARSATEL CORPORATION,**
a Florida corporation

By: _____

Name: Harrison Vargas

Title:  Chief Executive Officer

NASHVILLE 75177-6 715622v3

# EXHIBIT 3

# E-RECORDED

Instr# 115488631 , Page 1 of 24, Recorded 12/07/2018 at 12:33 PM
~~Broward County Commission~~
Mtg Doc Stamps: $4900.00 Int Tax: $2800.00

**Prepared by and Return to:**
Nicole R. Avallone, Esq.
Dickinson Wright PLLC
350 East Las Olas Blvd., Suite 1750
Fort Lauderdale, FL 33301
(954) 991-5420
File No. 75177-6

[Space Above This Line For Recording Data]

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT ("Mortgage") is made as of December 5, 2018, by and between **GINNA PAULSEN and HARRISON VARGAS, husband and wife**, with a mailing address of 10007 Vestal Place, Coral Springs, FL 33071 (hereinafter referred to as "Mortgagor") for the benefit of **WBDH-BC HOLDINGS LTD.**, an Ontario Corporation (together with its successors and assigns), with a mailing address of 199 Bay Street, Suite 2200, Commerce Court West, Toronto, Ontario M5L 1G4 ("Mortgagee").

## RECITALS

A.      Mortgagee is providing a loan (the "Loan") to or for the benefit of Mortgagor and the following additional obligors: Comtel Direct, LLC, a Florida limited liability company and Varsatel Corporation, a Florida corporation (collectively, hereinafter "Obligors") in accordance with the terms and conditions of the Loan Agreement executed by Obligors and Mortgagee to be effective as of December 4, 2018 (the "Loan Agreement"; capitalized terms used herein without definition have the meanings given to them in the Loan Agreement and such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor). In addition to the Loan Agreement, the Loan is or may be evidenced by additional documents evidencing, securing, guaranteeing and/or otherwise documenting the terms and conditions of the Loan, including the Guaranty executed by Mortgagor in favor of Mortgagee and dated as of December 5, 2018 (the "Guaranty") and all other Transaction Documents (together with this Mortgage and the Loan Agreement, collectively, "Loan Documents", such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor).

B.      The Mortgagee has requested that Mortgagor further secure the Loan and the Obligations by, among other things, encumbering Mortgagor's real property with this Mortgage;

C.      As used in this Mortgage the term "Obligations" means: (i) the prompt payment to Mortgagee of any and all sums owed by Mortgagor or Obligors to Mortgagee pursuant to the Loan Documents; (ii) the proper, complete, and punctual performance by any Obligor or Mortgagor of all the terms, covenants and conditions contained in this Mortgage and the other Loan Documents; (iii) the prompt repayment of all sums which are at any time or from time to time advanced or paid by Mortgagee pursuant to the authorizations contained in this Mortgage or the other Loan Documents; (iv) the repayment of all reimbursement obligations due or that may become due under or in connection with any present or future letters of credit issued by a Mortgagee for the account of Mortgagor or any Obligor; (v) all other indebtedness, obligations and liabilities of any Obligor or Mortgagor to Mortgagee of every nature and description, now existing or hereafter arising, however evidenced, direct or indirect, fixed or contingent, liquidated or unliquidated, due or to become due, secured or unsecured, joint, several or joint and several,

**E-RECORDED**                                    simplifile

ID: **INSTR # 115488631**; Page 1 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

**Prepared by and Return to:**
Nicole R. Avallone, Esq.
Dickinson Wright PLLC
350 East Las Olas Blvd., Suite 1750
Fort Lauderdale, FL 33301
(954) 991-5420
File No. 75177-6

[Space Above This Line For Recording Data]

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT ("Mortgage") is made as of December 5, 2018, by and between **GINNA PAULSEN and HARRISON VARGAS, husband and wife**, with a mailing address of 10007 Vestal Place, Coral Springs, FL 33071 (hereinafter referred to as "Mortgagor") for the benefit of **WBDH-BC HOLDINGS LTD.**, an Ontario Corporation (together with its successors and assigns), with a mailing address of 199 Bay Street, Suite 2200, Commerce Court West, Toronto, Ontario M5L 1G4 ("Mortgagee").

## <u>RECITALS</u>

A.       Mortgagee is providing a loan (the "Loan") to or for the benefit of Mortgagor and the following additional obligors: Comtel Direct, LLC, a Florida limited liability company and Varsatel Corporation, a Florida corporation (collectively, hereinafter "Obligors") in accordance with the terms and conditions of the Loan Agreement executed by Obligors and Mortgagee to be effective as of December 4, 2018 (the "Loan Agreement"; capitalized terms used herein without definition have the meanings given to them in the Loan Agreement and such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor). In addition to the Loan Agreement, the Loan is or may be evidenced by additional documents evidencing, securing, guaranteeing and/or otherwise documenting the terms and conditions of the Loan, including the Guaranty executed by Mortgagor in favor of Mortgagee and dated as of December 5, 2018 (the "Guaranty") and all other Transaction Documents (together with this Mortgage and the Loan Agreement, collectively, "Loan Documents", such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor).

B.       The Mortgagee has requested that Mortgagor further secure the Loan and the Obligations by, among other things, encumbering Mortgagor's real property with this Mortgage;

C.       As used in this Mortgage the term "Obligations" means: (i) the prompt payment to Mortgagee of any and all sums owed by Mortgagor or Obligors to Mortgagee pursuant to the Loan Documents; (ii) the proper, complete, and punctual performance by any Obligor or Mortgagor of all the terms, covenants and conditions contained in this Mortgage and the other Loan Documents; (iii) the prompt repayment of all sums which are at any time or from time to time advanced or paid by Mortgagee pursuant to the authorizations contained in this Mortgage or the other Loan Documents; (iv) the repayment of all reimbursement obligations due or that may become due under or in connection with any present or future letters of credit issued by a Mortgagee for the account of Mortgagor or any Obligor; (v) all other indebtedness, obligations and liabilities of any Obligor or Mortgagor to Mortgagee of every nature and description, now existing or hereafter arising, however evidenced, direct or indirect, fixed or contingent, liquidated or unliquidated, due or to become due, secured or unsecured, joint, several or joint and several,



E-RECORDED                    simplifile'
ID: INSTR # 115488631; Page 2 of 24
County: Broward, Florida
Date: 12/7/2018          Time: 12:33 PM

which indebtedness may, but need not, be evidenced by promissory notes of any Obligor or Mortgagor or by Mortgagor's or any Obligors endorsement or guarantee of obligations of another, including without limitation, all principal, interest, charges, overdrafts, costs of collection, reasonable attorneys' fees and expenses and other expenses of Mortgagee which Mortgagor or any Obligor is obligated to pay and amounts advanced by a Mortgagee in discharge of the obligations of Mortgagor or any Obligor, whether such amounts are from time to time reduced, thereafter increased or entirely extinguished and thereafter reincurred, together with all renewals, modifications, consolidations and extensions thereof; and (vi) the payment of all of the costs, fees, commissions, and expenses of Mortgagee in enforcing the provisions of the Loan Documents. All of the foregoing shall be subject to the Recovery Limit, as defined herein.

E.      **NOTWITHSTANDING THE AMOUNTS OUTSTANDING FROM TIME TO TIME UNDER THE LOAN, THE OBLIGATIONS SECURED BY THIS MORTGAGE SHALL BE LIMITED TO THE MAXIMUM AMOUNT OF $1,400,000.00 ("RECOVERY LIMIT"), IN PRINCIPAL PLUS ALL COSTS OF ENFORCEMENT AND COLLECTION OF THE AMOUNTS DUE MORTGAGEE UNDER THIS MORTGAGE, PLUS ANY ADVANCES MADE BY MORTGAGEE TO PROTECT THE PROPERTY AND THE MORTGAGEE'S INTEREST THEREIN INCLUDING, BUT NOT LIMITED TO THE PAYMENT OF ANY TAXES WHICH CONSTITUTE A LIEN ON THE PROPERTY, TOGETHER WITH INTEREST ON ALL OF THE FOREGOING IN ACCORDANCE WITH THE LOAN, PROVIDED THAT THE FOREGOING LIMITATION SHALL APPLY ONLY TO THE RIGHTS CREATED BY THIS MORTGAGE AND SHALL NOT IN ANY MANNER LIMIT, AFFECT OR IMPAIR ANY GRANT OF A SECURITY INTEREST OR OTHER RIGHT HERETOFORE OR HEREAFTER GRANTED IN FAVOR OF THE MORTGAGEE PURSUANT TO THE PROVISIONS OF THE MORTGAGE. THE FOREGOING LIMITATION OF LIEN IS NOT INTENDED TO AND SHALL NOT LIMIT THE RIGHT OF THE MORTGAGEE TO MAKE DISCRETIONARY FUTURE ADVANCES FROM TIME TO TIME IN ACCORDANCE WITH SECTION 697.04, FLORIDA STATUTES AND IN CONNECTION THEREWITH, TO ELECT TO INCREASE THE MAXIMUM AMOUNT OF THE PRINCIPAL INDEBTEDNESS SET FORTH HEREIN WHICH MAY BE SECURED FROM TIME TO TIME BY THE LIEN OF THIS MORTGAGE.**

## <u>GRANT</u>

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the full and absolute payment and performance of each of the Obligations, Mortgagor grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the Mortgagee its successors and assigns, in fee simple, the property of which the Mortgagor is now seized and possessed and in actual possession, situated in the County of Broward, State of Florida, which is more fully described in Exhibit "A" attached hereto and made part hereof ("Land").

AND TOGETHER WITH all buildings, structures, or improvements, and replacements thereof, now or hereafter existing on or to be erected upon the Land ("Improvements"). The Land and Improvements are collectively referred to as the "Real Property."

AND TOGETHER with all plant equipment, apparatus, machinery, fittings, appliances, furniture, furnishings, fixtures and other chattels and personal property and replacements thereof (exclusive of any inventory held for sale or resale by Mortgagor) owned by Mortgagor (collectively, "Personalty").

AND TOGETHER WITH all plans and specifications, surveys and surveyor's reports, engineer's and architect's reports, diagrams and drawings, all licenses, permits and approvals and applications therefor from governmental authorities, service contracts, books, records, reports, accounting records, invoices, change orders, correspondence, diagrams, drawings, schematics, sales and promotional literature and forms,

2

E-RECORDED
ID: INSTR # 115488631; Page 3 of 24
County: Broward, Florida
Date: 12/7/2018          Time: 12:33 PM

advertising materials and the like, wherever located and whenever created, compiled, or made with respect to the construction of the Improvements upon the Land and any leasing of space in the completed Improvements, to the extent assignable without breaching any obligation related thereto.

AND TOGETHER WITH all easements, rights, privileges, and appurtenances thereunto belonging or in any way appurtenant, and all of the right, title, interest, estate, or claim of Mortgagor in or to the streets, ways, alleys, and waters adjoining or adjacent to the Real Property, whether now existing or hereafter acquired.

AND TOGETHER WITH all mineral rights, and mining rights, as well as all minerals, sand, gravel, soil and the like (including oil and gas) which have not been extracted from the Land.

AND TOGETHER WITH all documents, instruments, accounts, inventory, general intangibles, chattel paper, contract rights, inventory and accounts now owned or hereafter acquired by Mortgagor, as such items of property may from time to time exist, together with all modifications, accessions and substitutions therefor and proceeds therefrom including all present and future contracts of sale of all or any part or portion of the Real Property, and all extensions and renewals thereof and substitutions therefor, independent of the term or duration thereof and whether or not evidenced by a written document (collectively, "Contracts"), and all sale proceeds and other sums payable with respect to the Contracts, including, but not limited to, any and all deposits, fees, charges, reimbursements, option payments, insurance proceeds, payments made in consequence of any defaults by any purchasers under the Contracts (collectively, "Purchasers", or individually, "Purchaser") or in settlement, compromise or satisfaction of any obligations of a Purchaser due Mortgagor as a result or in consequence of the Contracts and further including all claims and rights to the payment of money at any time arising in connection with any of the Contracts or breaches of any of the Contracts, or rejections of any of the Contracts by any Purchaser thereunder under Section 365 of the United States Bankruptcy Code, as amended, all rights to recover damages arising out of any of such breaches or rejections, all rights to take charges payable by such Purchaser with respect to the portion of the Real Property covered by the Contract following the entry of an order for relief under the United States Bankruptcy Code in respect of such Purchaser and all rentals and other charges outstanding under the Contract as of the date of the entry of the order for relief;

AND TOGETHER WITH all water, sanitary and storm sewer systems now or hereafter owned by Mortgagor, its successors or assigns, which are now or hereafter located on, over or upon the Land or any part thereof, including but not limited to all water mains, real property service laterals, hydrants, valves and appurtenances, sanitary sewer lines, sanitary sewer mains, sanitary sewer laterals, sanitary sewer manholes and sanitary sewer appurtenances;

AND TOGETHER WITH all paving for streets, roads, walkways or entranceways now or hereafter owned by Mortgagor which are now or hereafter located on the Land or any part thereof;

AND TOGETHER WITH all of Mortgagor's rights to any fictitious, trade or other names used in connection with the Land, the Improvements, or the Personalty, the good will of Mortgagor in connection therewith, and the right to carry on business under any and all such name or names and variation thereof;

AND TOGETHER WITH all accounts, property, securities or monies of Mortgagor which may at any time be deposited with, maintained at, assigned to, delivered to, or come into the possession of Mortgagee;

AND TOGETHER WITH all of Mortgagor's right, title and interest in and to all tenant security deposits, cash, utility deposits and insurance premium rebates to which Mortgagor may be entitled or which Mortgagor may be holding;

AND TOGETHER WITH all the rights, title, interest and privileges which Mortgagor as seller has or may have in the contracts of sale now existing or hereafter made and affecting the Real Property, as such contracts may have been, or may from time to time be, modified, extended and renewed, with all deposits, proceeds, income and profits due and becoming due therefrom.

AND TOGETHER WITH all rights, benefits, profits, rents. accounts, general intangibles, and monies payable under, by reason of, or with respect to any restrictive covenants, easements, agreements applicable to the Real Property or adjoining lands, or contracts of sale with respect thereto, and all proceeds and products thereof, with the right to: (a) collect any sums of money at any time payable to Mortgagor in consequence of such rights and benefits, including the release, modification, or amendment thereof, for application to the Obligations; and (b) utilize any collection or enforcement rights or remedies to collect the same which may be available to Mortgagor under law.

AND ALSO TOGETHER WITH: (a) all of the proceeds of the voluntary or involuntary conversion of the aforementioned property or, any part of the aforementioned property into cash or liquidated claims, whether by way of condemnation, insured casualty, judgment or otherwise, as well as a security interest which is hereby granted to Mortgagee in the same; (b) all rents, profits, and benefits, including any deposits of tenants to secure payment of the same and performance of the terms and conditions of any oral or written lease, with respect to the leasing of all or any portion of the Real Property, with the right to collect such rents, profits, and benefits at any time for application to the Obligations and to utilize any collection or enforcement rights or remedies which may be available to Mortgagor under law or any written lease, but without any duty or obligation to perform on behalf of Mortgagor any of Mortgagor's duties or obligations to any lessee; and (c) all revenues and profits, accounts receivable and contract rights, including any deposits of purchasers to secure payment of the contract price and performance of the terms and conditions of any contract of sale for the Real Property, with the right to collect the same at any time for application to the Obligations and to utilize any collection or enforcement rights or remedies which may be available to Mortgagor under law or any contract of sale, but without any duty or obligation to perform on behalf of Mortgagor any of Mortgagor's duties or obligations to any purchaser of the Real Property.

All of the aforementioned Real Property, Personalty, Contracts, and other rights and benefits and all other property described in the above stated granting clauses of this Mortgage are referred to collectively as the "Secured Property." To the extent that any items of Secured Property are not or have not yet become fixtures and permanent additions to and a part of the Real Property, and are instead personal property Mortgagor grants, re-grants, conveys, re-conveys and confirms to Mortgagee a continuing security interest under Florida law, in all of such items of personal property, fixtures or property other than real property and the proceeds and products thereof, as well as in all substitutions, renewals, replacements, additions, modifications and accretions thereof and in all of such items hereafter acquired and constituting after acquired property, for so long as such items are or remain personal property and not fixtures and permanent additions to the Real Property.

TO HAVE AND TO HOLD all and singular the Secured Property hereby conveyed, and the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof and also all the estate, right, title, interest property, possession, claim and demand whatsoever as well in law as in equity of the said Mortgagor in and to the same and every part and parcel thereof unto the said Mortgagee in fee simple.

PROVIDED ALWAYS that if the Mortgagor shall pay to the Mortgagee any and all indebtedness due by Mortgagor to Mortgagee (including the indebtedness due under the Loan Agreement, the Guaranty and any and all renewals of the same) and shall perform, comply with and abide by each and every stipulation, agreement, condition, and covenant of the Loan Agreement and of this Mortgage; then this

**E-RECORDED**                    simplifile

ID: INSTR # 115488631; Page 5 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

Mortgage and the estate hereby created shall cease and be null and void.  Provided, it is further covenanted and agreed by the parties hereto that this Mortgage also secures the payment of and includes all future or further advances as shall be made by Mortgagee herein, or its successors or assigns to or for the benefit of the Mortgagor or any Obligor, or their heirs, personal representatives or assigns within twenty (20) years from the date hereof to the same extent as if such made on the date of the execution of this Mortgage.

To protect the security of this Mortgage, the Mortgagor further covenants, warrants and agrees with the Mortgagee as follows:

## ARTICLE 1

## COVENANTS, AGREEMENTS AND REPRESENTATIONS
## AND WARRANTIES OF MORTGAGOR

Mortgagor covenants and agrees and represents and warrants (as of the date hereof and until all of the Obligations are paid in full) as follows:

**Section 1.1    Repayment.**  Mortgagor shall pay punctually all indebtedness secured by this Mortgage, together with interest thereon and any penalty, fee, charge, deposit, escrow or assessment, at the times and in the manner and amounts set forth in this Mortgage, the Loan Agreement, and each of the other Loan Documents.

**Section 1.2.    Performance.**  Mortgagor shall perform fully all duties, obligations, and requirements and comply exactly in all respects with the terms, covenants, conditions, representations and warranties of this Mortgage, the Loan Agreement and each of the other Loan Documents.

**Section 1.3.    Intentionally deleted**.

**Section 1.4.    Taxes and Expenses.**  Mortgagor shall pay and discharge, prior to the same becoming delinquent, all taxes of every kind and nature, real and personal; all general and special assessments and levies; all water, sewer and other utility charges, rents, and assessments; and any and all other public charges, dues, levies, impositions, or assessments of a like or different nature, imposed upon or assessed against the Secured Property or the rents, issues, income or profits thereof, and which are or may become liens against the same, as well as any ground rent to which the Real Property may be subject, and Mortgagor shall not permit to exist any lien or security interest for taxes, assessments, levies, fees, ground rents and public charges other than: (a) liens for taxes, assessments, levies, fees, rents, ground rents, and public charges not yet delinquent; and (b) liens and security interests which Mortgagee has specifically and in writing consented to the existence of and with respect to which Mortgagor has paid currently all sums secured thereby. Mortgagor shall, upon the request of the Mortgagee, deliver to the Mortgagee receipts evidencing the payment of all such taxes, assessments, levies, fees, rents, ground rents, and public charges imposed upon or assessed against the Secured Property, or the revenues, rents, issues, income, or profits thereof, as well as the payment of all superior liens and security interests with respect to which Mortgagee may have consented. Notwithstanding the above, Mortgagor may contest, at its expense, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any taxes or other charges enumerated above in this Section 1.4; provided that (i) such proceedings shall suspend the collection thereof, (ii) neither the Secured Property nor any part thereof or interest therein would be in any danger of being sold, forfeited or lost, (iii) neither Mortgagor nor Mortgagee would be in any danger of any civil or criminal liability for failure to pay same and the Secured Property or any part thereof would not be subject to the imposition of any lien as a result of such failure, and (iv) if the applicable tax or other charge could, if such amount remains unpaid, result in the enforcement of the taxing authority's lien against the Secured Property or any part thereof, Mortgagor shall have deposited the amount

5



of said taxes or charges together with interest, penalties, attorneys' fees and court costs with Mortgagee who shall have the sole and absolute discretion to pay such contested amounts in the event that, in the sole, absolute and subjective discretion of Mortgagee, the Secured Property or any part thereof is in danger of forfeiture or the Mortgagee is in danger of being held civilly or criminally liable with respect thereto or Mortgagee concludes, in its sole, absolute and subjective discretion, that the Secured Property or any part thereof is impaired thereby.

**Section 1.5.    Insurance.**  Mortgagor shall maintain the following insurance coverages with insurance companies rated at least "A" by A.M. Best Company:

**1.5.1.    Property Insurance.**

**a.    Physical Damage Insurance.** Mortgagor shall keep the Improvements insured against damage for the full repair and replacement value of the Improvements pursuant to an insurance policy in form and substance satisfactory to Mortgagee.

**b.    Intentionally deleted.**

**c.    Flood Insurance**.  In the event all or any portion of the Property currently or at any time in the future is determined to be located in an area designated as having special flood or mudslide hazards by the Secretary of Housing and Urban Development or the Director of the Federal Emergency Management Agency, pursuant to the provisions of the National Flood insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1973, as amended, Mortgagor shall maintain flood hazard insurance in the full insurable value of the Property, or the full amount of flood insurance available.

**d.    Claims.** In the event of loss, Mortgagor shall give immediate written notice to the insurance carrier and to Mortgagee. Mortgagor hereby authorizes and empowers Mortgagee as attorney-in-fact for Mortgagor to make proof of loss, to adjust and compromise any claim under the insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Mortgagee's expenses incurred in the collection of such proceeds; provided, however, that nothing contained in this Section shall require Mortgagee to incur any expense or take any action. Insurance proceeds shall be applied as specified in Article IV hereof.

**e.    General Insurance Requirements**. All insurance policies required pursuant to this Section shall: (i) be endorsed to name Mortgagee as mortgagee under a standard mortgagee clause, with losses payable solely to Mortgagee, without contribution, as its interests may appear, (ii) provide that they shall not be invalidated by a waiver of the right of subrogation by any insured; that the insurance carrier shall have no right of subrogation, and that the policies may not be canceled, terminated or changed without thirty (30) calendar days' prior written notice to Mortgagee; (iii) be endorsed so that in the event of a foreclosure or deed in lieu of foreclosure of this Mortgage, the purchaser or grantee of the Secured Property shall succeed to all the rights of Mortgagor, including any right to unearned premiums, in and to all policies of insurance required pursuant to this Section; (iv) be fully paid for; (v) be on forms and contain provisions and expiration dates which are reasonably approved by Mortgagee, without any exclusion for terrorism; and (vi) be issued by insurance companies which (A) are licensed to do business in the state where the Real Property is located, (B) have a Best's Key Rating of at least A, (C) have a Best's Financial Size Category of at least IX, and (D) otherwise are reasonably satisfactory to Mortgagee in all respects. Mortgagor shall deliver certified copies of all policies to Mortgagee together with the endorsements thereto required hereunder, or acceptable certificates evidencing the existence of such policies and endorsements. Not less than thirty (30) calendar days prior to the expiration dates of each policy required pursuant to this Section, Mortgagor shall deliver to Mortgagee a renewal policy or policies (or acceptable certificates evidencing the existence of such renewal policy or policies) marked "premium paid" for at least a one-year period, or accompanied by other evidence

E-RECORDED
simplifile

ID: INSTR # 115488631; Page 7 of 24
County: Broward, Florida
Date: 12/7/2018          Time: 12:33 PM

of payment satisfactory to Mortgagee.

   **f.**  **Other Insurance**. Mortgagor shall carry such other insurance relating to the Secured Property as may be reasonably required by Mortgagee.

   **Section 1.6.**  **Escrow.** Upon the occurrence of an Event of Default, Mortgagee, at any time or from time to time, upon notice to Mortgagor may require the deposit by Mortgagor with Mortgagee, at the time of each payment of an installment of interest, of principal, or of principal and interest under the Loan Agreement, of an additional amount sufficient to discharge the obligations of Mortgagor for: (a) the payment of taxes, assessments, levies, fees, rents, and other public charges, if any, imposed upon or assessed against the Secured Property or the revenues, rents, issues, income, or profits thereof, as provided in <u>Section 1.4</u>; or (b) the payment of the premiums for fire, casualty and other hazard insurance, and flood insurance, as provided by <u>Section 1.5</u>, for the purpose of providing a fund to assure the payment of the aforesaid expenses when and as they come due. The determination of the amount so payable and of the fraction or part thereof to be deposited with Mortgagee, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Mortgagee in its reasonable discretion. Such amounts shall be applied to the payment of the obligations in respect to which such amounts were deposited or, at the option of Mortgagee, to the payment of such obligations in such order of priority as Mortgagee shall determine, on or before the date they become delinquent. If Mortgagee determines prior to the due date of any of the aforementioned obligations that the amount then on deposit shall be insufficient for the payment of such obligations in full, Mortgagor, within ten (10) calendar days after demand, shall deposit the amount of the deficiency with Mortgagee. The contrary notwithstanding, Mortgagee shall retain the right under the provisions of this Mortgage to pay any such amount and to add the amount so paid, together with interest at the highest default rate provided in the Loan Agreement, to the Obligations.

   **Section 1.7.**  **Advancements**. If Mortgagor fails to perform any of the covenants contained in this Mortgage or to protect or preserve the Secured Property or the status and priority of the lien and security interest of this Mortgage (after the giving of any required notice and the expiration of any applicable cure period), the Mortgagee may make advances to perform the same on behalf of Mortgagor or to protect or preserve the Secured Property or the status and priority of the lien and security interest of this Mortgage, and all sums so advanced shall immediately upon advancement become a lien and security interest upon the Secured Property and shall be secured by this Mortgage. Mortgagor shall repay on demand all sums so advanced on Mortgagor's behalf, plus any reasonable expenses or costs incurred by the Mortgagee, including reasonable attorney's fees, with interest thereon at the default rate provided in the Loan Agreement. The provisions of this Section shall not be construed to prevent the institution of foreclosure upon the occurrence of an Event of Default. The contrary notwithstanding, the authorization contained in this Section shall impose no duty or obligation on the Mortgagee to perform any action or make any advancement on behalf of Mortgagor and is for the sole benefit and protection of Mortgagee.

   **Section 1.8.**  **Condition and Use of Improvements.** Mortgagor shall not abandon the Secured Property at any time, nor commit any waste on the Secured Property, nor make any change in the use of the Secured Property which will in any way increase any ordinary fire or other hazard insurance risk arising out of the operation of, or the construction of Improvements on, the Secured Property, Mortgagor shall maintain and keep the Secured Property in good operating order and condition at all times and shall promptly make, from time to time, all repairs, renewals, replacements, additions, and improvements in connection therewith which are needed or desirable. Mortgagor shall comply in all material respects with all statutes, ordinances, rules, regulations, or laws affecting the Secured Property or the use thereof. The Improvements shall not be removed, demolished or substantially altered, nor shall any Personalty be removed therefrom, without the prior written consent of Mortgagee, except where appropriate replacements, free of superior title, liens, security interests, or claims, are immediately made of a value at least equal to the value of the Personalty removed. Mortgagor shall permit the Mortgagee, or its agents or employees, at all reasonable times to enter

and inspect the Secured Property.

**Section 1.9.     Title to Secured Property; Liens.**  Mortgagor as of the date hereof has, and at all times during the term of this Mortgage shall maintain, good and marketable title to the Secured Property free and clear of any and all liens, charges, restrictions, encumbrances, security interests and adverse claims whatsoever, excepting any liens, charges, restrictions, encumbrances or security interests which: (a) are set forth in any title insurance policy issued in favor of, and approved by, Mortgagee with respect to the Real Property; (b) are expressly permitted by the provisions of this Mortgage; or (c) are otherwise expressly consented to in writing by Mortgagee.

**Section 1.10.     Transfer or Encumbrance**.  Except as otherwise provided in the Loan Agreement, title to all or any portion of the Secured Property shall not be acquired by any person, individual, partnership, association, or corporation, other than Mortgagor, by voluntary or involuntary conveyance, transfer, grant or assignment, by operation of law, or in any other manner, or become encumbered or charged with a lien or security interest of any kind or variety, excepting mortgages disclosed in writing to and approved in writing by Mortgagee, whether voluntary or involuntary, including any mechanic's or materialman's lien or judgment liens, junior, or of equal priority to the lien and security interest of this Mortgage, without the prior written consent of the Mortgagee.  The direct or indirect transfer or pledge of any ownership interest in Mortgagor shall constitute a prohibited transfer hereunder.  The contrary notwithstanding, if the ownership of the Secured Property becomes vested in a person, individual, partnership, association, or corporation other than Mortgagor, the Mortgagee may, without notice to Mortgagor, deal with such successor or successors in interest with reference to this Mortgage and the Obligations secured by it in the same manner as with Mortgagor, and any extension of the time of the Obligations or any other modifications of the terms of the Obligations at the instance of the then owner of the Secured Property shall not relieve Mortgagor of Mortgagor's liability on the Loan Agreement hereby secured or from the performance of any of the covenants and agreements contained herein or any of the covenants, terms, conditions, provisions, representations, or warranties contained in the Loan Documents, whether the extension or modification be made with or without the consent of Mortgagor.

**Section 1.11.     Condemnation**.  Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Secured Property or any portion thereof, shall notify the Mortgagee of the pendency of such proceedings.  The Mortgagee may participate in any such proceedings and Mortgagor from time to time shall deliver to the Mortgagee all instruments requested by Mortgagee to permit such participation. In the event of such condemnation proceedings, the award or compensation payable is hereby assigned and shall be paid to Mortgagee for application to and reduction of the Obligations, at the non-default rate of interest provided in the Loan Agreement, regardless of the rate of interest payable on the award by the condemning authority. The Mortgagee shall be under no obligation to question the amount of any such award or compensation and may accept the same in the amount in which the same shall be paid. In any such condemnation proceedings, the Mortgagee may be represented by counsel selected by Mortgagee at Mortgagor's sole expense.  In the event of any condemnation or taking, Mortgagor shall be free to assert its legal interests, if any, as authorized under Florida law.

**Section 1.12.     Future Advances**.  This Mortgage is given to secure not only existing Obligations, but also future advances made and future obligations incurred within twenty (20) years of the effective date hereof, whether such advances are obligatory or are to be made at the option of Mortgagee, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Mortgage, and also to secure all other sums or amounts that may be added to the Obligations pursuant to the terms of this Mortgage.  The total amount of Obligations that may be so secured may decrease or increase from time to but the aggregate unpaid balance so secured at one time shall not exceed $10,000,000.00, plus interest thereon, and any disbursements and expenses authorized hereunder or under any of the other Loan Documents, together with interest at the highest rate provided in the Loan Agreement.  Notwithstanding

E-RECORDED                    simplifile®
ID: INSTR # 115488631; Page 9 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

anything to the contrary herein contained, any sum or amount which may, pursuant to the terms hereof, be added to the Obligations, shall, at the option of Mortgagee, be deemed a "future advance" within the meaning of this Section.

**Section 1.13.    Intentionally deleted**.

**Section 1.14.    Zoning, Etc.; Restrictive Covenants**.  Mortgagor, in its use and operation of the Secured Property, shall comply fully with all applicable laws, rules and regulations of any federal, state, and local governmental authorities having jurisdiction over the Secured Property, including but not limited to, all zoning, land use, and environmental laws, rules and regulations. Mortgagor shall comply fully with all restrictions, covenants, easements, setbacks and other limitations on the use of the Secured Property contained in documents of public record.

**Section 1.15.    Preservation of Lien**.  Mortgagor shall take all steps and do all things necessary, convenient, or proper to establish, protect, preserve, and maintain the priority and status of the lien and security interest in the Secured Property established or intended to be established by this Mortgage, except and only to the extent Mortgagee may have consented specifically and in writing to a senior lien or security interest.

**Section 1.16.    Security Agreement**. This Mortgage, among other things, covers goods which are or are to become fixtures related to the Property.  This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property.  This Mortgage is to be filed for record in the real/immovable property records of Broward County, Florida.  The mailing address for Mortgagor is as stated above, and the address of the Mortgagee is as stated above.  Nothing contained in this Paragraph shall be construed to limit the scope of this Mortgage or its effectiveness as a financing statement covering any type of property.  Without limiting any other provision herein, Mortgagor hereby authorizes the Mortgagee to file in any filing or recording office, one or more financing statements and any renewal or continuation statements thereof, describing the Property. This Mortgage also shall constitute a security agreement from Mortgagor to Mortgagee under the Florida Uniform Commercial Code, and Mortgagor hereby grants to Mortgagee a security interest in all personal property comprising the Secured Property to secure repayment of the Obligations.  Mortgagor agrees that Mortgagee may file this Mortgage in the Land Records or other appropriate index as a financing statement for the Personalty.  This Mortgage or a photocopy hereof shall be sufficient as a financing statement.  Mortgagor agrees to execute and deliver to Mortgagee for filing with the local and central filing offices such financing and continuation statements as may be required in Mortgagee's sole opinion to perfect or continue as perfected the security interest created by this Mortgage. If Mortgagor fails upon demand to execute and deliver to Mortgagee such financing or continuation statements, Mortgagor shall thereupon automatically and irrevocably have appointed and does hereby appoint Mortgagee as Mortgagor's attorney-in-fact for the limited purpose of executing such financing or continuation statements, the power of attorney hereby given by Mortgagor to Mortgagee being a power of attorney coupled with an interest.  Inasmuch as the parties intend that this Mortgage shall, among other things, constitute a fixture filing, Mortgagor sets forth the following:

a.    The Debtor (Mortgagor) is: **GINNA PAULSEN and HARRISON VARGAS, husband and wife**, with a mailing address of 10007 Vestal Place, Coral Springs, FL 33071;

b.    The Secured Party is: **WBDH-BC HOLDINGS LTD.,** an Ontario corporation, with a mailing address 199 Bay Street, Suite 2200, Commerce Court West, Toronto, Ontario M5L 1G4;

c.    The collateral includes fixtures which are or shall be affixed to the Land; and

E-RECORDED simplifile

ID: **INSTR # 115488631**; Page 10 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

  **d.**  Debtor is the record owner of the land described in EXHIBIT A.

**Section 1.17.**  **Intentionally deleted.**

**Section 1.18.**  **Intentionally deleted.**

**Section 1.19.**  **Environmental Requirements**.

  **a.**  Mortgagor covenants and warrants that, to the best of its knowledge:

    (1)  the Secured Property (including the real property, surface water, groundwater, and Improvements to the real property) is free of all contamination, including (A) asbestos in any form; (B) urea formaldehyde foam insulation; (C) transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; or (D) any other chemical, material or substance which is prohibited by any federal, state, county, regional, local or other governmental authority or which is in excess of any limitations set by such authority or in violation of regulations promulgated by such authority or which has not been handled in accordance with any special handling in collection, storage, treatment or disposal under any federal, state or local law, ordinance or regulation or administrative order or decree including, without limitation, the following: (i) oil, petroleum products, and their by-products; (ii) any "hazardous waste", "hazardous substance" or "release" as defined by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended from time to time, and regulations promulgated thereunder ("CERCLA"); or (iii) any "solid waste" or "disposal" as defined in the Resource Conservation and Recovery Act of 1976, as amended from time to time, and the regulations promulgated thereunder ("RCRA"), or any law regulating hazardous or toxic substances or materials enacted by the State of Florida (the foregoing (A)-(D) are hereinafter the "Hazardous Materials"); and

    (2)  the Real Property is not now being used nor, to the best of its knowledge, has it ever been used for any activities involving directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Materials; (3) the Secured Property and Mortgagor's operations on the Real Property are in compliance with all applicable laws, rules and regulations pertaining to health or the environment; (4) neither the Secured Property, or any portion thereof, nor Mortgagor is subject to any existing, pending or threatened investigation or inquiry by any governmental authority or any remedial obligations under any applicable laws, rules or regulations pertaining to health or the environment; and (5) there are no underground tanks on the Real Property and no underground tanks were located on the Real Property in the past and subsequently removed or filled.

  **b.**  Mortgagor shall not install, store, use, treat, transport, or dispose (or permit or acquiesce in the installation, storage, use, treatment, transportation, or disposal by Mortgagor, its agents, employees, independent contractors or tenants on the Real Property) of any Hazardous Materials in more than *de minimis* amounts necessary in connection with the construction of the Improvements or otherwise in compliance with law and in the normal course of business. In the event of any such installation, storage, use, treatment, presence, transportation or disposal, whether prior to or during the term of this Loan, and whether by Mortgagor, any predecessor in title or any other party, Mortgagor shall remove (or cause to be removed) any Hazardous Materials or otherwise comply with the regulations or orders of any local, state or federal authority or agency having jurisdiction over the Real Property, all at the expense of Mortgagor. If Mortgagor shall fail to proceed with such removal or otherwise comply with such regulations within any reasonable period or within the cure period permitted under applicable federal, state or local regulations or order, Mortgagee may declare an Event of Default or may, but shall not be obligated to, do whatever is necessary to eliminate such Hazardous Material from the Real Property or otherwise comply with the

E-RECORDED
Simplifile
ID: INSTR # 115488631; Page 11 of 24
County: Broward, Florida
Date: 12/7/2018       Time: 12:33 PM

applicable regulation or order, and the cost thereof shall be so much additional indebtedness secured hereby and shall become immediately due and payable without notice thereof at the Default Rate (defined in the Loan Agreement) provided for in the Loan Agreement. Mortgagor shall give Mortgagee and its agents and employees access to the Real Property for such purposes and hereby specifically grants to Mortgagee a license effective upon expiration of the aforesaid applicable cure period to remove the Hazardous Materials.

        **c.**      Mortgagor shall promptly notify Mortgagee in writing of any order or pending or threatened action by any regulatory agency or other governmental body, or any claims made by any third party, relating to Hazardous Materials on, or emanations from, the Real Property, and shall promptly furnish Mortgagee with copies of any correspondence or legal pleadings in connection therewith.

        **d**      In addition, Mortgagee shall have the right, but shall not be obligated, to notify any state, federal or local governmental authority of information which may come to its attention with respect to Hazardous Materials, on or emanating from the Secured Property and Mortgagor irrevocably releases Mortgagee from any claims of loss, damage, liability, expense or injury relating to or arising from, directly or indirectly, any such disclosure.

        **e.**      The liability of Mortgagor to Mortgagee under the covenants of this Section is not limited by any exculpatory provisions in the Loan Agreement or in the other documents securing this Loan and shall survive any foreclosure of this Mortgage or any transfer of the Secured Property by deed in lieu of foreclosure.

        **f.**      At any time during the term of this Loan, Mortgagee may require Mortgagor to provide to Mortgagee, at the expense of Mortgagor, an inspection or audit of the Real Property, prepared by a qualified consultant approved by Mortgagee, certifying as to the presence or absence of Hazardous Materials, or to permit Mortgagee to so inspect or audit the Secured Property at Mortgagor's expense. Mortgagor hereby grants to Mortgagee, its employees, agents and independent contractors, the right to enter upon the Secured Property for the purpose of conducting tests, soil borings, the installation of monitoring wells and such other tests as Mortgagee deems necessary or desirable.

        **g.**      Mortgagor expressly acknowledges and agrees that it will reimburse, defend, indemnify and hold harmless the Mortgagee, its successors, assigns claiming any interest in the Secured Property by, through or under Mortgagee, from and against any and all liabilities, claims, damages, demands, causes of action, administrative orders, consent agreements, penalties, expenditures, losses or charges (including, but not limited to, all costs of investigation, monitoring, reasonable legal fees, remedial response removal, restoration or permit acquisition) which may, now or in the future be undertaken, suffered, paid, awarded, assessed, or otherwise incurred as the result of or in connection with:

        **(i)**      claims relating directly or indirectly, in whole or in part, to the presence or removal of any Hazardous Materials at the Secured Property;

        **(ii)**      any investigation, monitoring, clean up, removal, restoration, remedial response or remedial work undertaken on the Real Property by or on behalf of Mortgagor subsequent to the date hereof;

        **(iii)**      any activity on or off the Real Property, whether prior to or during the term of the Loan, and whether such activity was carried on by Mortgagor or any predecessor in title or any employees, agents, contractors or third parties, if such activity involved Hazardous Materials, in whole or in part, directly or indirectly, to the extent it affects the Secured Property;

        **(iv)**      noncompliance with any applicable federal, state or local laws,

E-RECORDED                                            simplifile
ID: INSTR # 115488631; Page 12 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

rules or regulations relating to Hazardous Materials at the Real Property; or

(v)      Mortgagor's breach of any warranty given or agreement set forth in this Section.

**h.**      The foregoing indemnification and agreements shall survive the release or other termination of this Mortgage (by operation of law or otherwise). Mortgagor acknowledges and agrees that its grant of the Secured Property to the Mortgagee shall not and does not relieve or release it of any legal liability and responsibility (under common law, statute or regulation) it would otherwise have as the owner of the Secured Property, whether by way of damages, penalties, remedial actions, or otherwise for any adverse effects or consequences resulting at any time from any contamination of the soil, facilities, buildings, and/or groundwaters which existed on, above or under the Secured Property, *provided, however,* that no indemnified party shall have the right to be indemnified hereunder for any liability resulting from the willful misconduct or gross negligence of such indemnified party (as finally determined by a court of competent jurisdiction).

**Section 1.20.     Assignment Of Leases And Rents**. Mortgagor assigns to Mortgagee all leases and rents of the Real Property, independent of whether a receiver is appointed or not; provided, however, that nothing herein shall obligate Mortgagee to perform any of Mortgagor's duties or obligations under any lease or shall entitle any lease to continue in full force and effect after a foreclosure sale unless Mortgagee has subordinated the lien of this Mortgage such that the foreclosure sale is subject to a lease. Mortgagor shall perform all of its obligations under all leases of all or any portion of the Real Property in the manner and within the time specified in those leases, and shall take all steps which may be required to preserve and maintain the liability of any lessee under any such lease and the enforceability thereof. Mortgagor shall notify Mortgagee promptly of any defense or claim of non-liability, whether in whole or in part, by any such lessee, of which claim or defense Mortgagor has knowledge. If Mortgagor executes a separate assignment of leases and for the benefit of Mortgagee, the terms and conditions contained therein shall be incorporated by reference in this Mortgage and such terms and conditions control in the event of any inconsistency with the items and conditions contained herein regarding the assignment of leases and rents. Provided, however, that Mortgagor shall have a conditional license to collect the rents, issues and profits (but not more than one month in advance) and to exercise all rights of a landlord under any such leases prior to the occurrence of an Event of Default under any of the Loan Documents. Upon any occurrence of an Event of Default, the license granted to Mortgagor herein shall be automatically revoked without further notice to or demand upon Mortgagor, and Mortgagee shall have the right, in its discretion, without notice, by agent or by a receiver appointed by a court, and without regard to the adequacy of any security for the Obligations, (i) to enter upon and take possession of the Real Property, (ii) notify tenants, subtenants and any property manager to pay rents to Mortgagee or its designee, and upon receipt of such notice such persons are authorized and directed to make payment as specified in the notice and disregard any contrary direction or instruction by Mortgagor, and (iii) in its own name, sue for or otherwise collect rents, including those past due, and apply rents, less costs and expenses of operation and collection, including attorneys' fees, to the Obligations in such order and manner as Mortgagee may determine or as otherwise provided for herein. Mortgagee's exercise of any one or more of the foregoing rights shall not cure or waive any Default or notice of Default hereunder.

**Section 1.21.     Change in Tax Laws**. In the event of the passage of any Federal, state, municipal or other law, rule, regulation or ordinance subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of debts secured by mortgages or the manner of collecting taxes so as to impose on Mortgagee any new tax or increase in tax (excluding any changes in income tax rates, laws and regulations and any other enactments, modifications or changes in law that have an adverse effect on Mortgagee in any capacity other than as a Mortgagee or secured party under this Mortgage), Mortgagor shall promptly pay any such tax. In the event that Mortgagor fails to make such

E-RECORDED            Simplifile

ID: INSTR # 115488631; Page 13 of 24
County: Broward, Florida
Date: 12/7/2018      Time: 12:33 PM

prompt payment or in the event any such Federal, state, municipal or other law, rule, regulation or ordinance prohibits Mortgagor from making such payment or would penalize Mortgagee if Mortgagor makes such payment, then the entire unpaid balance of the Loan Agreement and all other sums secured by this Mortgage shall, upon written notice or demand to Mortgagor, immediately become due and payable at the option of Mortgagee.

**Section 1.22.** **Intentionally deleted**.

**Section 1.23.** **No Violation**. The Secured Property are in material compliance with all laws, regulations, ordinances and orders of public authorities applicable to it. Loan proceeds are not intended to be used, and will not be used, for family, household, agricultural or personal purposes.

**Section 1.24.** **Authority**. Mortgagor has the power and authority to consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery, and performance of this Mortgage.

**Section 1.25.** **Validity of Mortage**. The execution, delivery and performance by Mortgagor of the\is Mortgage: (i) are within the legal powers of Mortgagor; (ii) have received all necessary governmental approval; (iii) will not violate any provision of law, or any order of any court or other agency of government; and (iv) will not result in a breach of or constitute a default under any agreement or other instrument to which Mortgagor is a party or by which Mortgagor or the Property is bound, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of Mortgagor's property or assets, except as contemplated by the provisions of the Loan Documents. This Mortgage, when executed and delivered by Mortgagor, will constitute the legal, valid and binding obligation of Mortgagor, enforceable against Mortgagor in accordance with its terms.

**Section 1.26.** **Intentionally deleted**.

**Section 1.27.** **Taxes**. Mortgagor has paid all taxes relating to the Secured Property which have become due or pursuant to any assessments, and Mortgagor does not know of any basis for any additional assessment in respect of such taxes.

**Section 1.28.** **Litigation**. There is not now pending against or affecting the Secured Property, nor, to the knowledge of Mortgagor, is there threatened, any action, suit or proceeding at law or in equity or by or before any administrative agency which, if adversely determined, would materially affect or impair the Secured Property.

**Section 1.29.** **Intentionally deleted**.

**Section 1.30.** **Intentionally deleted**.

**Section 1.31.** **Leases**. There are no material leases affecting the Secured Property.

**Section 1.32.** **USA Patriot Act**. Neither Mortgagor nor any affiliate of Mortgagor is identified in any list of known or suspected terrorists published by any United States government agency, including, without limitation, (i) the annex to Executive Order 13224 issued on September 23, 2001 by the President of the United States and (ii) the Specially Designated Nationals List published by the United States Office of Foreign Assets Control.



**E-RECORDED**                                                   simplifile·

ID: **INSTR # 115488631**; Page 14 of 24
County: Broward, Florida
Date: 12/7/2018          Time: 12:33 PM

## ARTICLE 2

## EVENTS OF DEFAULT

Each of the following events shall constitute an event of default ("Event of Default") under this Mortgage and shall entitle the Mortgagee to exercise all rights and remedies provided in Article 3 hereof:

**Section 2.1.      Loan Agreement Default**. The occurrence of an Event of Default under the Loan Agreement shall be deemed an Event of Default hereunder.

**Section 2.2.      Failure To Perform**. A failure to perform or observe any of the covenants and agreements of this Mortgage and such failure (which, in Mortgagee's sole, absolute and subjective discretion, is capable of being cured) is not cured within fifteen (15) calendar days following the giving of written notice thereof by Mortgagee to Mortgagor.

**Section 2.3.      Intentionally deleted**.

**Section 2.4.      Senior Lien In Bankruptcy**. The existence of a lien or security interest senior or of equal priority to the lien and security interest of this Mortgage created pursuant to Section 364 of the United States Bankruptcy Code as amended.

**Section 2.5.      Default Under Other Liens**.  A default under any document or instrument creating a lien or security interest in all or any part of the Secured Property, whether senior, junior, or of equal priority to the lien and security interest of this Mortgage, and such default is not cured within the applicable grace or cure period.

**Section 2.6.      Denial Of Validity Or Enforceability**.  The validity or enforceability of this Mortgage shall be contested by Mortgagor, or Mortgagor shall deny that Mortgagor has any or any further liability hereunder.

**Section 2.7.      Failure To Give Notice Of Default**. The failure by Mortgagor to advise Mortgagee promptly of the existence of any condition or event, which is known or which reasonably should be known to Mortgagor and which is, or which will be with the giving of notice, an Event of Default under this Mortgage.

**Section 2.8.      Cross Default**. A default under any obligation or indebtedness owed or guaranteed by Mortgagor or any Obligor or guarantor of the Loan to Mortgagee, regardless, in either case, of when created or whether secured or unsecured, which continues beyond the expiration of any applicable grace or cure period.

**Section 2.9.      Misrepresentations**. Any representation contained in this Mortgage was knowingly false or misleading in any material respect at the time it was made or delivered.

## ARTICLE 3

## RIGHTS ON EVENT OF DEFAULT

Upon the occurrence of an Event of Default, the Mortgagee may, at its sole and absolute option and without notice or demand, accelerate and declare immediately due and payable all Obligations, and institute

foreclosure proceedings as provided below and may, with or without declaring the Obligations immediately due and payable, and with or without foreclosing, exercise any other right or remedy provided for herein, in the Loan Agreement or in any other Loan Document, or under law, in equity, by statute, regulation or otherwise.

**Section 3.1.     Sale of the Secured Property.**

    **a.     Foreclosure of Real Property.** Mortgagee may institute an action to foreclose this Mortgage, or take such other action at law or in equity for the enforcement of this Mortgage and the security interest, liens, and encumbrances herein created as to the Real Property and realization on the mortgage security or any other security herein or elsewhere provided for, as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the principal debt, with interest at the rate stipulated in the Loan Agreement to the date of default, and thereafter at a "Default Rate" which shall be the highest rate permitted by applicable law, together with all other sums due by Mortgagor in accordance with the provisions of the Loan Agreement and this Mortgage, and all sums which may have been advanced by Mortgagee for taxes, water or sewer rents, charges or claims, payments on prior liens, insurance or repairs to the Real Property, and all costs of suit at trial and appellate levels.

    **Section 3.1.1.     Foreclosure of Personality.** Upon the occurrence of an Event of Default, should Mortgagee elect to cause any of the Secured Property to be disposed of as personal property, Mortgagee may dispose of all or any part thereof in any manner now or hereafter permitted under Uniform Commercial Code, Chapter 679, Florida Statutes (the "Florida UCC"); it being hereby agreed that fifteen (15) days' notice as to time and place of any sale shall be reasonable. Any such disposition may be conducted by an employee or agent of Mortgagee. Mortgagee shall be eligible to purchase any part or all of such property at such disposition. Any such disposition may be by public or private sale as Mortgagee may so elect, subject to the provisions of the Florida UCC. Mortgagee shall have all of the rights and remedies of a secured party under the Florida UCC. Expenses of retaking, holding, preparing for sale, selling or the like shall include Mortgagee's attorneys' fees and disbursements, and upon the occurrence of an Event of Default, Mortgagor, upon demand of Mortgagee, shall assemble such personal property and make it available to Mortgagee at the Land, or at a place which is deemed to be reasonably convenient to Mortgagee and Mortgagor. Any notices required under the Florida Uniform Commercial Code with respect to the sale or other disposition of any of the Secured Property shall be deemed reasonable if mailed by the Mortgagee to Mortgagor at its last known address at least fifteen (15) days prior to such sale or other disposition, and in the case of a private sale, need only state that the Mortgagee intend to negotiate such a sale.

    **Section 3.1.2.     Application of Proceeds of Sale and Other Monies.** The proceeds of any sale of the Secured Property or any part thereof or any interest therein, whether pursuant to foreclosure or power of sale or otherwise hereunder, together with any other monies at any time held by the Mortgagee pursuant to this Mortgage, shall be applied to pay:

    FIRST: All costs and expenses of enforcing this Mortgage, including, without limitation, all costs and expenses of the sale of the Secured Property or any part thereof or any interest therein, and all costs and expenses of entering upon, taking possession of, removing, holding, constructing improvements on, and operating and managing the Secured Property or any part thereof, and all costs and expenses of repairs, renewals, replacements, additions, betterments and improvements to the Secured Property, and all attorneys' fees and disbursements incurred in connection with any of the foregoing, as the case may be, together with compensation of the Mortgagee as provided herein;

    SECOND: Any taxes, levies, assessments or other charges, together with costs and interest, which have, or in the reasonable opinion of the Mortgagee may have, priority over the lien of this Mortgage, including the pro rata portion thereof applicable to the taxable period during which any payment is made

E-RECORDED    simplifile·

ID: INSTR # 115488631; Page 16 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

pursuant to this Section 3.1.5;

THIRD: All amounts of principal and interest due and payable on the Obligations (whether at maturity, on a date fixed for any payment or prepayment thereof, upon acceleration, or otherwise), including any late charges accrued thereon (to the extent permitted under applicable law) and any other indebtedness secured by this Mortgage, in whatever manner or order Mortgagee may elect;

FOURTH: The amount of any liens of record inferior to this Mortgage, together with lawful interest, and enforceable claims of third parties against the proceeds of any sale; and

FIFTH: The amount of any surplus then remaining from such proceeds to Mortgagor, unless otherwise required by law or directed by a court of competent jurisdiction.

In the event that the proceeds of any such sale or sales, together with all other monies at the time held by the Mortgagee under this Mortgage, are insufficient to pay the foregoing costs and expenses, Mortgagee may, at its sole option, advance such sums as Mortgagee in its sole and absolute discretion shall determine for the purpose of paying all or any part of such costs and expenses, and all such sums so advanced shall be secured by this Mortgage and shall be repaid on demand, together with interest at the default rate of interest under the Loan Agreement.

**Section 3.2.    Right to Perform Mortgagor's Covenants, Etc.** If Mortgagor shall fail to make any payment or perform any act required to be made or performed under this Mortgage or under any other Loan Document, Mortgagee, without waiving or releasing any Obligation or Event of Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Mortgagor, and may enter upon the Secured Property or any part thereof for such purpose and take all such action thereon as, in the opinion of Mortgagee, may be reasonably necessary or appropriate therefor. All sums so paid by Mortgagee and all fees, costs and expenses (including, without limitation, attorneys' fees and disbursements) so incurred, shall be secured by this Mortgage and shall be repaid upon demand, together with interest thereon at the default rate set forth in the Loan Agreement.

**Section 3.3.    Possession Upon Default.**

**a.    Surrender or Taking of Possession**. If an Event of Default shall have occurred, Mortgagor, upon the execution of applicable notice and cure periods, and upon demand of Mortgagee, shall forthwith surrender to Mortgagee the actual possession of the Secured Property, and to the extent permitted by law, Mortgagee may enter and take possession of the Secured Property and may exclude Mortgagor and Mortgagor's agents, invitees and employees wholly therefrom. In taking possession of the Secured Property, Mortgagee may proceed without legal process, if this can be done without breach of the peace. If Mortgagor shall fail to surrender to Mortgagee the actual possession of the Secured Property upon demand, then Mortgagee, to the extent permitted under applicable law, without further notice, may (i) enter upon and take possession of the Secured Property or any part thereof by force, summary proceedings, ejectment or otherwise; (ii) remove Mortgagor and all other persons or entities; and (ii) remove from the Secured Property any and all property owned by other persons or entities.

**b.    Entering into Possession**. Upon every such entering and taking of possession, Mortgagee may hold, store, use, operate, manage, control and maintain the Secured Property and conduct the business thereof, including, without limitation, (i) employ watchmen to protect the Secured Property from degradation or injury and to preserve and protect the Secured Property, (ii) pay and discharge all debts, obligations and liabilities incurred with respect to the Secured Property and all mechanics' and materialmen's or other liens affecting the Secured Property, (iii) make all necessary and proper repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase and

E-RECORDED
simplifile
ID: INSTR # 115488631; Page 17 of 24
County: Broward, Florida
Date: 12/7/2018      Time: 12:33 PM

otherwise acquire additional fixtures, personalty and other property; (iv) insure or keep the Secured Property insured; (v) manage and operate the Secured Property and exercise all the rights and powers of Mortgagor, in its name or otherwise, with respect to the Secured Property; and (vi) enter into any agreements with respect to the exercise by others of any of the powers herein granted to Mortgagee, all as Mortgagee may from time to time determine, in its sole, absolute and subjective discretion, to be necessary or desirable. Mortgagee also may collect and receive all of the earnings, income, rents, profits, issues and revenues of the Secured Property or any part thereof including those past due as well as those accruing thereafter. Mortgagee shall not be liable for or by reason of any such entry, taking of possession or removal, or holding, operation or management, except that any amount so received by the Mortgagee shall be applied as provided in Section 3.1.2 hereof. All sums expended by Mortgagee pursuant to this Section shall be secured by this Mortgage, and shall be repaid on demand, together with interest thereon at the default rate set forth in the Loan Agreement.

       **c.**       **Attorney-in-Fact.** For the purpose of carrying out the provisions of this Section 3.3, Mortgagor hereby constitutes Mortgagee, with full power of substitution, as the true and lawful attorneys-in-fact of Mortgagor to do and perform any and all actions permitted by this Section 3.3, exercisable upon the occurrence of an Event of Default, including, without limitation, (i) to use any funds of Mortgagor for the purpose of paying, settling or compromising all existing bills and claims which are or may be liens against the Secured Property, and as may otherwise be necessary or desirable for the continuation of the work, or for the clearance of title, or paying for the account of Mortgagor any amounts payable by Mortgagor under this Mortgage; (ii) to employ such contractors, subcontractors, agents, architects, engineers and inspectors as shall be required to maintain or operate the Secured Property; and (iii) to execute all applications and certificates in the name of Mortgagor which may be required by any of the Loan Documents and to do any and every act which Mortgagor might do in its own behalf. Such appointment shall be deemed to be coupled with an interest which cannot be revoked. The attorneys-in-fact also shall have power to prosecute and defend all actions or proceedings in connection with the Secured Property.

**Section 3.4.**     **Separate Action.**

       **a.**       **Right to Maintain Separate Action.** Upon the occurrence of an Event of Default, including, without limitation, if Mortgagor shall fail to pay timely, such amounts as may be due on this Mortgage, the Loan Agreement, or each other Loan Document, Mortgagee shall be entitled or empowered to institute such action or proceedings at law, in equity by statute, regulation or other appropriate proceeding as may be advised by its counsel to protect and enforce this Mortgage, the Loan Agreement or each other Loan Document, including, without limitation, for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgments or final decree against Mortgagor and collect, out of the property of Mortgagor wherever situated, as well as out of the Secured Property, in any manner provided by law, movies adjudged or decreed to be payable. Mortgagee shall be entitled to recover judgment as aforesaid before, after, or during the pendency of any proceedings for the enforcement of the provisions of this Mortgage, or the foreclosure of the lien hereof. In the event of a sale of the Secured Property, and of the application of the proceeds of sale as provided in this Mortgage, to the payment of the Obligations, Mortgagee shall be entitled to enforce payment of and to receive all. amounts then remaining due and unpaid upon the Obligations, and shall be entitled to recover judgment for any portion of the Obligations remaining unpaid, with interest thereon at the default rate set forth in the Loan Agreement. No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Secured Property or upon any other property of Mortgagor shall affect in any manner or to any extent the lien of this Mortgage upon the Secured Property or any part thereof, or any liens, rights, powers, or remedies of Mortgagee hereunder, and such liens, rights, powers, and remedies shall continue unimpaired as before. Any monies thus collected by Mortgagee under this Section shall be applied by Mortgagee in accordance with the provisions of Section 3.1.2 hereof.



E-RECORDED
simplifile'
ID: INSTR # 115488631, Page 18 of 24
County: Broward, Florida
Date: 12/7/2018          Time: 12:33 PM

**b.    Cost of Enforcement**. Mortgagor shall pay on demand all reasonable fees, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by or on behalf of Mortgagee, together with accrued interest thereon at the default rate set forth in the Loan Agreement, in enforcing or sustaining the priority of this Mortgage, the Loan Agreement or any other Loan Document.  Such fees, costs and expenses shall be secured by this Mortgage, and shall be repaid upon demand.

**Section 3.5    Appointment of Receiver**. If, upon the occurrence of an Event of Default, the Mortgagee shall, as a matter of right, to the extent permitted under applicable law, be entitled to, and at the direction of Mortgagee shall, appoint a receiver for all or any part of the Secured Property, whether such receivership shall be incidental to a proposed sale of the Secured Property or otherwise, and Mortgagor hereby consents to the appointment of such a receiver and shall not oppose any such appointment. In addition to the foregoing, if an Event of Default shall have occurred, and whether or not Mortgagee shall cause the Obligations secured hereby to become due and payable immediately, Mortgagee shall be entitled as a matter of right, to the extent permitted under applicable law, without regard to the value of the Secured Property as security for the amount due or the solvency of Mortgagor or any other person(s) or entity(ies) liable for the payment of such amount, and without notice to Mortgagor or any other such person(s) or entity(ies) (such notice being hereby waived), to the appointment of a receiver with full and complete authority to enter upon the Secured Property, to employ watchmen to protect the Secured Property from degradation or injury and to preserve and protect the Secured Property, to continue any and all outstanding contracts, or at the receiver's option, to enter into a new contract or contracts, and to pay and discharge all debts, obligations and liabilities incurred with respect to the Secured Property and all mechanic's, materialmen's or other liens affecting the Secured Property. All disbursements made by the receiver under this Section 3.5 and the expenses of receivership shall be secured by this Mortgage, and shall be repaid upon demand, together with interest thereon at the default rate of interest set forth in the Loan Agreement.

**Section 3.6.    Waivers Of Stay, Exemptions**. Mortgagor shall not at any time insist upon, or plead, or in any manner whatsoever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Secured Property or any part thereof, wherever enacted, now or at any time, hereafter in force, which may affect the covenants and terms of performance of this Mortgage, nor claim, take, or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Secured Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provisions herein, or pursuant to the decree, judgment, or order of any court of competent jurisdiction; nor after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the Secured Property so sold or any part thereof; and Mortgagor expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any power herein granted or delegated to the Mortgagee, but to suffer and permit the execution of every power as though no law or laws had been made or enacted. Mortgagor, for Mortgagor and all who may claim under Mortgagor, waives, to the extent that Mortgagor lawfully may, all right to have the Secured Property marshaled upon any foreclosure hereof.

**Section 3.7.    Remedies Nonexclusive**. The rights and remedies provided in this Article 3 upon the occurrence of an Event of Default shall be nonexclusive and shall be in addition to all other remedies and rights available under this Mortgage, the Loan Agreement, and each other Loan Document or applicable law, rule or regulation. All rights and remedies available in the Event of Default shall be cumulative and the exercise of any one or more of the available rights and remedies shall not be considered as or result in a waiver of any other right or remedy and any particular right or remedy may be exercised in conjunction with any or all other rights and remedies provided hereunder or under any other Loan Document.

**Section 3.8.    Indemnification**. If Mortgagee or any of its affiliates acquires the Secured Property after a foreclosure sale or public auction, Mortgagor hereby indemnifies and holds Mortgagee harmless from

**E-RECORDED**   simplifile®
ID: INSTR # 115488631; Page 19 of 24
County: Broward, Florida
Date: 12/7/2018      Time: 12:33 PM

any loss, cost or expense which Mortgagee may sustain as a result of (a) selling the Secured Property so acquired for less than the Obligations; and (b) an action being brought against Mortgagee, following a foreclosure sale or public auction, under either (i) Section 548 of the United States Bankruptcy Code as amended, on the ground that the consideration paid by Mortgagee for the Secured Property was not "reasonably equivalent value," or (ii) any applicable state fraudulent conveyance act, or Section 544(b) of the United States Bankruptcy Code as amended, on the ground that the consideration paid by Mortgagee for the Secured Property was not "fair consideration" or was otherwise inadequate.

## ARTICLE 4

## APPLICATION OF NET PROCEEDS

**Section 4.1     Application of Net Proceeds.** Net Proceeds (defined below) received by the Mortgagee or Mortgagor by reason of (i) damages to or destruction of the Secured Property, or (ii) the exercise of the power of eminent domain, or (iii) the right of any governmental body or agency to purchase any part of the Secured Property, or (iv) a sale of the Secured Property by Mortgagor in reasonable anticipation of the taking thereof by eminent domain, shall, at the direction of Mortgagee, be applied either to the repair, restoration and replacement of the damaged or destroyed property or toward the payment of the Obligations. *Provided*, however, if no Default exists under the Loan Documents, Net Proceeds shall be applied to restoration or replacement of the property which was damaged or destroyed upon receipt by Mortgagee of evidence satisfactory to it that (i) sufficient funds are available to pay the costs of restoring or replacing the Secured Property; (ii) the value of the completed Secured Property shall be at least equal to the value of the Secured Property immediately prior to the damage or destruction; and (iii) the restoration or replacement will be completed within twelve (12) months from the date of such damage or destruction. The foregoing sentence shall not apply to the application of any condemnation awards, such application to be in the sole and absolute discretion of Mortgagee.

The term "Net Proceeds" shall mean when used with respect to any condemnation award or insurance proceeds allocable to the Secured Property, the gross proceeds from condemnation or insurance allocable, with respect to which that term is used, remaining after payment of all expenses (including reasonable attorneys' fees) incurred in the collection of such gross proceeds.

**Section 4.2.     Repair in Accordance with Satisfactory Procedures.** Any repair, restoration or replacement shall be in accordance with procedures reasonably satisfactory to Mortgagee.

**Section 4.3.     Net Proceeds Held in Trust.** Any and all Net Proceeds to be received by Mortgagor hereby are deemed to be, and shall be, hold by Mortgagor in trust for the benefit of Mortgagee.

**Section 4.4.     Notice.** In the case of any material damage to or destruction of any part of the Secured Property, Mortgagor shall give notice within five (5) days thereof to Mortgagee. In case of any taking of all or part of the Secured Property as provided in Section 4.1, the party upon which notice of such taking is served shall give notice within five (5) days thereof to the other. Each such notice shall describe generally the nature and extent of such damage, destruction, taking, loss, proceeding or negotiation.

## ARTICLE 5

## MISCELLANEOUS

**Section 5.1.     Warranties.** Mortgagor warrants specially the Secured Property and that it has good and marketable title thereto, and that it will forever warrant and defend the same and the validity and

E-RECORDED

simplifile

Doc. INSTR # 115488631; Page 20 of 24
County: Broward, Florida
Date: 12/7/2018     Time: 12:33 PM

priority of the lien and security interest of this Mortgage to the Mortgagee against the claims of any and all other persons. Mortgagor further warrants that Mortgagor will execute such other and further assurances as may be requisite.

Section 5.2.      **Waivers.** Mortgagee may at any time or from time to time waive all or any rights under this Mortgage or any other Loan Document, but any waiver or indulgence by Mortgagee at any time or from time to time shall not constitute, unless specifically so expressed by Mortgagee in writing, a future waiver of performance or exact performance by Mortgagor.

Section 5.3.      **No Third Party Mortgagee Rights**.  No person not a party to this Mortgage shall have any benefit hereunder nor have third party Mortgagee rights as a result of this Mortgage or any other Loan Document, except as set forth herein or therein, nor shall any person be entitled to rely on any actions or inactions of Mortgagee, all of which are done for the sole benefit and protection of Mortgagee.

Section 5.4.      **Continuing Obligation Of Mortgagor**.  The terms, conditions, and covenants set forth herein and in the other Loan Documents shall survive closing and shall constitute a continuing obligation of Mortgagor during the course of the transaction contemplated herein.

Section 5.5.      **Binding Obligation**.  This Mortgage shall be binding upon the parties and their personal representatives, successors and assigns.

Section 5.6.      **Final Agreement**.  This Mortgage and the Loan Documents contain the final and entire agreement and understanding of the parties, and any terms and conditions not set forth in this Mortgage or the Loan Documents are not a part of this Mortgage and the understanding of the parties hereto.

Section 5.7.      **Amendment**.  This Mortgage may be amended or altered only in a writing signed by the party to be bound by the amendment, change or alteration.

Section 5.8.      **Photocopies Sufficient.**  A carbon, photographic, or other reproduction of this Mortgage shall be sufficient as a financing statement.

Section 5.9.      **Notices**.  Any notice required or permitted by or in connection with this Mortgage shall be in writing and shall be made by hand delivery, by Federal Express, or other similar overnight delivery service, or by certified mail, return receipt requested, postage prepaid, addressed to the respective parties at the appropriate address set forth below or to such other address as may be hereafter specified by written notice by the respective parties. Notice shall be considered given as of the date of hand delivery, one (1) business day after delivery to Federal Express or similar overnight delivery service, or three (3) business days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was given as provided herein.  If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

      **If to Mortgagee.**

      c/o R.C. Morris Capital Management Ltd.
      Suite 810 – 570 Granville Street
      Vancouver, British Columbia V6C 3P1
      Canada
      Attn: Conrad Krebs



With a copy to:

Dickinson Wright PLLC
424 Church St., Suite 800
Nashville, TN 37219
Attn: James B. Cunningham

**If to Mortgagor.**

10007 Vestal Place
Coral Springs, Florida 33071

With a copy to:

George Pazuniak
c/o O'Kelly Ernst & Joyce, LLC
901 N. Market St. Suite 1000
Wilmington, DE 19801

   **Section 5.11.    Modification to Loan Agreement, Mortgage, Etc.**  Mortgagee may at any time extend the time for payment of the Obligations, or any part thereof, or interest thereon, and waive any of the covenants or conditions in the Loan Agreement or in the Mortgage contained, in whole or in part, either at the request of Mortgagor or of any person having an interest in the Secured Property, take or release other security, release any part of the Secured Property from the effect of this Mortgage, release any party primarily or secondarily liable on the Loan Agreement or on such other security, grant extensions, renewals or indulgences therein, apply to the payment of the principal and interest and premium, if any, of the Obligations any part or all of the proceeds obtained by sale or otherwise as herein provided, without resort or regard to other security, or resort to any one or more of the securities or remedies which Mortgagee may have and which in its absolute discretion it may pursue for the payment of all or any part of the Obligations at that time, in such order and in such manner as it may determine, all without in any way releasing Mortgagor from any of the covenants, agreements or conditions of the Loan Agreement or of this Mortgage, and without releasing any remaining property from the effect of this Mortgage.

   **Section 5.12.    Incorporation By Reference.**  The terms, conditions, and provisions of the Loan Documents are incorporated by reference in this Mortgage to the same extent as if set forth in full in this Mortgage. Should any of the terms, conditions, and provisions of the Loan Documents conflict with the terms conditions, or provisions of this Mortgage, the Mortgagee shall select which of the terms, covenants, and conditions shall govern and control.

   **Section 5.13.    Terminology.**  Whenever used herein, the term the "Mortgagor" includes the personal representatives, successors, and assigns of Mortgagor, and the term "Mortgagee" includes all holders from time to time of the beneficial interest in the Loan Agreement. The use of the singular includes the plural, and the plural includes the singular. The use of any gender applies to all genders.

   **Section 5.14.    Joint And Several Liability.**  If at any time there exists more than one Mortgagor, all liabilities under this Mortgage shall be joint and several with respect to Mortgagors.

   **Section 5.15.    Invalidity.**  If any provision or part of any provision contained in this Mortgage shall be found for any reason to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions or the remaining part of any effective provisions of this Mortgage and this Mortgage shall be construed as if such invalid, illegal; or unenforceable provision or

E-RECORDED   simplifile
ID: INSTR # 115488631; Page 22 of 24
County: Broward, Florida
Date: 12/7/2018       Time: 12:33 PM

part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

Section 5.16.    **Choice Of Law**.  The laws of the State of Florida (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this Mortgage and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this Mortgage and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this Mortgage or which occurred or were to occur as a direct or indirect result of this Mortgage having been executed.

Section 5.17.    **Statutory References**.  Except as otherwise specifically provided herein, this Mortgage is expressly made, executed and delivered pursuant and subject to, and shall be construed in accordance with Florida law.  All obligations and duties imposed upon Mortgagor by such code provisions and all rights and remedies conferred upon Mortgagee thereby are hereby expressly affirmed.  All of the terms, covenants, agreements and conditions hereinafter contained, to the extent the same may differ from or supplement the code provisions, shall be construed as providing Mortgagee with rights and remedies additional and cumulative to those specified in the code provisions (to the extent permitted by applicable law) and shall not be construed in any way as excluding the code provisions or depriving Mortgagee of any of its rights, privileges or remedies thereunder.

Section 5.18.    **Intentionally Deleted**.

Section 5.19.    **Consent To Jurisdiction; Agreement As To Venue**.  Mortgagor irrevocably consents to the non-exclusive jurisdiction of the courts of Florida and of the United States District Court, if a basis for federal jurisdiction exists. Mortgagor agrees that venue shall be proper in any circuit court in the State of Florida selected by Mortgagee or in the United States District Court, if a basis for federal jurisdiction exists and waives any right to object to the maintenance of a suit in any of the state or federal courts of the State of Florida on the basis of improper venue or of inconvenience of forum.

Section 5.20.    **Time**.  Time is of the essence of all Obligations.

Section 5.21.    **Disclosure**.  Mortgagee may from time to time assign or grant participation in the Loan and/or the Obligations, and Mortgagor consents to the delivery by Mortgagee to any acquirer or prospective acquirer of any interest or participation in or with respect to all or part of the Loan and/or the Obligations such information as Mortgagee now or hereafter has relating to the Secured Property, Mortgagor, any party obligated for payment of any part of the Obligations, any tenant or guarantor under any lease with respect to all or any part of the Secured Property and any agent or guarantor under any management agreement affecting any part of the Secured Property.

Section 5.22.    **Intentionally deleted**.



IN WITNESS WHEREOF, Mortgagor has duly executed this Mortgage as of the date first above written (notwithstanding the actual date of execution and delivery hereof).

WITNESSES:                                      MORTGAGOR:

Print Name: ___NEIL PADUA___

GINNA PAULSEN

Print Name: ___Wendy Borda___

HARRISON VARGAS

STATE OF FLORIDA          )
                                          : SS
COUNTY OF BROWARD     )

The foregoing instrument was acknowledged before me this 6th day of December, 2018 by GINNA PAULSEN and HARRISON VARGAS. They [__] are personally known to me or [X] have produced a driver's license as identification.

[Notary Seal]

Notary Public:

Sign: ___Lucas Velez___
Print Name: ___Lucas Velez___
My Commission Expires: July 10/2020

**E-RECORDED** simplifile*

ID: **INSTR # 115488631**; Page 24 of 24
County: Broward, Florida
Date: 12/7/2018        Time: 12:33 PM

**EXHIBIT "A"**

<u>Legal Description</u>

Lot 16, Block E, MAPLEWOOD, according to the Plat thereof, recorded in Plat Book 80, Page 37, of the Public Records of Broward County, Florida.

Parcel Identification Number: 484128-03-0880

24

# EXHIBIT 4

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is executed to be effective as of December 5, 2018, by and between **GINNA PAULSEN**, an individual, and **HARRISON VARGAS**, an individual (collectively, "**Guarantors**" and each individually a "**Guarantor**") and **WBDH-BC HOLDINGS LTD.** ("**Lender**").

### BACKGROUND

A.   **COMTEL DIRECT, LLC**, a Florida limited liability company, and **VARSATEL CORPORATION**, a Florida corporation (collectively, "**Borrower**") and Lender have entered into that certain Loan Agreement, dated as of even date herewith (including all exhibits and schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "**Loan Agreement**") and Lender has, subject to certain terms and conditions set forth therein, agreed to make the Loan and other financial accommodations in favor of Borrower.

B.   Guarantors are Affiliates of Borrower and as such will derive direct and indirect economic benefits from the making of the Loan and other financial accommodations provided to Borrower by Lender.

C.   WHEREAS, in order to induce Lender to enter into the Loan Agreement and other Transaction Documents and to induce Lender to make the Loan and other financial accommodations to Borrower, Guarantors have agreed to guarantee payment of the Obligations (as defined herein).

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants hereinafter contained, and to induce Lender to provide the Loan and other financial accommodations to Borrower, it is agreed as follows:

1.   **DEFINITIONS.**

(a)   Capitalized terms used herein shall have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein.

(b)   References to this "**Guaranty**" shall mean this Guaranty, including all amendments, modifications and supplements and any annexes, exhibits and schedules to any of the foregoing, and shall refer to this Guaranty as the same may be in effect at the time such reference becomes operative.

(c)   "**Loan Parties**" means the Borrower and the Guarantors and "**Loan Party**" means any of them.

(d)   "**Obligations**" means the Loan, Indebtedness, obligations and liabilities of Borrower to Lender under the Loan Agreement and the other Transaction Documents, whether

84242416

matured or un-matured, liquidated or unliquidated, direct or indirect, voluntary or involuntary absolute or contingent, joint or several, due or to become due, now existing or hereafter arising under the Loan Agreement and the other Transaction Documents, or any other agreement executed in connection herewith or therewith.  The term includes, without limitation, all interest (including interest accruing on or after an insolvency event, whether or not such interest constitutes an allowed claim), charges, expenses, commitment, facility, closing and collateral management fees, premiums, attorneys' fees and disbursements, and any other sum chargeable to any Borrower, provided that any of the foregoing are required to be paid under the Loan Agreement and the other Transaction Documents or any other agreement executed in connect herewith or therewith, but not otherwise. Any reference in this Agreement to the Obligations shall include all or any portion thereof, and any extensions, modifications, renewals, alterations thereof, both prior or subsequent to any insolvency proceeding.

(e)    **"Termination Date"** shall mean the date on which (a) the Loan has been repaid in full in cash and (b) all other Obligations under the Loan Agreement and the other Transaction Documents have been completely discharged (other than contingent indemnification obligations not yet due and payable).

## 2.    <u>THE GUARANTY</u>.

(a)    <u>Guaranty of Guaranteed Obligations of Borrower</u>.  Guarantors hereby unconditionally guarantee to Lender and its successors, endorsees, transferees and assigns, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations (hereinafter the **"Guaranteed Obligations"**).   Guarantors agree that this Guaranty is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:

(1)    the genuineness, validity, regularity, enforceability or any future amendment of, or change in this Guaranty, any other Transaction Document or any other agreement, document or instrument to which any Loan Party is or may become a party;

(2)    the absence of any action to enforce this Guaranty or any other Transaction Document or the waiver or consent by Lender with respect to any of the provisions thereof;

(3)    the existence, value or condition of, or failure to perfect any lien against, any Collateral for the Guaranteed Obligations or any action, or the absence of any action, by Lender in respect thereof (including, without limitation, the release of any such security); or

(4)    the insolvency of the Loan Parties or any other party to any Transaction Document; or

(5)    any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment in full of the Guaranteed Obligations),

-2-



it being agreed by Guarantors that their obligations under this Guaranty shall not be discharged until the Termination Date. Guarantors shall be regarded, and shall be in the same position, as principal debtor with respect to the Guaranteed Obligations. Guarantors agree that any notice or directive given at any time to Lender which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by Lender, and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless Lender have specifically agreed otherwise in writing. It is agreed by Guarantors and Lender that the foregoing waivers are of the essence of the transaction contemplated by the Transaction Documents and that, but for this Guaranty and such waivers, Lender would decline to enter into the Loan Agreement.

(b)     Secured Guaranty.    The payment and performance of Guarantors' obligations to Lender under this Guaranty are secured by the Pledge and the Mortgage executed by Guarantors in favor of Lender in connection with the Loan Agreement.

(c)     Demand by Lender.   In addition to the terms of the Guaranty set forth in **Section 2(a)** hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding principal amount of the Guaranteed Obligations under the Loan Agreement (including all accrued interest thereon) is declared to be immediately due and payable, then Guarantors shall, without demand, pay to the holders of the Guaranteed Obligations the entire outstanding Guaranteed Obligations due and owing to such holders. Payment by Guarantors shall be made to Lender in immediately available funds to an account designated by Lender or at the address set forth herein for the giving of notice to Lender or at any other address that may be specified in writing from time to time by Lender, and shall be credited and applied to the Guaranteed Obligations.

(d)     Enforcement of Guaranty.   In no event shall Lender have any obligation (although it is entitled, at its option) to proceed against any Loan Party or any other party to any Transaction Documents or any Collateral pledged to secure Guaranteed Obligations before seeking satisfaction from any Guarantor, and Lender may proceed, prior or subsequent to, or simultaneously with, the enforcement of Lender's rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any lien it may have as security for all or any portion of the Guaranteed Obligations.

(e)     Waiver.   In addition to the waivers contained in **Section 2(a)** hereof, Guarantors waive, and agree that it shall not at any time insist upon, plead or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by Guarantors of the Guaranteed Obligations under, or the enforcement by Lender of this Guaranty. Guarantors hereby waive diligence, presentment and demand (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Guaranteed Obligations, notice of adverse change in Borrower's financial condition or any other fact which might increase the risk to Guarantors)

-3-

with respect to any of the Guaranteed Obligations or all other demands whatsoever and waive the benefit of all provisions of law which are or might be in conflict with the terms of this Guaranty.  Guarantors represent, warrant and agree that, as of the date of this Guaranty, their obligations under this Guaranty are not subject to any offsets or defenses (other than payment in full of the Guaranteed Obligations) against Lender of any kind. Guarantors further agree that their obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender of any kind which may arise in the future.

(f)     Benefit of Guaranty.  The provisions of this Guaranty are for the benefit of Lender and their successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between Borrower, Guarantors and Lender, the obligations of any Loan Party.  In the event all or any part of the Guaranteed Obligations are transferred, endorsed or assigned by Lender to any Person or Persons, any reference to "Lender" or "Lender" herein shall be deemed to refer equally to such Person or Persons.

(g)     Modification of Guaranteed Obligations, Etc.   Guarantors hereby acknowledge and agree that Lender may at any time or from time to time, with or without the consent of, or notice to, Guarantors but subject to the terms of the Transaction Documents and Applicable Law:

(1)     change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Guaranteed Obligations;

(2)     take any action under or in respect of the Transaction Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(3)     amend or modify, in any manner whatsoever, the Transaction Documents (other than this Guaranty, which shall be amended or modified as provided herein);

(4)     extend or waive the time for any Loan Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Transaction Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(5)     upon the occurrence of an Event of Default that remains uncured beyond any applicable notice and cure period, take and hold Collateral for the payment of the Guaranteed Obligations guaranteed hereby or sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which Lender have been granted a lien, to secure any Obligations;

(6)     release anyone who may be liable in any manner for the payment of any amounts owed by any Loan Party to Lender;

(7)     modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of any Loan Party are subordinated to the claims of Lender; and/or

(8)    apply any sums by whomever paid or however realized to any amounts owing by any Loan Party to Lender in such manner as Lender shall determine in its sole discretion;

and Lender shall not incur any liability to Guarantors as a result thereof, and no such action shall impair or release the Guaranteed Obligations of Guarantors under this Guaranty.

(h)    Reinstatement.  This Guaranty shall remain in full force and effect and continue to be effective should any petition be filed by or against any Loan Party for liquidation or reorganization, should any Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of such Loan Party's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lender, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Guaranteed Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(i)    Deferral of Subrogation, Etc.  Notwithstanding anything to the contrary in this Guaranty, or in any other Transaction Document, each Guarantor hereby:

(1)    expressly and irrevocably waives, on behalf of itself and its successors and assigns (including any surety) until the Termination Date, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against any Loan Party in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; and

(2)    acknowledges and agrees (i) that this waiver is intended to benefit Lender and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that Lender and their successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this **Section 2(h)** and their rights under this **Section 2(h)** shall survive payment in full of the Guaranteed Obligations.

(j)    Election of Remedies.  If Lender may, under Applicable Law, proceed to realize benefits under any of the Transaction Documents giving Lender a lien upon any Collateral owned by any Loan Party, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at their sole option, determine which of such remedies or rights they may pursue without affecting any of such rights and remedies under this Guaranty.  If, in the exercise of any of its rights and remedies, any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party, whether because of any

-5-

applicable laws pertaining to "election of remedies" or the like, Guarantors hereby consent to such action by such Lender and waives any claim based upon such action, even if such action by such Lender shall result in a full or partial loss of any rights of subrogation which Guarantors might otherwise have had but for such action by such Lender.  Any election of remedies which results in the denial or impairment of the right of any Lender to seek a deficiency judgment against any Loan Party shall not impair any Guarantor's obligation to pay the full amount of the Guaranteed Obligations.  In the event and Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Transaction Documents, such Lender may bid all or less than the amount of the Guaranteed Obligations and the amount of such bid need not be paid by such Lender but shall be credited against the Guaranteed Obligations.  The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the collateral and the difference between such bid amount and the remaining balance of the Guaranteed Obligations shall be conclusively deemed to be the amount of the Guaranteed Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

3. **DELIVERIES.**  In a form satisfactory to Lender, Guarantors shall deliver to Lender, concurrently with the execution of this Guaranty and the Loan Agreement, the Transaction Documents and other instruments, certificates and documents as are required to be delivered by Borrower to Lender under the Credit Agreement.

4. **AUTHORIZATION; ENFORCEABLE GUARANTEED OBLIGATIONS**. The execution, delivery and performance of this Guaranty and all other Transaction Documents and all instruments and documents to be delivered by each Guarantor hereunder and under the Loan Agreement have been duly authorized by all necessary or proper action, are not in contravention of any provision of any Guarantor's organizational documents, do not violate any law or regulation, or any order or decree of any Governmental Authority, do not conflict with or result in the breach of, or constitute a default under, or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Guarantor is a party or by which any Guarantor or any of its property is bound, do not result in the creation or imposition of any lien upon any of the property of any Guarantor, other than those in favor of Lender and the same do not require the consent or approval of any Governmental Authority or any other Person.  On or prior to the Closing Date, this Guaranty and each of the Transaction Documents to which any Guarantor is a party shall have been duly executed and delivered for the benefit of or on behalf of each Guarantor, and each shall then constitute a legal, valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms.

5. **FURTHER ASSURANCES.**  Guarantors agree, upon the written request of any Lender, to execute and deliver to Lender, from time to time, any additional instruments or documents reasonably considered necessary by Lender to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

6. **PAYMENTS FREE AND CLEAR OF TAXES.  All payments required to be made by any Guarantor hereunder shall be made to Lender free and clear of, and without**

deduction for, any and all present and future Taxes that would be required to be paid by any Guarantor and excluding any Taxes that would normally be payable by Lender. If any Guarantor shall be required by law to deduct any such Taxes from or in respect of any sum payable hereunder, (a) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 6) Lender receive an amount equal to the sum it would have received had no such deductions been made, (b) such Guarantor shall make such deductions, and (c) such Guarantor shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within thirty (30) days after the date of any payment of Taxes, Guarantors shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof. Guarantors shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 6) paid by any Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

7. **OTHER TERMS.**

(a) Entire Agreement. This Guaranty, together with the other Transaction Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to a guaranty of the loans and advances under the Transaction Documents and/or the Guaranteed Obligations.

(b) Headings. The headings in this Guaranty are for convenience of reference only and are not part of the substance of this Guaranty.

(c) Severability. Whenever possible, each provision of this Guaranty shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

(d) Notices. Whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Guaranty, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be addressed to the party to be notified as follows:

(1)     If to Guarantors:

Harrison Vargas and Ginna Paulsen
10007 Vestal Place, Coral Springs, FL 33071
Emails:     hvs@cht-holdings.com
            gpaulsen@cht-holdings.com

with a copy to (which shall not constitute notice):

George Pazuniak
c/o O'Kelly Ernst & Joyce, LLC
901 N. Market St. Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
gp@del-iplaw.com

     (2)     If to Lender:

570 Granville Street, Suite 810
Vancouver, British Columbia V6C 3P1
Canada
Attention:    Conrad Krebs
Phone:    (604) 639-8196
Email:    ckrebs@rcmorris.com

with a copy to (which shall not constitute notice):

Dickinson Wright PLLC
424 Church Street, Suite 800
Nashville, Tennessee 37219
Attention:    James B. Cunningham
Phone:    (248) 433-7540
Email:    JCunnigham@dickinsonwright.com

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

     (c)    Successors and Assigns. This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including a debtor-in-possession on behalf of any Guarantor) and shall, together with the rights and remedies of Lender, inure to the benefit of Lender, all future holders of any instrument evidencing any of the Guaranteed Obligations and their respective successors and assigns. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Guaranteed Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lender. Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

     (f)    No Waiver; Cumulative Remedies; Amendments. No Lender shall by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by such Lender and then only to the extent therein set forth. A waiver by any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which any Lender would

-8-



otherwise have had on any future occasion.  No failure to exercise nor any delay in exercising on the part of any Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law.  None of the terms or provisions of this Guaranty may be waived, altered, modified, supplemented or amended except by an instrument in writing, duly executed by Lender and Guarantors.

(g)    Termination.  This Guaranty is a continuing guaranty and shall remain in full force and effect until the Termination Date.  Upon payment and performance in full of the Guaranteed Obligations, Lender shall deliver to Guarantors such documents as Guarantors may reasonably request to evidence such termination.

(h)    Counterparts.  This Guaranty may be executed in any number of counterparts, each of which shall collectively and separately constitute one and the same agreement.

(i)    GOVERNING LAW.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE TRANSACTION DOCUMENTS, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF FLORIDA. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN THIS GUARANTY. NOTHING IN THIS GUARANTY WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(j)    WAIVER OF JURY TRIAL.   LENDERS AND GUARANTORS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND TO THE FULLEST EXTENT PERMITTED BY LAW WAIVE ANY RIGHTS THAT THEY MAY HAVE TO CLAIM OR RECEIVE CONSEQUENTIAL OR SPECIAL DAMAGES IN CONNECTION WITH ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.

(Signature pages to follow)



IN WITNESS WHEREOF, the parties hereto have executed and delivered this Guaranty as of the date first above written.

**GUARANTORS:**

LENDER:

**WBDH-BC HOLDINGS LTD.,**
An Ontario corporation

_____
Ginna Paulsen

By: _____
Name:  Christopher Morris
Title:   President

_____
Harrison Vargas

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Guaranty as of the date first above written.

**GUARANTORS:**

_____
Ginna Paulsen

_____
Harrison Vargas

**LENDER:**

**WBDH-BC HOLDINGS LTD.,**
An Ontario corporation

By: _____
Name:  Christopher Morris
Title:   President

## SCHEDULE I

### Addresses of Guarantors

10007 Vestal Place, Coral Springs, FL 33071



# EXHIBIT 5

## PLEDGE AGREEMENT

This PLEDGE AGREEMENT (this *"Pledge"*) is entered into as of December 5, 2018, by Ginna Paulsen and Harrison Vargas (collectively, *"Pledgor"*), in favor of **WBDH-BC HOLDINGS LTD.** (*"Lender"*).

### P R E L I M I N A R Y   S T A T E M E N T S

A.      Comtel Direct, LLC, a Florida limited liability company (*"Comtel"*), Varsatel Corporation, a Florida corporation (*"Varsatel"*), and Lender have entered into a Loan Agreement dated as of even date herewith (as amended, modified, or restated from time to time, the *"Loan Agreement"*).  Capitalized terms not otherwise defined in this Pledge shall have the meanings given in the Loan Agreement.

B.      As a condition to the effectiveness of Lender's obligations under the Loan Agreement, Pledgor is required, among other things, to grant to Lender a first-priority lien on and security interest in all membership interests, units, shares, stock or other ownership shares or interests of Comtel and Varsatel that Pledgor owns or otherwise controls (the *"Pledged Shares"*) on the terms set forth herein.

THEREFORE, to secure the full, prompt and complete payment and performance of the *"Secured Obligations"*, as that term is defined in the Security Agreements, for value received and pursuant to the Transaction Documents, Pledgor grants, assigns and transfers to Lender a first-priority security interest in and to the following (collectively referred to in this Pledge as the *"Collateral"*):  the Pledged Shares, together (except as may otherwise be provided herein) with (i) any cash or property received in exchange or in substitution for such interests, (ii) distributions which may be made on, or distributed in consequence of the ownership of, the Pledged Shares, any securities, instruments or distributions of any kind issued, issuable or received upon conversion of, in respect of, or in exchange for any of the Pledged Shares including, without limitation, those arising from a reclassification, reorganization, merger, consolidation, sale of assets, or other exchange of securities or distributions of any kind upon or with respect to the Pledged Shares, and (iii) any subscriptions, warrants, options, accounts, general intangibles or other rights issued in connection with any of the Pledged Shares.

1.      <u>Representations and Warranties</u>.  Pledgor represents, warrants, and agrees as follows for the benefit of Lender:

(a)      The Organizational Documents of Comtel and Varsatel are in full force and effect.  Pledgor will not amend, supplement, or otherwise modify, nor allow the amendment, supplement or other modification of the Organizational Documents in any manner which would have a material adverse effect on Lender's rights without Lender's prior written consent, not to be unreasonably withheld.  Prior to entering into any amendment, supplement, or modification of the Organizational Documents that is not prohibited hereby and that does not require Lender's prior written consent as described in the preceding sentence, Pledgor will provide a copy of the proposed amendment, supplement, or modification to Lender.

(b)     The Pledged Shares constitute 100% of the membership interests in Comtel and constitute 100% of the voting power of all classes of membership interests in Comtel.  The Pledged Shares constitute 100% of the outstanding common stock of Varsatel and constitute 100% of the voting power of all classes of stock of Varsatel.  The Collateral is, and will at all times be, owned by the Pledgor free and clear of any and all options, claims, security interests, liens, pledges, and encumbrances except (i) that created by this Pledge and (ii) other liens and security interests permitted under the Loan Agreement.

(c)     Pledgor has the full power and legal authority to enter into this Pledge and to consummate the transactions contemplated hereby (including the right and power to pledge and transfer the Collateral), and this Pledge constitutes the authorized, valid, and legally binding obligation of Pledgor, enforceable in accordance with its terms, except as limited by equitable principles and by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d)     The execution and delivery of this Pledge, the consummation of the transactions provided for herein, and the fulfillment of the terms hereof will not result in the breach of any of the terms or provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation under, any agreement or other instrument to which Pledgor is a party or by which Pledgor is bound or any provision of the Operating Agreement.

(e)     No approvals of any nature are required by any governmental or regulatory body in connection with the pledge of the Collateral provided for herein and no such approvals are required in connection with the transfer of the Collateral upon the exercise of Lender's rights hereunder.

(f)     The Pledged Shares have been duly authorized and validly issued, are fully paid and nonassessable, and are not subject to any statutory, contractual (in the Organizational Documents or otherwise), or other restriction governing their issuance, transfer, ownership, or control, which restrictions would limit the effectiveness or enforceability of the security interest created pursuant to this Pledge.

(g)     Varsatel Corporation has one-hundred (100) authorized shares.  At closing, Pledgor will deliver a certificate to Lender, together with such corresponding assignments separate from certificate duly executed in blank by Pledgor as required by Lender for the Varsatel Corporation stock.  Within thirty (30) days after closing, Pledgor shall cause the Comtel membership interests certificated and deliver such certificates to Lender, together with such assignments as required by Lender.

2.     <u>Voting</u>.  Prior to any Event of Default (as defined in the Loan Agreement) occurring, Pledgor will have the right to vote the Pledged Shares; provided, however, that Pledgor will not in any event vote Pledged Shares in a manner which would cause or constitute an Event of Default or would otherwise be inconsistent with any of the terms or provisions of this Pledge or the Transaction Documents.  Upon the occurrence of an Event of Default and during the continuance thereof and immediately upon the giving of notice thereof by Lender to the Pledgor, Lender and its successors and assigns will have the right to vote the Pledged Shares to the extent permitted by

applicable law, irrespective of whether Lender exercises any of its own rights and remedies hereunder or under applicable law, and for such purpose Lender and its successors and assigns are designated as proxy, which designation will be deemed to be coupled with an interest and to be irrevocable and valid until the termination of the security interest herein granted.  The designation set forth in the previous sentence will be deemed to amend and supersede any inconsistent provision in the Organizational Documents or other documents to which the Pledgor is subject or to which it is a party.  Pledgor will execute all further documents and take all further actions as may be reasonably requested by Lender to affect Lender's right to vote the Pledged Shares.

3.      Registration of Collateral.  To the extent permitted by applicable corporate law, the Pledged Shares will, upon any Event of Default and at the option of Lender, be registered in the name of the Lender or its nominee(s), but until the occurrence of an Event of Default, Pledgor will remain the legal and beneficial owner of such securities or interests and will retain all of the incidents of ownership, including the right to vote the Pledged Shares as provided in Section 2 hereof.  Lender's rights hereunder may be exercised in addition to such other rights of Lender upon the occurrence of any Event of Default.  Nothing herein will be construed to subject Lender to liability as a member of Comtel or a shareholder of Varsatel nor will Lender be deemed to have assumed any obligations under the Organizational Documents or otherwise.

4.      Covenants of Pledgor.  Until Lender's security interest terminates pursuant to this Pledge, Pledgor will comply with the following covenants and agreements insofar as they expressly apply to Pledgor, and Pledgor will vote the Pledged Shares to cause Comtel and Varsatel to comply with the following covenants and agreements:

(a)     Other than distributions and payments permitted under the Loan Agreement, Pledgor will immediately pay over to Lender all distributions, payments, or other proceeds on the Collateral in the same form as so received (with any necessary endorsement), which will be applied to the Secured Obligations in a manner and order as determined in Lender's discretion.

(b)     Pledgor will not, unless otherwise authorized under the Transaction Documents, (i) directly or indirectly declare, order, pay, make, or set apart any sum or property for distribution to any owner of the Pledged Shares, (ii) cause or permit to be issued any securities or interest of any kind, or any options, warrants, or other rights entitling any person or entity to acquire any securities of, or interest in, Comtel or Varsatel, (iii) make any commitment to purchase, liquidate, or otherwise acquire any such securities or interests, or (iv) authorize or cause any change in Comtel's or Varsatel's capital structure or the Organizational Documents.

(c)     Pledgor will execute and deliver, upon Lender's request, from time to time, such financing statements, continuation statements, assignments, security agreements, and other instruments or documents as the Lender may request to perfect, and to keep and continue perfected at all times, Lender's security interest in the Collateral.

(d)     Pledgor will not sell or encumber any of the Collateral without Lender's prior written consent, nor will it create, assume or permit or suffer to exist any security interest, lien, charge, or other encumbrance in favor of any individual or entity in, on or to any of the Collateral, except as permitted under the Loan Agreement.

5.    <u>Remedies Upon Default</u>.  In addition to any other rights accorded to Lender hereunder, upon the occurrence and during the continuation of an Event of Default:

(a)    Except as otherwise provided in the Loan Agreement, Lender will be entitled to receive any cash distributions or payments on the Collateral directly and to exercise in Lender's discretion all voting rights pertaining thereto.  All cash distributions or payments which are received by Pledgor contrary to the provisions of this Section 5(a) will be received in trust for the benefit of Lender, will be segregated from other funds of Pledgor, and will be forthwith paid over to Lender as Collateral in the same form as so received (with any necessary endorsement).

(b)    Lender will have the right to exercise all rights with respect to the Collateral as if it were the sole and absolute owner thereof, including, without limitation, to vote or to exchange, at its sole discretion, any and all of the Collateral in connection with (i) a merger, reorganization, consolidation, recapitalization or other readjustment concerning or involving the Collateral or Comtel or Varsatel, (ii) any sale, lease or other transfer of all or any portion of Comtel's or Varsatel's assets, and (iii) any amendment of the Organizational Documents.

(c)    Pledgor will take any action necessary or required or requested by Lender in order to allow the Lender to fully enforce its security interest in the Collateral hereunder and to realize thereon to the fullest extent possible, including, but not limited to, filing any claims with any court, liquidator, trustee, guardian, receiver, or other similar person or party.

(d)    Lender will have all of the rights of a secured party under the Uniform Commercial Code of the State of Florida, as amended, and any other applicable law, including the right (i) to sell any or all of the Collateral at one or more public or private sales upon delivery of written notice thereof to Pledgor (at the address set forth in or designated pursuant to Section 9 hereof) of the time and place of any public sale and of the date on which the Collateral will first be offered for sale in the case of any private sale, and to bid or purchase at any public or private sale any part or all thereof in its own or a nominee's name, free and clear of any equity of redemption, and (ii) to apply the net proceeds of the sale, after deduction for any costs and expenses of sale (including any liabilities incurred in connection therewith), including reasonable attorneys' fees, to pay the Obligations in the manner and order as determined in Lender's discretion.  Pledgor acknowledges and agrees that the notice provided for above is reasonable.  Further, Lender will be entitled to the appointment of a receiver for all or any part of the business of Comtel and Varsatel, which receiver will have such powers as may be conferred by the appointing authority.  Pledgor acknowledges and agrees that Lender is not required to exercise all remedies and rights available to it equally with respect to all of the Collateral, and Lender may select less than all of the Collateral with respect to which the remedies as determined by Lender may be exercised.  Pledgor waives to the extent permitted by law any rights it may have of equity, redemption, stay, or appraisal with respect to the Collateral.

6.    <u>Power of Attorney</u>.  Pledgor appoints Lender as its attorney-in-fact, irrevocably, to do any and all acts and things which Lender may deem necessary to exercise Lender's remedies pursuant to Section 5 of this Pledge.

7.      Non-Waiver and Non-Exclusive Remedies.

(a)      Non-Exclusive Remedies.  No remedy or right herein conferred upon, or reserved to, Lender is intended to be to the exclusion of any other remedy or right, but each and every such remedy or right will be cumulative and will be in addition to every other remedy or right given hereunder, and now or hereafter existing at law or in equity.

(b)      Delay and Non-Waiver.  No delay or omission by Lender in exercising any remedy or right accruing upon an Event of Default will impair any such remedy or right, or will be construed to be a waiver of any Event of Default, or an acquiescence therein, nor will it affect any subsequent Event of Default of the same or of a different nature.

8.      Termination of Security Interest.  At such times as (a) all commitments of Lender to make loans or otherwise extend credit to Comtel and Varsatel have expired or been terminated, (b) all of the Secured Obligations have been paid and performed in full, and (c) such satisfaction of the Secured Obligations is not then subject to any filed or threatened claim, contest, voidance, avoidance, or offset of any type which, in Lender's reasonable judgment, might adversely affect its right to the indefeasible payment of the Secured Obligations, to the extent that rights in the Collateral will not have been sold or otherwise applied by Lender pursuant to the terms hereof, then the security interest provided herein will terminate and Lender will return to Pledgor all Collateral then held by Lender and will execute, in form for filing, termination statements, if required, of the security interest granted herein and, thereafter, no party hereto will have any further rights or obligations hereunder.

9.      Miscellaneous Provisions.

(a)      Notices.  All notices, requests, consents, demands, approvals and other communications hereunder shall be delivered to Pledgor and Lender at their respective addresses for notice as provided in the Security Agreements.

(b)      Successors and Assigns.  The terms herein will be binding upon and will inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

(c)      Entire Agreement.  This Pledge is a Transaction Document.  This Pledge and the other Transaction Documents set forth all of the promises, covenants, agreements, conditions, and understandings among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral or written, with respect thereto, except as contained or referred to herein.  The terms of this Pledge may be amended, terminated, or modified or supplemented upon the written consent of the parties hereto.

(d)      Governing Law.  This Pledge and the rights and obligations of the parties hereunder will be construed and enforced in accordance with and will be governed by the laws of the State of Florida, without regard to the laws as to conflicts of laws.

(e)     Severability.  If any of the provisions or terms of this Pledge will for any reason be held to be invalid or unenforceable, such invalidity or unenforceability will not affect any other of the terms hereof, but this Pledge will be construed as if such invalid or unenforceable term had never been contained herein.

(f)     Defined Terms.  Terms used but not defined herein will have the meanings ascribed thereto in the Loan Agreement.

(g)     Headings; Counterparts.   Headings in this Pledge are for purposes of reference only, and will not limit or otherwise affect the meaning hereof.  This Pledge may be executed in one or more counterparts, each of which will constitute an original agreement, but all of which together will constitute one and the same instrument.

(h)     Obligations Absolute.   The rights of Lender and the security interest hereunder, and all obligations of Pledgor hereunder, will be absolute and unconditional, will not be subject to any counterclaim, setoff, recoupment or defense based upon any claim Pledgor may have against Lender and will remain in full force and effect without regard to, and, except by (x) full and indefeasible satisfaction of the Obligations, or (y) an explicit amendment or modification of this Pledge signed by the Pledgor, will not be released, discharged or in any way affected by, any circumstance or condition (whether or not Pledgor will have any knowledge or notice thereof), including, without limitation, (a) any amendment or modification of or supplement to the Transaction Documents or any grant of any additional liens to Lender to secure the Obligations, or any release of any lien granted to Lender to secure the Obligations (provided that any amendment, modification or supplement of or to the Transaction Documents explicitly ; (b) any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such instrument, or any exercise or nonexercise of any right, remedy, power or privilege under or in respect of any such instrument; (c) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceeding with respect to Comtel, Varsatel or Pledgor or their respective properties or creditors; (d) any invalidity or unenforceability, in whole or in part, of any term hereof or of any of the Transaction Documents; (e) any failure on the part of Comtel, Varsatel or Pledgor for any reason to perform or comply with any term of the Transaction Documents; or (f) any other occurrence whatsoever, whether similar or dissimilar to the foregoing.

(I)     WAIVER OF JURY TRIAL. LENDER AND PLEDGOR, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS PLEDGE OR ANY RELATED INSTRUMENT OR AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS PLEDGE OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY OF THEM.  NEITHER LENDER NOR PLEDGOR WILL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  THESE PROVISIONS WILL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED

BY EITHER LENDER OR PLEDGOR EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY BOTH OF THEM.

[The remainder of this page intentionally left blank.  Signatures appear on next page.]

IN WITNESS WHEREOF, the parties have caused this Pledge to be duly executed and delivered on the date first above written.

PLEDGOR:

Name: GINNA PAULSEN

Name: HARRISON VARGAS

The undersigned acknowledges the foregoing Pledge Agreement. The undersigned further agrees that, to the extent its Organizational Documents are inconsistent with Section 1 of this Pledge, such Organizational Documents are hereby deemed amended such that the representations and warranties made in Section 1 of this Pledge are true and correct:

COMTEL DIRECT, LLC,
a Florida limited liability company

By: _____

Name:  Ginna Paulsen

Title:  President

The undersigned acknowledges the foregoing Pledge Agreement.  The undersigned further agrees that, to the extent its Organizational Documents are inconsistent with Section 1 of this Pledge, such Organizational Documents are hereby deemed amended such that the representations and warranties made in Section 1 of this Pledge are true and correct:

**VARSATEL CORPORATION,**
a Florida corporation

By: _____

Name:  Harrison Vargas

Title:  Chief Executive Officer

# EXHIBIT 6

## ASSIGNMENT OF PROCEEDS AND GUARANTY

This Assignment of Proceeds and Guaranty (this "Assignment") is made and entered into this  21  day of January, 2020, by and between **VARSATEL CORPORATION**, a Florida corporation ("Assignor"), **WBDH-BC HOLDINGS LTD.** ("Assignee"), **LDI NETWORKS INC.**, a Florida corporation ("LDI") and **LOUIS ARRIOLA**, an individual ("Guarantor").

### RECITALS

A.      Assignor, including related entities, is presently entitled to receive the sum of $855,343.87 (the "Current Proceeds") from LDI from certain past business arrangements. LDI and the Assignor are in ongoing discussions regarding the payment timing of the Current Proceeds.

B.      Pursuant to that certain business arrangement more particularly described on Exhibit A (the "Agreement"), the Assignor will be entitled to receive from LDI not less than $164,000 (calculated as $174,000 of generated profit less a $10,000 service fee) on a monthly basis (though in any event paid weekly) during the term of the Agreement (together, the "Future Proceeds").

C.      Assignor wishes to assign to Assignee all of Assignor's right, title and interest in and to the Future Proceeds pursuant to the terms of this Assignment.

D.      Assignor wishes to direct LDI to pay the Future Proceeds of $41,000 per week directly to the Assignee.

E.      Guarantor wishes to personally guaranty the payment of the Current Proceeds to Assignor and the Future Proceeds to Assignee.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Assignment and Assumption.  Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to the Future Proceeds.  Assignee hereby assumes and undertakes all of Assignor's right, title, interest, in and to the Future Proceeds.

2.      Payment Direction.  Assignor hereby directs LDI to pay the Future Proceeds to Assignee directly, when due to be paid to Assignor pursuant to the Agreement per the wire details listed in Exhibit B.

3.      Guaranty. Guarantor hereby unconditionally guarantees to Assignor and Assignee, as applicable, and their successors, endorsers, transferees and assigns, the prompt payment of the (a) Current Proceeds by LDI to Assignor, and (b) Future Proceeds by LDI to Assignee, when due to be paid to Assignor pursuant to the Agreeement.  Guarantor agrees that this Guaranty is a guaranty of payment and performance and not of collection, and that his obligations under this Guaranty shall be primary, absolute and unconditional.

*H.V   LA*

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first above written.

**VARSATEL CORPORATION,**
a Florida corporation

By: _____
Its:

**WBDH-BC HOLDINGS LTD.**

By: Christopher Morris
Its: Director

**LDI NETWORKS INC.,** a Florida corporation

By: Louis R. Arriola
Its: CEO

**LOUIS ARRIOLA,** an individual

## **EXHIBIT A**

The terms of the Agreement are generally as follows:

- Varsatel, with LDI's assistance, will open an account (the "Varsatel Account") within the Teleescrow platform (the "Platform"), as governed by a Payment Services Agreement between Varsatel and Teleescrow LLC signed January __, 2020 (the "Teleescrow Agreement").
- Varsatel will contribute funds into the Varsatel Account (the "Contribution"), with an initial contribution of $2,000,000, to be held in escrow for the purpose of buying and selling wholesale telecommunication minutes, as mutually agreed between LDI and Varsatel (the "Purpose").
- All funds contributed by Varsatel will remain on deposit with and only be used within the Varsatel Account.
- LDI will arrange for and manage an ongoing series of transactions to be routed through the Varsatel Account in accordance with the Purpose.
- LDI will ensure that a minimum amount of revenue is run through the Varsatel Account such that at least $174,000 a month in profit is generated.
- Such profit amount (the "Monthly Fee"), will be payable every Monday for the preceding week's revenue. The Monthly fee should be paid out in accordance with the Assignment of Proceeds and Guaranty document signed by the parties on January 21, 2020.
- Varsatel will pay to LDI a monthly service fee of $10,000 (the "Service Fee"), which LDI will invoice on a monthly basis, in arrears. The Service Fee shall be payable only if LDI delivers on all the Monthly Fee payments required in any given month.
- The Monthly Fee should continue indefinitely, for as long as for as long as funds are in the Varsatel Account and under the management of LDI.
- Either party may terminate the Purpose with 90 days advance notice, or as mutually agreed. At the end of any such notice period, Varsatel will withdraw its Contribution.
- Varsatel must maintain real time, online access to the Varsatel Account with 24/7 availability.
- It is understood that any settlement or transactional issues and/or disputes in the Platform would be the responsibility of LDI, with no liability or recourse to Varsatel. For greater certainty, LDI will be responsible for payment of the Monthly Fee until the Purpose is terminated according to these terms. These terms should be read to expressly prohibit any right of set-off or holdback with respect to the Monthly Fee or Contribution in relation to a dispute of any kind.
- These terms should be read to enhance and further protect Varsatel in addition to any terms of the Teleescrow Agreement, and LDI hereby covenants and agrees that it shall bear any/all risk of loss or damages in relation to the Teleescrow Agreement and the Platform.
- All customers and vendors under Varsatel account will not take any risks. Vendor's funds will go into an Escrow account LDI will be responsible for and monies pointing to Varsatel on the customer end "Before the service is provided" would also be the responsibility of LDI.
- Any disputes, offsets, loss of revenue among customers within the platform will not be the responsibility of Varsatel, including but not limited to any kind of hacking the Platform can or may be subject to.

# **EXHIBIT B**

ASSIGNEE NAME:

WBDH-BC Holdings Ltd.

ASSIGNEE ADDRESS:

Suite 810 – 570 Granville Street,
Vancouver, BC, V6C 3P1

BRANCH#:
00010

ACCOUNT #:


BANK #:
003

BANK ADDRESS:
Royal Bank of Canada
Main Branch – 1025 West Georgia street
Vancouver, BC, V6E 3N9

SWIFT CODE #:
ROYCCAT2

# EXHIBIT 7

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is executed to be effective as of January 18, 2020, by and between **LOUIS ARRIOLA**, an individual, and **LDI NETWORKS INC.**, a Florida corporation (collectively, "**Guarantors**" and each individually a "**Guarantor**") and **WBDH-BC HOLDINGS LTD.** ("**Lender**").

## BACKGROUND

A.  **COMTEL DIRECT, LLC**, a Florida limited liability company, and **VARSATEL CORPORATION**, a Florida corporation (collectively, "**Borrower**") and Lender have entered into that certain Loan Agreement, dated as of December 5, 2018, as amended by the First Amendment to Loan Agreement dated January 18, 2019, and the Second Amendment to Loan Agreement dated as of December 20, 2019 (including all exhibits and schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "**Loan Agreement**") and Lender has, subject to certain terms and conditions set forth therein, agreed to make the Loan and other financial accommodations in favor of Borrower.

B.  Guarantors will derive direct and indirect economic benefits from the making of the Loan and other financial accommodations provided to Borrower by Lender.

C.  WHEREAS, in order to induce Lender to enter into the Loan Agreement and other Transaction Documents and to induce Lender to make the Loan and other financial accommodations to Borrower, Guarantors have agreed to guarantee payment of the Obligations, subject to the terms of this Guaranty.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants hereinafter contained, and to induce Lender to provide the Loan and other financial accommodations to Borrower, it is agreed as follows:

1.  **DEFINITIONS.**

    (a)    Capitalized terms used herein shall have the meanings assigned to them in the Loan Agreement, unless otherwise defined herein.

    (b)    References to this "**Guaranty**" shall mean this Guaranty, including all amendments, modifications and supplements and any annexes, exhibits and schedules to any of the foregoing, and shall refer to this Guaranty as the same may be in effect at the time such reference becomes operative.

    (c)    "**Loan Parties**" means the Borrower and the Guarantors and "**Loan Party**" means any of them.

    (d)    "**Obligations**" means the Loan, Indebtedness, obligations and liabilities of Borrower to Lender under the Loan Agreement and the other Transaction Documents, whether



84242416

matured or un-matured, liquidated or unliquidated, direct or indirect, voluntary or involuntary absolute or contingent, joint or several, due or to become due, now existing or hereafter arising under the Loan Agreement and the other Transaction Documents, or any other agreement executed in connection herewith or therewith. The term includes, without limitation, all interest (including interest accruing on or after an insolvency event, whether or not such interest constitutes an allowed claim), charges, expenses, commitment, facility, closing and collateral management fees, premiums, attorneys' fees and disbursements, and any other sum chargeable to any Borrower, provided that any of the foregoing are required to be paid under the Loan Agreement and the other Transaction Documents or any other agreement executed in connect herewith or therewith, but not otherwise. Any reference in this Agreement to the Obligations shall include all or any portion thereof, and any extensions, modifications, renewals, alterations thereof, both prior or subsequent to any insolvency proceeding.

(e)   "**Termination Date**" shall mean the date on which (a) the Loan has been repaid in full in cash and (b) all other Obligations under the Loan Agreement and the other Transaction Documents have been completely discharged (other than contingent indemnification obligations not yet due and payable).

## 2.    THE GUARANTY.

(a)   <u>Guaranty of Guaranteed Obligations of Borrower</u>.   Guarantors hereby unconditionally guarantee to Lender and its successors, endorsees, transferees and assigns, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations (hereinafter the "**Guaranteed Obligations**").   Guarantors agree that this Guaranty is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:

(1)   the genuineness, validity, regularity, enforceability or any future amendment of, or change in this Guaranty, any other Transaction Document or any other agreement, document or instrument to which any Loan Party is or may become a party;

(2)   the absence of any action to enforce this Guaranty or any other Transaction Document or the waiver or consent by Lender with respect to any of the provisions thereof;

(3)   the existence, value or condition of, or failure to perfect any lien against, any Collateral for the Guaranteed Obligations or any action, or the absence of any action, by Lender in respect thereof (including, without limitation, the release of any such security); or

(4)   the insolvency of the Loan Parties or any other party to any Transaction Document; or

(5)   any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment in full of the Guaranteed Obligations),



it being agreed by Guarantors that their obligations under this Guaranty shall not be discharged until the Termination Date. Guarantors shall be regarded, and shall be in the same position, as principal debtor with respect to the Guaranteed Obligations. Guarantors agree that any notice or directive given at any time to Lender which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by Lender, and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless Lender have specifically agreed otherwise in writing. It is agreed by Guarantors and Lender that the foregoing waivers are of the essence of the transaction contemplated by the Transaction Documents and that, but for this Guaranty and such waivers, Lender would decline to enter into the Loan Agreement.

(b)     Secured Guaranty.     The payment and performance of Guarantors' obligations to Lender under this Guaranty are secured by the Pledge and the Mortgage executed by Guarantors in favor of Lender in connection with the Loan Agreement.

(c)     Demand by Lender.  In addition to the terms of the Guaranty set forth in **Section 2(a)** hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding principal amount of the Guaranteed Obligations under the Loan Agreement (including all accrued interest thereon) is declared to be immediately due and payable, then Guarantors shall, without demand, pay to the holders of the Guaranteed Obligations the entire outstanding Guaranteed Obligations due and owing to such holders. Payment by Guarantors shall be made to Lender in immediately available funds to an account designated by Lender or at the address set forth herein for the giving of notice to Lender or at any other address that may be specified in writing from time to time by Lender, and shall be credited and applied to the Guaranteed Obligations.

(d)     Enforcement of Guaranty.  In no event shall Lender have any obligation (although it is entitled, at its option) to proceed against any Loan Party or any other party to any Transaction Documents or any Collateral pledged to secure Guaranteed Obligations before seeking satisfaction from any Guarantor, and Lender may proceed, prior or subsequent to, or simultaneously with, the enforcement of Lender's rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any lien it may have as security for all or any portion of the Guaranteed Obligations.

(e)     Waiver.  In addition to the waivers contained in **Section 2(a)** hereof, Guarantors waive, and agree that it shall not at any time insist upon, plead or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by Guarantors of the Guaranteed Obligations under, or the enforcement by Lender of this Guaranty. Guarantors hereby waive diligence, presentment and demand (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Guaranteed Obligations, notice of adverse change in Borrower's financial condition or any other fact which might increase the risk to Guarantors) with respect to any of the Guaranteed Obligations or all other demands whatsoever and waive the



benefit of all provisions of law which are or might be in conflict with the terms of this Guaranty. Guarantors represent, warrant and agree that, as of the date of this Guaranty, their obligations under this Guaranty are not subject to any offsets or defenses (other than payment in full of the Guaranteed Obligations) against Lender of any kind. Guarantors further agree that their obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender of any kind which may arise in the future.

(f)     <u>Benefit of Guaranty</u>.  The provisions of this Guaranty are for the benefit of Lender and their successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between Borrower, Guarantors and Lender, the obligations of any Loan Party.  In the event all or any part of the Guaranteed Obligations are transferred, endorsed or assigned by Lender to any Person or Persons, any reference to "Lender" or "Lender" herein shall be deemed to refer equally to such Person or Persons.

(g)     <u>Modification of Guaranteed Obligations, Etc</u>.   Guarantors hereby acknowledge and agree that Lender may at any time or from time to time, with or without the consent of, or notice to, Guarantors but subject to the terms of the Transaction Documents and Applicable Law:

(1)     change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Guaranteed Obligations;

(2)     take any action under or in respect of the Transaction Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(3)     amend or modify, in any manner whatsoever, the Transaction Documents (other than this Guaranty, which shall be amended or modified as provided herein);

(4)     extend or waive the time for any Loan Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Transaction Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(5)     upon the occurrence of an Event of Default that remains uncured beyond any applicable notice and cure period, take and hold Collateral for the payment of the Guaranteed Obligations guaranteed hereby or sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which Lender have been granted a lien, to secure any Obligations;

(6)     release anyone who may be liable in any manner for the payment of any amounts owed by any Loan Party to Lender;

(7)     modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of any Loan Party are subordinated to the claims of Lender; and/or



(8)      apply any sums by whomever paid or however realized to any amounts owing by any Loan Party to Lender in such manner as Lender shall determine in its sole discretion;

and Lender shall not incur any liability to Guarantors as a result thereof, and no such action shall impair or release the Guaranteed Obligations of Guarantors under this Guaranty.

(h)      Reinstatement.  This Guaranty shall remain in full force and effect and continue to be effective should any petition be filed by or against any Loan Party for liquidation or reorganization, should any Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of such Loan Party's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lender, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Guaranteed Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(i)      Deferral of Subrogation, Etc.  Notwithstanding anything to the contrary in this Guaranty, or in any other Transaction Document, each Guarantor hereby:

(1)      expressly and irrevocably waives, on behalf of itself and its successors and assigns (including any surety) until the Termination Date, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against any Loan Party in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; and

(2)      acknowledges and agrees (i) that this waiver is intended to benefit Lender and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that Lender and their successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this **Section 2(h)** and their rights under this **Section 2(h)** shall survive payment in full of the Guaranteed Obligations.

(j)      Election of Remedies.  If Lender may, under Applicable Law, proceed to realize benefits under any of the Transaction Documents giving Lender a lien upon any Collateral owned by any Loan Party, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at their sole option, determine which of such remedies or rights they may pursue without affecting any of such rights and remedies under this Guaranty.  If, in the exercise of any of its rights and remedies, any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party, whether because of any

applicable laws pertaining to "election of remedies" or the like, Guarantors hereby consent to such action by such Lender and waives any claim based upon such action, even if such action by such Lender shall result in a full or partial loss of any rights of subrogation which Guarantors might otherwise have had but for such action by such Lender. Any election of remedies which results in the denial or impairment of the right of any Lender to seek a deficiency judgment against any Loan Party shall not impair any Guarantor's obligation to pay the full amount of the Guaranteed Obligations. In the event and Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Transaction Documents, such Lender may bid all or less than the amount of the Guaranteed Obligations and the amount of such bid need not be paid by such Lender but shall be credited against the Guaranteed Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the collateral and the difference between such bid amount and the remaining balance of the Guaranteed Obligations shall be conclusively deemed to be the amount of the Guaranteed Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

3. **DELIVERIES.** In a form satisfactory to Lender, Guarantors shall deliver to Lender, concurrently with the execution of this Guaranty and the Loan Agreement, the Transaction Documents and other instruments, certificates and documents as are required to be delivered by Borrower to Lender under the Credit Agreement.

4. **AUTHORIZATION; ENFORCEABLE GUARANTEED OBLIGATIONS**. The execution, delivery and performance of this Guaranty and all other Transaction Documents and all instruments and documents to be delivered by each Guarantor hereunder and under the Loan Agreement have been duly authorized by all necessary or proper action, are not in contravention of any provision of any Guarantor's organizational documents, do not violate any law or regulation, or any order or decree of any Governmental Authority, do not conflict with or result in the breach of, or constitute a default under, or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Guarantor is a party or by which any Guarantor or any of its property is bound, do not result in the creation or imposition of any lien upon any of the property of any Guarantor, other than those in favor of Lender and the same do not require the consent or approval of any Governmental Authority or any other Person. On or prior to the Closing Date, this Guaranty and each of the Transaction Documents to which any Guarantor is a party shall have been duly executed and delivered for the benefit of or on behalf of each Guarantor, and each shall then constitute a legal, valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms.

5. **FURTHER ASSURANCES.** Guarantors agree, upon the written request of any Lender, to execute and deliver to Lender, from time to time, any additional instruments or documents reasonably considered necessary by Lender to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

6. **PAYMENTS FREE AND CLEAR OF TAXES. All payments required to be made by any Guarantor hereunder shall be made to Lender free and clear of, and without deduction for, any and all present and future Taxes that would be required to be paid by**



any Guarantor and excluding any Taxes that would normally be payable by Lender.  If any Guarantor shall be required by law to deduct any such Taxes from or in respect of any sum payable hereunder, (a) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 6) Lender receive an amount equal to the sum it would have received had no such deductions been made, (b) such Guarantor shall make such deductions, and (c)  such Guarantor shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law.  Within thirty (30) days after the date of any payment of Taxes, Guarantors shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof. Guarantors shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 6) paid by any Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

7.   **OTHER TERMS**.

(a)   Entire Agreement.  This Guaranty, together with the other Transaction Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to a guaranty of the loans and advances under the Transaction Documents and/or the Guaranteed Obligations.

(b)   Headings.  The headings in this Guaranty are for convenience of reference only and are not part of the substance of this Guaranty.

(c)   Severability.  Whenever possible, each provision of this Guaranty shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

(d)   Notices.  Whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Guaranty, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be addressed to the party to be notified as follows:

(1)   If to Guarantors:

Louis Arriola
848 Brickell Key
PH 4603
Miami, FL 33131

LDI Networks Inc.



550 Biltmore Way
Suite 116
Coral Gables, FL 33134

(2)    If to Lender:

570 Granville Street, Suite 810
Vancouver, British Columbia V6C 3P1
Canada
Attention:    Conrad Krebs
Phone:        (604) 639-8196
Email:        ckrebs@rcmorris.com

with a copy to (which shall not constitute notice):

Dickinson Wright PLLC
424 Church Street, Suite 800
Nashville, Tennessee 37219
Attention:    James B. Cunningham
Phone:        (248) 433-7540
Email:        JCunnigham@dickinsonwright.com

or at such other address as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

(e)    Successors and Assigns.  This Guaranty and all obligations of Guarantors hereunder shall be binding upon the successors and assigns of Guarantors (including a debtor-in-possession on behalf of any Guarantor) and shall, together with the rights and remedies of Lender, inure to the benefit of Lender, all future holders of any instrument evidencing any of the Guaranteed Obligations and their respective successors and assigns.  No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Guaranteed Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lender.  Guarantors may not assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Guaranty.

(f)    No Waiver; Cumulative Remedies; Amendments.  No Lender shall by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by such Lender and then only to the extent therein set forth.  A waiver by any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which any Lender would otherwise have had on any future occasion.  No failure to exercise nor any delay in exercising on the part of any Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law.  None of the terms or



provisions of this Guaranty may be waived, altered, modified, supplemented or amended except by an instrument in writing, duly executed by Lender and Guarantors.

(g)     Termination.  This Guaranty is a continuing guaranty and shall remain in full force and effect until the Termination Date.  Upon payment and performance in full of the Guaranteed Obligations, Lender shall deliver to Guarantors such documents as Guarantors may reasonably request to evidence such termination.

(h)     Counterparts.  This Guaranty may be executed in any number of counterparts, each of which shall collectively and separately constitute one and the same agreement.

(i)     GOVERNING LAW.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE TRANSACTION DOCUMENTS, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF FLORIDA. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN THIS GUARANTY. NOTHING IN THIS GUARANTY WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(j)     WAIVER OF JURY TRIAL.   LENDERS AND GUARANTORS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND TO THE FULLEST EXTENT PERMITTED BY LAW WAIVE ANY RIGHTS THAT THEY MAY HAVE TO CLAIM OR RECEIVE CONSEQUENTIAL OR SPECIAL DAMAGES IN CONNECTION WITH ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.

(k)     Limited Guaranty.  Notwithstanding anything in this Guaranty to the contrary, in no event will Guarantors' obligations to Lender under this Guaranty exceed Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate.

(Signature pages to follow)



IN WITNESS WHEREOF, the parties hereto have executed and delivered this Guaranty as of the date first above written.

**GUARANTORS:**                                    **LENDER:**

**LDI NETWORKS INC.,**                             **WBDH-BC HOLDINGS LTD.,**
A Florida corporation                              An Ontario corporation


By: _____*Louis Arriola*_____                      By: _____
Name:  Louis Arriola                               Name:  Christopher Morris
Title:   Authorized Signatory                      Title:    President


By: _____
Name:  Brad Fain
Title:    Authorized Signatory


_____*Louis Arriola*_____
Louis Arriola

# EXHIBIT 8

**Payments from MSG or Varsatel to CHT**

| Payor | Type | Date | Commentary | Account | Amount ($) |
|---|---|---|---|---|---|
| MSG | Check | 12/05/2018 | Thallus Innovation | Due from CHT DR | 45,013.65 |
| MSG | Check | 12/18/2018 | CHT HOLDINGS | Due from CHT DR | 10,000.00 |
| MSG | Check | 12/20/2018 | CHT HOLDINGS, LLC | Due from CHT Holdings | 20,000.00 |
| MSG | Check | 01/28/2019 | CHT HOLDINGS | due from CHT Limited | 20,000.00 |
| MSG | Check | 02/05/2019 | CHT HOLDINGS | Due from CHT Holdings | 7,573.97 |
| MSG | Check | 02/07/2019 | CHT HOLDINGS, LLC | Due from CHT Holdings | 22,000.00 |
| MSG | Check | 03/25/2019 | CHT HOLDINGS | Due from CHT Holdings | 23,000.00 |
| MSG | Check | 04/22/2019 | CHT HOLDINGS | Due from CHT Holdings | 18,500.00 |
| MSG | Check | 04/24/2019 | CHT HOLDINGS | Due from CHT Holdings | 20,000.00 |
| MSG | Check | 05/24/2019 | CHT HOLDINGS | Due from CHT Holdings | 21,000.00 |
| MSG | Check | 06/21/2019 | CHT HOLDINGS | Due from CHT Holdings | 22,000.00 |
| MSG | Check | 07/26/2019 | CHT HOLDINGS | Due from CHT Holdings | 21,000.00 |
| MSG | Check | 08/27/2019 | CHT HOLDINGS, LLC | Due from CHT Holdings | 21,000.00 |
| MSG | Check | 09/05/2019 | COGENT | | 2,044.75 |
| MSG | Check | 09/26/2019 | CHT HOLDINGS | Due from CHT Holdings | 13,375.00 |
| | **Total** | | | | **286,507.37** |

**Funds requested for CHT uses**
*funds were originally sent to Varsatel as part of a larger fundings*

| Payor | Type | Date | Commentary | Account | Amount ($) |
|---|---|---|---|---|---|
| RCM | Wire | 03/20/2020 | operations and CHT only payroll | | 306,284.00 |
| RCM | Wire | 05/12/2020 | operations and CHT only payroll | | 12,000.00 |
| RCM | Wire | 06/01/2020 | operations and CHT only payroll | | 40,150.00 |
| RCM | Wire | 07/02/2020 | operations and CHT only payroll | | 40,150.00 |
| RCM | Wire | 07/07/2020 | operations and CHT only payroll | | 219,554.00 |
| RCM | Wire | 08/10/2020 | operations and CHT only payroll | | 182,850.00 |
| RCM | Wire | 09/21/2020 | operations and CHT only payroll | | 118,750.00 |
| | | | | | 12,000.00 |
| | **Total** | | | | **931,738.00** |

**1,218,245.37**